[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15093

_____

D.C. Docket No. 2:12-cr-14022-KMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEXANDER MICHAEL ROY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 26, 2017)

ON PETITION FOR REHEARING

Before ED CARNES, Chief Judge, TJOFLAT, HULL, MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JULIE CARNES, and JILL PRYOR, Circuit Judges.

ED CARNES, Chief Judge:

Because it is a document designed to govern imperfect people, the Constitution does not demand perfect trials and errors do not necessarily require the reversal of a conviction.  More than thirty years ago, the Supreme Court reminded us:  "As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one."  Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436 (1986).  Alexander Roy, who was convicted in federal court of five sex-related crimes involving minors, received a fair trial although not a perfect one.

The error in Roy's trial occurred when his counsel returned a few minutes late from a lunch break on the third day of the six-day trial.  He missed only a small part of the testimony of the 12th of 13 government witnesses.  Counsel was out of the courtroom for only seven minutes of a trial that lasted 1,884 minutes or 31.4 hours (not counting recesses and jury deliberations).  That is less than one-half of one percent of the trial time.  During his absence counsel missed only 18 answers out of a total of approximately 2,745 answers that were given by government witnesses during the trial.  That is less than one percent of the total testimony against Roy.  And the little testimony that counsel had missed was repeated in even more detail by the same witness after counsel returned to the courtroom.

2

The parties agree that it was Sixth Amendment error for inculpatory testimony to be taken in the absence of defense counsel. Their primary disagreement is about whether it was a type of structural error for which prejudice is presumed, or trial error to which the harmless error rule applies. They also disagree about whether our review is limited to plain error and about whether the error was actually harmless.

## I. The Charged Crimes

Roy was charged in a five-count indictment with sex crimes related to minor girls. Count 1 charged him with attempted child enticement in violation of 18 U.S.C. § 2422(b), based on his efforts to arrange a sexual encounter with someone he believed to be a 13-year-old girl in response to an internet ad posted by law enforcement. That charge did not involve any child pornography. And no questions about the Count 1 charge were asked during counsel's brief absence. None.

Counts 2–5 did involve child pornography. Each of those four counts charged Roy with knowingly possessing "any visual depiction" of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), (b)(2) (emphasis added). The difference between those four counts is based on the four different electronic devices Roy used to store his images of child pornography: his desktop computer (Count 2); his laptop computer (Count 3); his USB thumb drive (Count 4); and

3

three of his CD-ROM discs (Count 5). All that the government had to prove under each of Counts 2–5 was that Roy knowingly possessed one or more images of child pornography on the electronic device specified in that count. It could be the same image or images on each device or different images, so long as there was at least one on each device. As we will discuss in more detail in the next part, the evidence proved without dispute that there were multiple still images and video images of child pornography involving a number of different minors on each of Roy's four electronic devices. Roy had a sexual relationship with one of the minors, and he had produced the pornographic still and video images of that child, some of which were contained on all four devices. Each of the four devices also contained other child pornography, involving different minors, that Roy had downloaded from the internet.

## II.  The Evidence

For analytical ease we break the testimony and evidence presented during the trial down into three categories: that presented before counsel's brief absence from the trial, that presented during his absence, and that presented after he returned.

### A.  Before Counsel's Absence

During the first two days of Roy's six-day trial, with defense counsel present at all times, the government called 10 witnesses whose testimony focused on the

4

attempted child enticement charge in Count 1. Their unrefuted testimony showed that Roy, a middle school teacher, set up a sexual encounter that he thought would involve a 13-year-old girl and her mother, and he drove to a pre-arranged location to meet the mother and child so that he could have sex with the child. Their testimony also showed that he went to the illicit rendezvous with condoms and a bottle of Astroglide lubricant in his pockets. Roy's lawyer was in the courtroom for the entirety of those first two days of trial and for the presentation of all of the testimony and evidence about the crime that was charged in Count 1. He did not miss any of it on any day. On the third day of trial, before the lunch break and in counsel's presence, there was additional testimony about Count 1, including the fact that Roy had traveled more than an hour to get to the meeting place for the purpose of having sex with a 13-year-old girl.

Much of the testimony on that third morning, however, went to Counts 2–5 and concerned Roy's sexual relationship with L.B., the girl in the pornographic images and videos that Roy himself had produced and stored, along with child pornography from the internet, on his four electronic devices specified in those four counts. That same morning, with defense counsel present, William Kulp, an agent of the Florida Department of Law Enforcement, testified without objection that L.B. was born on May 9, 1989. That means any pornography of her that was produced before May 9, 2007 is child pornography. See 18 U.S.C. § 2256(1)

5

(defining "minor" for this purpose as anyone under 18 years of age).  The principal at the high school L.B. had attended identified photos of her in various school yearbooks, three of which were admitted into evidence without objection.  The principal's testimony and those yearbook exhibits enabled the jury to compare how L.B. looked at various ages during her school years with how she looked in the pornography that Roy had produced.

The third and final government witness to be called before the lunch break on the third day was Deputy Sheriff Charlie Longson, a computer forensics expert. In defense counsel's presence, he testified extensively about his qualifications and how he examines a computer.  He also testified about the user and email/messenger accounts that he had found on Roy's desktop computer.  That testimony was used, among other things, to put into evidence Roy's email messages setting up his sexual liaison with the (fictitious) 13-year-old and the sexually oriented instant messenger conversations between Roy and (the real) L.B. that were on his computer.  Longson's testimony was interrupted by a lunch break.

## B.  During Counsel's Absence

Defense counsel returned late from the lunch break on the third day of trial and missed seven minutes of Deputy Longson's continuing testimony.  During the seven minutes counsel was out of the courtroom, Longson gave 18 answers to the AUSA's questions.  All of those 18 answers concerned only six of the numerous

6

images of child pornography, and all six of those images were of a single female subject. Those particular images of the young female were found in only one of the several file folders containing child pornography that were on Roy's desktop computer. That folder, when discovered by Longson on Roy's desktop computer had been labeled "2006-03-11." On that date, L.B. indisputably would have been 16 years old.

Longson testified that those six images showed "a nude white female . . . bound to a table by her feet with rope" and with "an orange cloth . . . secured around her neck with silver duct tape." He also testified that the six images were taken with a Kodak v530 Zoom Digital Camera on March 10, 2005, were initially uploaded onto a computer on March 11, 2006, and were then transferred to Roy's desktop computer on April 4, 2009. During the seven minutes while defense counsel was out of the courtroom, no exhibits were admitted into evidence and Longson did not identify L.B. as the female in the six pornographic images.

## C. After Counsel Returned

Soon after counsel returned to the courtroom, the testimony that Longson had given during counsel's brief absence was repeated.[1] And it was only after

---

[1] There is only one difference. In his testimony while defense counsel was absent, Longson said that the photographic images of the young female were taken on March 10, 2005; in his

counsel returned that Longson identified L.B. as the young female in the six images of pornography found on the desktop computer that he had been testifying about.

This is how those events unfolded.  After defense counsel entered the courtroom, the prosecutor asked the court for permission to speak with him, which the court granted.  There was then a pause in the proceedings, and after the prosecutor and defense counsel had an opportunity to speak, the prosecutor approached witness Longson with 10 exhibits:  the six pornographic images of L.B. that Longson had found in the "2006-03-11" folder on Roy's desktop computer; three other pornographic images of L.B. from a different folder on that computer, which was titled "2006-12-04";[2] and a "contact sheet" generated by the camera showing still images from a pornographic video of L.B., also recovered from that second folder.  See also infra n.3.

---

testimony after counsel returned, he said that they were taken on March 11, 2006.  Regardless of whether the photographic images were taken in March 2005 (when L.B. would have been 15 years old) or March 2006 (when L.B. would have been 16 years old), she was a minor at the time.  She did not turn 18 until May 9, 2007.  See infra at 5–6.

[2] In one place the transcript identifies this folder as "2006-02-04," but the immediately following question on that same page ("So December 4th, 2006?") and the other references to the folder name indicate that this was a transcription error and the folder was actually called "2006-12-04."  For that reason, we are referring to it that way in this opinion.  The difference, in any event, is immaterial.

With counsel present Longson then described in detail what each of those images depicted, and he also testified that the six images from the "2006-03-11" folder had been created on March 11, 2006, and uploaded onto Roy's desktop computer (which Roy had acquired later) on April 4, 2009.  Those six images showed the then-16-year-old L.B. "bound to a table by her feet with a . . . red and white ski rope"; she was wearing an "orange hood across her head with silver duct tape secured around the neck"; there was a "dildo inserted in her vagina" and "a male's penis . . . suspended above [her] body."  During that and all the other testimony that would follow counsel was there.

He was present when Longson first described the other three pornographic images of L.B. found on Roy's desktop computer in the "2006-12-04" folder.  Those images showed L.B. lying naked in a bathtub, and written in "black ink both on [her] chest between the breasts and then on [her] stomach over the nav[e]l" were the words "Alex's Little Cunt."  (Roy's first name, of course, is Alexander, and his roommate and L.B. both called him "Alex.")  Longson testified that those particular pornographic images were taken on December 2, 2006.  On that date, L.B. indisputably would have been only 17 years old, which means she was a minor for purposes of the child pornography charges against Roy in Counts 2–5.

At that point in the trial, Deputy Longson described for the first time the contact sheet taken from the "2006-12-04" folder showing nine images from the

pornographic video of L.B.  A few pages later in the transcript, Longson repeated his earlier testimony that all of the images of L.B. on Roy's desktop had been taken with a Kodak v530 Zoom Digital Camera, which is the model of camera recovered from Roy's home during the police search.

At the times all of those images of L.B. — the six in the "2006-03-11" folder and the three plus the contact sheet from the "2006-12-04" folder — were created, she was a minor for purposes of the child pornography charges against Roy in Counts 2–5 because she was under 18 years of age.  See 18 U.S.C. § 2256(1).  The 10 exhibits consisting of those images were admitted into evidence without objection.  Being present during all of the testimony we have just recounted, Roy's trial counsel had an opportunity to object to the testimony or to admission of the exhibits into evidence, if there were any basis for doing so.  He did not object to any of it.

In the presence of defense counsel, Longson also testified about finding on Roy's desktop, laptop, thumb drives, and CD-ROM discs numerous pornographic videos of L.B. that had been made between October and December 2006 using a Kodak v530 Zoom Digital Camera.  It was undisputed that L.B. would have been 17 years old, and therefore a minor, during all of that time.  Some of those videos showed:  L.B. bound and blindfolded with a "body net covering her body" and "a red dildo inserted into her anus"; L.B. "fully nude" with a "dildo in her vagina"

while she "perform[ed] fellatio on a white male"; L.B. "fully nude" with a "vibrator in her vagina" while a white male "attempt[ed] to have annal [sic] sex with her"; L.B. performing fellatio after removing a "school-girl outfit"; L.B. having sexual intercourse with a man while she was tied up; and L.B. lying "nude in [a] bathtub" with "Alex's little cunt" scrawled across her chest and stomach while a man urinated on her. Longson described each of those videos and they were admitted into evidence. Although defense counsel was present during all of that testimony and admission of exhibits, he did not object to any of it.

Deputy Longson's testimony in defense counsel's presence about the child pornography that he found on Roy's desktop, laptop, USB drive, and CD-ROM discs was not limited to all of the images and videos of L.B. He also testified about finding in temporary internet files on Roy's desktop computer several images of downloaded child pornography involving minors other than L.B., which is a subject that had not been mentioned at all during counsel's brief absence from the courtroom. With counsel present, Longson described how one of those images of other minors showed "two or three subjects under the age of 18 engaged in sexual activity with two men." He also described finding on Roy's laptop a folder labeled "Girls," which contained pornographic images of other minors and files named "kingpouge_14," "vica16," and "svet_16." Longson testified that he had found five images of child pornography featuring minors other than L.B. on Roy's

11

USB thumb drive.  And he testified that he had found on Roy's CD-ROM discs multiple pornographic images of minors other than L.B., which were copies of images on Roy's other devices.

All of those were pornographic images of minors other than L.B., and all of them were admitted into evidence.  Although he was present during all of that testimony, defense counsel did not object to any of it.  Any one of those pornographic images of minors other than L.B. was enough by itself to prove the crime of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), (b)(2), which is the crime charged in Counts 2–5 of the indictment.

Once the prosecution completed its direct examination of Longson, defense counsel cross-examined him over the course of 45 pages of the trial transcript.  He attempted to challenge Longson's testimony that the images and videos of L.B. were created when she was under the age of 18.  His challenge fell short, however, because Longson explained that data embedded in the images and videos of L.B. showed that they had been taken on a date when L.B. was a minor.  Defense counsel did not even attempt during cross-examination or at any other time to challenge Longson's testimony about the pornographic images involving minors other than L.B.

12

On the fourth day of trial, the government called its last witness and then rested. The defense called a few witnesses, including Robert Deane Moody, its own computer forensics expert. He testified that there were reported problems with the battery life of the Kodak camera model that Roy had used to produce the pornographic images of L.B., which would cause the camera's internal clock to reset to its default date and time if the camera's battery went dead. If the internal clock in the camera used to create the images of L.B. had reset, in his opinion it was possible that the creation dates that Deputy Longson had noted for the L.B. images and videos might be inaccurate.

Moody conceded, however, that the problems he had described were not necessarily present in all Kodak v530 cameras, and he conceded that Roy's camera might not have had any battery issues anyway. He admitted that the dates applied by a user to the computer folders in which the L.B. images were stored (i.e., "2006-03-11," "2006-10-13," and "2006-12-04") were all consistent with the creation dates that the camera had automatically embedded in those images themselves. Moody also admitted that the images and videos were numbered sequentially and none of them showed any signs of having reverted back to an earlier date.

13

### III.  The Facts Concerning Counsel's Brief Absence

We know only these facts about counsel's absence.  On the third day of trial during the testimony of Deputy Longson, who was the 12th of 13 government witnesses, the judge announced the lunch break:  "Okay.  So let's go ahead and break for lunch and ask you to be back at 1:30."  The jury left the courtroom at 12:33.  The next thing in the transcript is this parenthetical notation by the court reporter:  "(Court recessed at 12:34 p.m., and proceedings continued, without the presence of defense counsel, at 1:29 p.m.)."

The testimony of Deputy Longson resumed at 1:29 p.m. and continued for two-and-a-half transcript pages, consisting of 18 questions and answers, after which the following occurred:

[AUSA]:    Your Honor, may I have a moment while I approach Counsel?
            (Defense counsel entered the courtroom at 1:36 p.m.)
            (Pause.)
[AUSA]:    Thank you, Your Honor.  May I approach, Your Honor?
The Court:  All right.
[AUSA]:    I'm showing the witness Government's Exhibits 73-01 through 73-10.[3]

---

[3] Exhibits 73-01 through 73-06 are the pornographic still images of L.B. from the "2006-03-11" folder that was found on Roy's desktop computer.  Exhibits 73-07 through 73-09 are the still pornographic images of L.B. that were found in the "2006-12-04" folder on Roy's desktop computer.  And Exhibit 73-10 is the "contact sheet" showing several still images from the pornographic video of L.B. in that same folder.

14

To recap, after lunch the trial resumed one minute earlier than it had been scheduled to, and defense counsel returned six minutes later than the time he had been instructed to be there. As a result, he missed seven minutes of a trial that lasted a total of 1,884 minutes or 31.4 hours (not counting recesses and jury deliberations), which means he was present during 99.6 percent of the trial. Counsel missed hearing only 18 answers given by one of the 13 government witnesses against him, who collectively gave a total of approximately 2,745 answers. Even if we consider only the testimony of Deputy Longson, the witness who was on the stand when he returned late, counsel missed only three of the 175 pages of Longson's total testimony (which consisted of 111 pages of direct examination, 45 pages of counsel's cross-examination, and 19 pages of redirect examination). We know that from the record.

We do not know why counsel returned late from lunch. We also do not know if he realized when he walked in late that some testimony had been taken in his absence, either because he heard testimony being given, or he saw that there was a witness on the stand and the AUSA was up, or because his client who had been present told him what had happened. And we do not know if either the

15

AUSA or the judge realized that defense counsel was absent when the trial resumed after lunch.[4]

One thing that we do know is that neither party wants us to take the necessary steps to find out any of those facts. Both sides insist that instead of remanding for an evidentiary hearing to determine all of the other facts about counsel's brief absence, including who knew what and when, we should decide the appeal solely on the basis of the facts that are already in the record.[5] We will.[6]

---

[4] If we were required to decide whether the judge realized that defense counsel was not present when he resumed the trial after the lunch break, we would take into account the fact that the judge had previously stated he would not start court after a recess without the lawyers being present. This is what the judge had told the jury before the recess at the end of the first day of trial:

> We will get started Monday at 9:00 o'clock. So if you are unfamiliar with coming into the Fort Pierce area that time of day, I ask that you give yourself a few extra moments and get here before 9:00 o'clock, 8:45, 8:50 or so, so we can get started on time. If we are missing just one of us, you, me, the lawyers, we can't get started. So in order to keep the case on track time-wise and [as a] courtesy to your fellow jurors, I would ask that you be here sometime before 9:00 o'clock so we can get started promptly at 9:00.

(Emphasis added.)

[5] The following exchange during oral argument between a judge of this Court and Roy's appellate counsel conveys Roy's position on the remand question:

| Marcus, J.: | . . . . I want to follow up on Judge Wilson's question. He asked you whether a remand is necessary if there's a Cronic violation. Your answer was no, because the record is complete. |
|---|---|
| Mr. Rashkind: | Correct. |
| Marcus, J.: | Let me ask the converse question. It would be equally true that a remand would be unnecessary even if harmless error applied, right? |
| Mr. Rashkind: | I think that's probably true. Yes, sir. |
| Marcus, J.: | Okay. So there's no reason for a remand no matter how we come at the question. |

16

## IV.  An Assumption to Simplify the Analysis And Focus on the Harmless Error Issue

The government argues that we should review only for plain error and that there isn't any.  See United States v. Duncan, 400 F.3d 1297, 1301 (11th Cir. 2005) ("We have discretion to correct an error under the plain error standard where (1) an error occurred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.").  Absent any knowledge of why defense counsel was absent, whether the AUSA or judge realized he was not present, about what counsel realized or didn't when he walked in late, and about whether he took some ameliorative action not reflected in the transcript, we will not apply the plain error rule or remand for any findings necessary to decide if it is applicable.  Instead, in order to simplify our analysis, we will indulge the assumption that the plain error

Mr. Rashkind:    I don't — I think you're right.

The government's position was essentially the same.

[6] The lead dissent has difficulty confining itself to the facts in the record, as the parties agree that we should.  It almost does, but just five sentences from the end of its opinion, the dissent says:  "When a district court allows substantive, inculpatory evidence against a criminal defendant in the absence of any counsel and in the presence of the jury . . . ." Dissenting Op. at 265.  The problem with "allows" is that it implies the district court noticed defense counsel was absent and went on.  There is nothing in the record to indicate that the district court did that. Instead, as we have pointed out, the indication is that the court did not notice counsel was absent, although we make no assumption either way.  See supra n.4.

17

rule does not apply even though there was no contemporaneous objection.  We can indulge that assumption because even with it the result is the same.

Given that scope of review, we do agree with Roy that absent evidence of an attempt to deliberately inject error into the record and without a waiver from the defendant, it is a violation of the Sixth Amendment for inculpatory testimony to be taken from a government witness without the presence of at least one of the defendant's counsel, regardless of whether the judge or the AUSA noticed that counsel was not there.  We do not, however, agree with Roy that prejudice is presumed and reversal is automatic.  Instead, for the reasons that follow we hold that the harmless error rule is applicable to this brief absence of counsel from the courtroom, and that the absence was harmless beyond a reasonable doubt in this case.

### V.  Analysis: Why the Harmless Error Rule Applies and the Rare Exceptions to It Do Not

Given our assumptions in Roy's favor, the outcome turns on whether the error in this case, like most constitutional errors, is one to which the harmless error rule applies or instead is one of those rare cases where the presumption of prejudice applies.[7]  If counsel's brief absence is a type of structural error, we

---

[7]  This case does not involve one of those more common Sixth Amendment claims alleging that counsel's performance was outside the wide range of reasonable professional assistance and that it prejudiced the defendant, with prejudice being defined as a reasonable probability of a

presume prejudice and there will be no room for the application of the harmless

error rule.  If it is not structural error, and no other rare exception requiring that

prejudice be presumed fits, the harmless error rule applies. And, as we will explain

later, the error was harmless beyond a reasonable doubt.  See infra Part VI.

### A.  The Importance of the Harmless Error Rule and How Pervasively It Applies

The harmless error rule serves vital interests, chief of which is conserving

scarce judicial resources by avoiding pointless retrials.  Applying the rule to

determine whether error, including constitutional error, affected the result of a trial

is also essential to avoid a "sporting theory of justice" and a regime of gotcha

review.  See United States v. Agurs, 427 U.S. 97, 108, 96 S. Ct. 2392, 2400 (1976)

(quotation marks omitted).

"Reversal for error, regardless of its effect on the judgment, encourages

litigants to abuse the judicial process and bestirs the public to ridicule it."  Van

Arsdall, 475 U.S. at 681, 106 S. Ct. at 1436 (quotation marks omitted).  The

---

different result but for counsel's deficient performance. See Strickland v. Washington, 466 U.S. 668, 689–90, 694–95, 104 S. Ct. 2052, 2065–66, 2068 (1984).  That type of attorney error issue is the stuff of Strickland v. Washington and the tens of thousands of decisions that have cited, discussed, and applied that progenitor of modern ineffective assistance law.  Given the limited knowledge we have about the circumstances involving the absence of Roy's counsel and what, if anything, he realized when he returned to the courtroom, and given the assumptions we have made, see supra Part IV, we are not treating this as an attorney error case. See Vines v. United States, 28 F.3d 1123, 1127 (11th Cir. 1994) ("Strickland assumes the presence of counsel and is therefore inapplicable in the absence of counsel context.").  Nor do the parties treat it as one.

Supreme Court has explained that the harmless error rule "promotes public respect for the criminal process by focusing on the underlying fairness of the trial." Neder v. United States, 527 U.S. 1, 18, 119 S. Ct. 1827, 1838 (1999) (quotation marks omitted); see also Johnson v. United States, 520 U.S. 461, 470, 117 S. Ct. 1544, 1550 (1997) (reviewing only for plain error a violation of the Sixth Amendment right to jury trial and deciding that "there is no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings. Indeed, it would be the reversal of a conviction such as this which would have that effect.") (quotation marks and alterations omitted); see also 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Shinseki v. Sanders, 556 U.S. 396, 407–08, 129 S. Ct. 1696, 1705 (2009) (construing § 2111 "as expressing a congressional preference for determining 'harmless error' without the use of presumptions insofar as those presumptions may lead courts to find an error harmful, when, in fact, in the particular case before the court, it is not").

We are, after all, talking about "the harmless error rule," not "the harmless error exception." Because errorless trials are not expected, much less required, harmless error analysis is the rule, not the exception. How broadly the rule applies

is evident from the Supreme Court's observation that:  "Since this Court's landmark decision in Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless."  Arizona v. Fulminante, 499 U.S. 279, 306, 111 S. Ct. 1246, 1263 (1991) (emphasis added).  The Court drove home that point by listing in the Fulminante opinion 16 different constitutional violations that it had held are subject to the harmless error rule.  And the decision in Fulminante became a 17th example by holding that admission of a coerced confession is another error that can and should be reviewed for harmlessness.  Id. at 306–09, 111 S. Ct. at 1263–64.  See infra at 76–78.

The dissenting opinion seeks to sweep away the important point that the Supreme Court made in Fulminante when it listed 16 constitutional errors (plus the one in that case itself) that have been held to be subject to harmless error analysis instead of a presumption of prejudice.[8]  See infra at 76–77.  The dissent would replace the Supreme Court's instruction in Fulminante about the breadth of the harmless error rule with an alternative message that only "unimportant and

---

[8] There are three dissenting opinions.  All of our references to "the dissent" and "the dissenting opinion" are to the principal dissenting opinion, which was authored by Judge Wilson and joined by Judge Martin.

insignificant" constitutional errors are subject to harmless error review under Chapman. See Dissenting Op. at 221.  But under Chapman constitutional errors are not to be classified by the importance or significance of the constitutional right that was violated but by the effect of the violation "in the setting of a particular case."  See Chapman, 386 U.S. at 22, 87 S. Ct. at 827.  That is why, as the Court's Fulminante list shows, the harmless error rule has been applied to all types of constitutional errors, including:  defects of every sort in jury instructions; restrictions on the right to cross-examine adverse witnesses; improper comments on the right to remain silent at trial; violation of the right of the defendant to be present at trial; admission of a coerced confession; admission of evidence in violation of the right to counsel; and denial of counsel at a preliminary hearing. See infra at 76–77.  Those violations do not involve "unimportant and insignificant" constitutional rights, but the Court has applied the harmless error rule to them nonetheless.

## B.  The Cronic Exception

For virtually every rule of law, however, there is an exception or two, sometimes more.  One of those exceptions at issue in this appeal is the Cronic exception, which provides that prejudice is to be presumed, and therefore the harmless error rule does not apply, when a criminal defendant has been completely denied the right to counsel for a critical stage of the trial, which is an error that

22

contaminates the entire proceeding.  See United States v. Cronic, 466 U.S. 648, 659 & n.25, 104 S. Ct. 2039, 2047 & n.25 (1984).  When an error of that magnitude happens, we do not ask whether the error was harmless; we irrebutably presume that it was harmful.  See id.; see also Bell v. Cone, 535 U.S. 685, 695–96, 122 S. Ct. 1843, 1850–51 (2002) (noting that Cronic "identified three situations implicating the right to counsel" in which prejudice to the defense could be presumed).  Roy's primary contention is that his counsel's brief absence from the courtroom is Cronic error.  It is not.

The Cronic decision limited the presumption of prejudice to cases where defense counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing" in the trial or where there is "the complete denial of counsel" at a "critical stage of [the] trial."  Cronic, 466 U.S. at 659, 104 S. Ct. at 2047 (emphasis added).  Roy has never contended, and could not contend, that his counsel entirely failed to subject the prosecution's case to meaningful testing. Defense counsel was present during 99.6 percent of Roy's trial, and he vigorously represented Roy.  Among other things, he cross-examined nine of the government's 13 witnesses, including Deputy Longson whom he cross-examined for 45 pages of the trial transcript.  Counsel also called his own competing expert witness in an attempt to rebut Longson's testimony.  And he gave a vigorous

23

closing argument.  In sum, Roy's counsel did "subject the prosecution's case to meaningful adversarial testing."  Id.

Instead of questioning the effectiveness of his representation, Roy contends his case falls within the Cronic exception because his counsel's brief absence during one small part of the testimony of one of the 13 government witnesses against him amounts to denial of counsel during a critical stage of the trial.  We turn now to the critical stage requirement that must be met before an error will be found to fit within the Cronic exception to the prejudice requirement and the harmless error rule.  See id.

The last time that we sat en banc in a case involving a Cronic issue, we emphasized that the exception applied "to only a very narrow spectrum of cases" where "the defendant was in effect denied any meaningful assistance at all."  Stano v. Dugger, 921 F.2d 1125, 1153 (11th Cir. 1991) (en banc) (emphasis added) (quotation marks omitted); see United States v. Kaid, 502 F.3d 43, 46 (2d Cir. 2007) (expressing "reluctance to extend a rule of per se prejudice in any new direction") (quotation marks omitted).  And we emphasized that the burden of establishing that an error warrants Cronic's presumption of prejudice is "a very heavy one."  Stano, 921 F.2d at 1153 (quotation marks omitted).

The difficulty of carrying that "very heavy" burden and the "very narrow" scope of the Cronic exception are evident from the fact that the Supreme Court has

24

repeatedly refused to find it applicable.  The Court has held that the Cronic exception did not apply, and the usual showing of actual prejudice was required, where trial counsel failed to present any mitigating evidence or make any final argument during the penalty phase of a capital trial.  Bell, 535 U.S. at 692–98, 122 S. Ct. at 1849–52.  And the Court has held that the Cronic exception did not apply and a showing of actual prejudice was required where trial counsel, without the defendant's consent, conceded that the defendant was guilty of capital murder as part of his strategy to avoid a death sentence.  Florida v. Nixon, 543 U.S. 175, 178, 190–92, 125 S. Ct. 551, 555, 562–63 (2004).  Only once in the 30 years since the Cronic decision was issued has the Supreme Court applied Cronic to presume prejudice.  See Penson v. Ohio, 488 U.S. 75, 88, 109 S. Ct. 346, 354 (1988) (holding that "the presumption of prejudice must extend as well to the denial of counsel on appeal" when the granting of an attorney's motion to withdraw had left the petitioner "entirely without the assistance of counsel on appeal").  The scope of the Cronic exception is that narrow; the burden of showing it applies is that heavy.

Even in Cronic itself the Court did not find that the Cronic exception to the harmless error rule applied.  That case involved a woefully inexperienced, young attorney who had been appointed to serve as counsel less than a month before trial in a complex mail fraud case, a case that the government had investigated for over four-and-a-half years during which it had reviewed thousands of documents.

25

Cronic, 466 U.S. at 649, 104 S. Ct. at 2041.  Despite those extreme facts, the Supreme Court refused to presume prejudice, requiring instead that the defendant show that he actually was prejudiced.  Id. at 662–66, 104 S. Ct. at 2049–50.  The Court remanded the case for the court of appeals to determine whether the defendant could establish deficient performance and prejudice, as required by Strickland v. Washington.  Id. at 666–67, 104 S. Ct. at 2051.

The Supreme Court's insistence on confining the Cronic exception within narrow boundaries is evident from the fact that in Nixon, Bell, and Cronic itself the Court reversed the decisions of lower courts that had held the exception applied and had presumed prejudice.  See Nixon, 543 U.S. at 189–93, 125 S. Ct. at 561–63; Bell, 535 U.S. at 688, 702, 122 S. Ct. at 1847, 1854; Cronic, 466 U.S. at 666–67, 104 S. Ct. at 2051.  And in all of those cases, the risk of prejudice to the defendant was much greater than the risk of prejudice to Roy from his lawyer's seven-minute absence during a six-day trial.

One way that the Supreme Court has ensured that the Cronic exception will remain rare, the scope of the decision will be narrow, and the burden of establishing the exception will be heavy is by requiring that there be a complete denial or total failure of counsel, if not at trial generally, at least at a critical stage of the prosecution.  See Cronic, 466 U.S. at 659, 104 S. Ct. at 2047 ("The presumption that counsel's assistance is essential requires us to conclude that a

26

trial is unfair if the accused is denied counsel at a critical stage of his trial."); see also Bell, 535 U.S. at 697, 122 S. Ct. at 1851 (noting that counsel's failure to test the prosecution's case "at specific points" does not rise to the level of Cronic error).

In the Cronic opinion itself, the Court's examples of a critical stage include Hamilton v. Alabama, 368 U.S. 52, 54–55, 82 S. Ct. 157, 159 (1961), where prejudice was presumed when the defendant was entirely denied any counsel throughout all of his arraignment, and White v. Maryland, 373 U.S. 59, 59–60, 83 S. Ct. 1050, 1051 (1963), where prejudice was presumed after the defendant was entirely denied counsel throughout all of his preliminary hearing. See Cronic, 466 U.S. at 659 n.25, 104 S. Ct. at 2047 n.25; see also Strickland v. Washington, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067 (1984) ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.") (emphasis added).

Roy's position depends on his proposition that what took place during the seven minutes when his counsel was out of the courtroom is unto itself a critical stage of the trial. If the 18 answers that counsel missed hearing from one government witness, out of a total of 2,745 answers from 13 government witnesses during the trial, do not by themselves constitute a separate stage of the trial, Roy's Cronic argument fails. So Roy argues, as he must, that what occurred during those

seven minutes must be considered by itself to be "a critical stage of his trial." Cronic, 466 U.S. at 659, 104 S. Ct. at 2047.[9]

What, then, is a "critical stage" of a trial? We, like the Sixth Circuit, "would welcome a comprehensive and final one-line definition of 'critical stage'" for the purposes of determining whether error is Cronic error. Van v. Jones, 475 F.3d 292, 312 (6th Cir. 2007). None exists, as that court recognized. Id. We do not, however, need a comprehensive or pithy definition of the term to conclude that the brief period during which Roy's counsel was absent from the courtroom is not itself a critical stage of the trial. If we held that seven minutes of a six day trial, and 18 answers from one of 13 government witnesses, who gave a total of 2,745 answers during their testimony, amounts to a stage of a trial, we would have to conclude that the presentation of the government witnesses at Roy's trial was a collection of 152 separate critical stages (2,745 ÷ 18 = 152.5) not even counting other parts of the trial. If we did that, Cronic's "very narrow" exception would be very broad, contrary to what the Supreme Court and this Court stated. See Stano, 921 F.2d at 1153.

If 18 answers from one of 13 witnesses against a defendant were enough to be a critical stage, what would not be? Would a single question and inculpatory

---

[9] En Banc Br. of Appellant at 23 ("The quoted direct examination of the government expert occurred during defense counsel's absence. It involved the admission of inculpatory and disputed evidence. It was, therefore, a critical stage of trial.").

answer from a government witness be enough to constitute a critical stage of the trial? Under Roy's extreme view it would be. He argues that: "The presentation of inculpatory testimony by a government witness is a critical stage of trial." En Banc Br. of Appellant at 14. The dissenting opinion agrees with that view. If counsel misses even one inculpatory answer from a government witness, in the dissent's view that's it, irreparable error has been committed no matter what happens in the rest of the trial. But it cannot be the law that every inculpatory answer given by every government witness (or defense witness on cross-examination) is a separate stage of the proceedings against the defendant. Trials don't consist of thousands of critical stages.

Although the brevity of counsel's absence in this case and how little he missed is striking, it's not merely the fleeting nature of the absence that convinces us that counsel was not gone during an entire "stage of [the] trial." See Cronic, 466 U.S. at 659, 104 S. Ct. at 2047. Length alone does not always define a stage of a trial. Depending on the circumstances, an arraignment could take 10 minutes or less, although it is a critical stage. See Bell, 535 U.S. at 695–96, 122 S. Ct. at 1851.

The Supreme Court has instructed us that it has used the term "critical stage" "to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused." Bell, 535 U.S. at 695–96, 122 S. Ct. at

29

1851. And decision after decision shows that what the Court means when it does use the term "stage" for <u>Cronic</u> purposes is a qualitatively distinct, discrete, and separate phase or step of a criminal proceeding where the defendant has a right to counsel, such as an arraignment, a post-indictment lineup, a preliminary hearing, a plea hearing, closing arguments as a whole, or a sentence proceeding as a whole. <u>See</u> <u>Montejo v. Louisiana</u>, 556 U.S. 778, 786, 129 S. Ct. 2079, 2085 (2009) (describing post-indictment interrogation as a critical stage); <u>Iowa v. Tovar</u>, 541 U.S. 77, 87, 124 S. Ct. 1379, 1387 (2004) ("A plea hearing qualifies as a 'critical stage.'"); <u>Gardner v. Florida</u>, 430 U.S. 349, 358, 97 S. Ct. 1197, 1205 (1977) ("[S]entencing is a critical stage of the criminal proceeding at which [the defendant] is entitled to the effective assistance of counsel."); <u>Gilbert v. California</u>, 388 U.S. 263, 272, 87 S. Ct. 1951, 1956 (1967) ("[A] post-indictment pretrial lineup . . . is a critical stage of the criminal prosecution . . . ."); <u>White</u>, 373 U.S. at 59–60, 83 S. Ct. at 1051 ("Whatever may be the normal function of the 'preliminary hearing' under Maryland law, it was in this case as 'critical' a stage as arraignment . . . ."); <u>Hamilton</u>, 368 U.S. at 53, 82 S. Ct. at 158 (describing arraignment as "a critical stage in a criminal proceeding").

In conformity with what the Supreme Court has done in this area, our sister circuits generally treat "stage" in "critical stage" as meaning either a self-contained proceeding or a discrete and separately identifiable portion of a larger proceeding.

30

See, e.g., United States v. Ross, 703 F.3d 856, 873–74 (6th Cir. 2012) (deciding that a competency hearing is a critical stage); McNeal v. Adams, 623 F.3d 1283, 1285, 1289 (9th Cir. 2010) (after considering several factors that might "make a proceeding a critical stage," holding that a hearing on a motion to compel the defendant to provide a DNA sample is not a critical stage) (emphasis added); McDowell v. Kingston, 497 F.3d 757, 762–63 (7th Cir. 2007) (explaining that no Supreme Court authority indicates "that [a defendant's] testimony, isolated from the rest of his defense, constitutes a critical stage of the litigation," and holding that even the complete testimony of the defendant is not a critical stage); Harrington v. Gillis, 456 F.3d 118, 132 (3d Cir. 2006) (noting that "an appeal is a critical stage of criminal proceedings") (emphasis added); United States v. Sanchez-Barreto, 93 F.3d 17, 20 (1st Cir. 1996) (noting that a "plea withdrawal hearing" is a critical stage) (emphasis added).

Those decisions of the Supreme Court and of other circuits are consistent with the everyday definition of "stage" as "a single step or degree in a process; a particular phase, period, position, etc., in a process, development, or series." Stage, Random House Webster's Unabridged Dictionary (2d ed. 2001) 1853–54. In our lives, as well as throughout the law, when we refer to "stages" we do not mean fleeting moments or small parts of events. Instead, we use the word to refer to larger, discrete component parts of a process that share a common characteristic.

31

For example, adolescence is a stage of life, but we would never speak or think of every minute, hour, or day during adolescence by itself as a separate or discrete stage of life.

The 18 questions and answers that Roy's counsel missed do not fit any accepted definition of "stage" or "critical stage." They do not constitute a separate step in the process of the trial, or a discrete phase of it. Not only are they not a stage of the trial, those 18 questions and answers are not even an identifiable stage of Deputy Longson's testimony. They are just a small part of it — only three transcript pages out of 177 total pages of his testimony. Nothing but counsel's absence marks the 18 questions to Longson as different from all of the others put to him before lunch or all of those put to him after he returned to the courtroom following lunch. They are all questions and answers of the same type as those that preceded and followed them, and they occurred during direct examination of the same one of the 13 government witnesses, asked by the same government lawyer. The 18 questions and answers counsel missed are just a small part of the more than 2,500 that occurred during the six-day trial. Not only that, but all of those 18 questions were repeated after counsel returned to the courtroom.

The only defining characteristic of what took place in the trial during the seven minutes while Roy's counsel was absent is that it occurred while Roy's counsel was absent. Roy would have us define "stage" to equate with the absence

32

of an attorney so that anything that happened in a trial during the absence of an attorney, however brief it was, would be a stage of the trial. That definition is hopelessly circular. Because the brief period during which Roy's counsel was absent is not itself a "stage of his trial," Roy did not suffer "the complete denial of counsel" for "a critical stage of his trial." Cronic, 466 U.S. at 659, 104 S. Ct at 2047. For that reason, there was no Cronic error in this case.

We will discuss the Cronic "critical stage" arguments of Roy and the dissent now. After doing that, we will turn to the related but different question of whether a presumption of prejudice should arise when defense counsel is absent from a substantial portion of the trial.

### 1. The Geders, Herring, and Brooks Decisions

The dissenting opinion relies on Geders v. United States, 425 U.S. 80, 96 S. Ct. 1330 (1976), Herring v. New York, 422 U.S. 853, 95 S. Ct. 2550 (1975), and Brooks v. Tennessee, 406 U.S. 605, 92 S. Ct. 1891 (1972), which it contends involved "the denial of counsel 'at a critical stage of . . . trial.'" Dissenting Op. at 255 & n.14 (alteration in original) (emphasis omitted) (quoting Cronic, 466 U.S. at 659, 104 S. Ct. at 2047). That interpretation ignores the unique type of constitutional violations those cases involved and it ignores what the Court later said about those decisions. See Perry v. Leeke, 488 U.S. 272, 279–80, 109 S. Ct. 594, 599–600 (1989).

33

In its pre-<u>Cronic</u> decision of <u>Geders</u>, the Court applied a presumption of prejudice to a Sixth Amendment violation that occurred when the trial court barred defense counsel from advising or otherwise assisting his client during a 17-hour recess.  425 U.S. at 91, 96 S. Ct. at 1337.  The order had prevented the defendant from discussing important matters with counsel, including "tactical decisions to be made and strategies to be reviewed."  <u>Id</u>. at 88, 96 S. Ct. at 1335.  The <u>Geders</u> decision did not explicitly apply the "critical stage" rule or analysis; in fact, the opinion does not mention the term "critical stage" or even the word "stage."

Instead, as the Court explained later, <u>Geders</u> was one of a line of decisions presuming prejudice where a defense attorney was prevented from, or impeded in, rendering assistance of counsel to his client because of an unconstitutional statute or court order.  <u>See</u> <u>Perry</u>, 488 U.S. at 279–80, 109 S. Ct. at 599–600.  Recognizing that special subtype of Sixth Amendment violation, as the Court pointed out in <u>Perry</u>, is consistent with what <u>Strickland</u> itself held.  <u>Id.</u> at 279, 109 S. Ct. at 599.  While shortcomings and failures of counsel require a petitioner to show prejudice from the deficient performance, "direct governmental interference with the right to counsel is a different matter."  <u>Id.</u>  The <u>Perry</u> Court quoted the following passage from <u>Strickland</u> to drive home the point:

> Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense.  See, <u>e.g.</u>, <u>Geders v. United States</u>, 425 U.S. 80, 96 S. Ct. 1330 (1976) (bar on

34

attorney-client consultation during overnight recess); Herring v. New York, 422 U.S. 853, 95 S. Ct. 2550 (1975) (bar on summation at bench trial); Brooks v. Tennessee, 406 U.S. 605, 612–13, 92 S. Ct. 1891, 1895 (1972) (requirement that defendant be first defense witness); Ferguson v. Georgia, 365 U.S. 570, 593–96, 81 S. Ct. 756, 768–70 (1961) (bar on direct examination of defendant).

Id. at 280, 109 S. Ct. at 599 (citations altered) (quotation marks omitted).

The statutory or court-ordered interference exception to the prejudice requirement that was applied in Geders, Herring, and Brooks, that was recognized in Strickland, and that was discussed in Perry, does not apply in this case and does not govern our critical stage analysis. No statute or court-ordered bar kept Roy's trial counsel out of the courtroom for those seven minutes following lunch on the second day of trial. And no statute or court order interfered with the ability of Roy's counsel to make independent decisions about how to conduct the defense.

## 2. The Gonzalez-Lopez, Woods, and Williams Decisions

The dissenting opinion also relies heavily on the Supreme Court's decision in United States v. Gonzalez-Lopez, 548 U.S. 140, 126 S. Ct. 2557 (2006), which did not involve an attorney's brief absence from the courtroom. Instead, it involved a complete violation of "the right of a defendant who does not require appointed counsel to choose who will represent him." Id. at 144, 126 S. Ct. at 2561; see id. at 143–44, 126 S. Ct. at 2561 (holding that the district court's erroneous rulings "violated respondent's Sixth Amendment right to paid counsel of his choosing"); id. at 146, 126 S. Ct. at 2562 ("[T]he right at stake here is the right

35

to counsel of choice[.]"); id. at 147, 126 S. Ct. at 2563 ("The right to select counsel of one's choice, by contrast [to the right to effective assistance of counsel], has never been derived from the Sixth Amendment's purpose of ensuring a fair trial."); id. at 152, 126 S. Ct. at 2566 ("[T]he Government has conceded that the District Court here erred when it denied respondent his choice of counsel.").

The deprivation of the right to retained counsel of choice in Gonzalez-Lopez was anything but momentary; it lasted longer than the trial itself. It was complete, lasting throughout the entirety of the opening statements, the presentation of all of the prosecution's case, the presentation of all of the defense case, the closing arguments, the jury instructions, the return of the verdict, and the post-verdict proceedings. Id. at 142–44, 126 S. Ct. at 2560–61. As the Supreme Court noted, "the deprivation of choice of counsel pervade[d] the entire trial." Id. at 150, 126 S. Ct. at 2565. As a result, the start-to-finish "erroneous deprivation of the right to counsel of choice" in Gonzalez-Lopez had "consequences that are necessarily unquantifiable and indeterminate" and "unquestionably qualifies as 'structural error.'" Id. at 150, 126 S Ct. at 2564 (quotation marks omitted).[10]

---

[10] In its Gonzalez-Lopez opinion the Court cited Cronic only once, actually relying on Cronic as support for the proposition that a defendant is usually required to show prejudice. See Gonzalez-Lopez, 548 U.S. at 146, 126 S. Ct. at 2562 ("The cases the Government relies on involve the right to the effective assistance of counsel, the violation of which generally requires a defendant to establish prejudice. See, e.g., Strickland, 466 U.S. at 694, 104 S. Ct. 2052; Mickens v. Taylor, 535 U.S. 162, 166, 122 S. Ct. 1237 (2002); United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039 (1984).") (citation reformatted).

36

The Supreme Court explained in some detail why it would be impossible to apply the harmless error rule and gauge the prejudicial effect of depriving a defendant of the attorney he had retained and forcing him to use a different one during the entire trial and post-trial stages:

> Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the "framework within which the trial proceeds," Fulminante, supra, at 310, 111 S. Ct. 1246 — or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.

Id. at 150, 126 S. Ct. at 2564–65. The Court also explained the difference between the denial of retained counsel of choice and more typical ineffective assistance violations:

> [I]f and when counsel's ineffectiveness "pervades" a trial, it does so (to the extent we can detect it) through identifiable mistakes. We can assess how those mistakes affected the outcome. To determine the effect of wrongful denial of choice of counsel, however, we would not be looking for mistakes committed by the actual counsel, but for differences in the defense that would have been made by the rejected counsel —

37

in matters ranging from questions asked on voir dire and cross-examination to such intangibles as argument style and relationship with the prosecutors. We would have to speculate upon what matters the rejected counsel would have handled differently — or indeed, would have handled the same but with the benefit of a more jury-pleasing courtroom style or a longstanding relationship of trust with the prosecutors. And then we would have to speculate upon what effect those different choices or different intangibles might have had. The difficulties of conducting the two assessments of prejudice are not remotely comparable.

Id. at 150–51, 126 S. Ct. at 2565. Those explanations underscore how distinguishable the Gonzalez-Lopez case is from this one.

None of the Supreme Court's reasoning about why it is impossible to gauge the prejudicial impact of forcing a different attorney on the defendant throughout the entire trial and post-trial stages of a case applies to a seven-minute absence of counsel during a six-day trial when the missed testimony was not only transcribed for review but was also repeated in the presence of counsel after he returned (and as repeated was transcribed again).

The momentary absence of counsel from the courtroom in this case is entirely different from the complete denial of counsel of choice throughout the Gonzalez-Lopez case. A momentary absence, unlike a complete denial of counsel of choice, does not affect the choice of "strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument." Id. at 150,

38

126 S. Ct. at 2564. It does not "affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial." Id. It does not require us to consider, as courts would with a complete denial of counsel of choice, "such intangibles as argument style and relationship with the prosecutors," or what things the denied counsel "would have handled differently — or indeed, would have handled the same but with the benefit of a more jury-pleasing courtroom style or a longstanding relationship of trust with the prosecutors." Id. at 151, 126 S. Ct. at 2565. The denial of counsel of choice "bears directly on the framework within which the trial proceeds — or indeed on whether it proceeds at all." Id. at 150, 126 S. Ct. at 2564–65 (quotation marks and citation omitted). The momentary absence of Roy's counsel from the courtroom does not.

To borrow the Supreme Court's words, "[t]he difficulties of conducting the two assessments of prejudice are not remotely comparable." Id. at 151, 126 S. Ct. at 2565. They are not comparable because what Roy's momentarily absent counsel would have done, or should have done, had he been present are "identifiable mistakes," and "[w]e can assess how those mistakes affected the outcome." Id. at

150–51, 126 S. Ct. at 2565; see infra Part VI (explaining why the error was harmless beyond a reasonable doubt in this case).[11]

The dissent also goes astray in its reading of Woods v. Donald, 575 U.S. ___, 135 S. Ct. 1372 (2015) (per curiam), a decision that actually reversed a grant of habeas relief based on a lower court's holding that Cronic error occurred when defense counsel was absent for 10 minutes during the testimony of a prosecution witness. See Dissenting Op. at 246. The Sixth Circuit had held that the state court decision denying the petitioner habeas relief because of that 10-minute absence was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court within the meaning of 28 U.S.C. § 2254(d)(1). 135 S. Ct. at 1375. In reversing the Sixth Circuit, the Supreme Court pointed out that none of its own holdings have addressed defense counsel's absence during the presentation of testimony that is irrelevant to the defendant's theory of the case. Id. at 1377. It did not hold or say, however, that a brief absence during testimony that is relevant to the defendant's theory of the case is Cronic error. In fact, the Court cautioned that it was expressing "no view on the merits of the underlying Sixth Amendment principle," because "[a]ll that matters

---

[11] How distinguishable Gonzalez-Lopez is from this case and others involving brief absences of counsel from the courtroom is evident from the dissent's inability to point to any decision of any court anywhere suggesting that the holding of Gonzalez-Lopez or anything the Supreme Court said in that case is applicable to momentary absence of counsel situations.

40

here, and all that should have mattered to the Sixth Circuit, is that we have not held that Cronic applies to the circumstances presented in this case." Id. at 1378 (quotation marks omitted).

Despite that caution, the dissent insists that more mattered in the Woods decision than the Supreme Court realized. What the Court failed to realize, according to the dissent, is that despite its protestations to the contrary, it was offering "valuable insight into the type of distinctions the Court may make if and when it takes such a case on direct review." Dissenting Op. at 246 n.11. So what should we believe — the Supreme Court's emphatic statement that it was expressing "no view on the merits of the underlying Sixth Amendment principle," or the dissent's insistence that yes it was? We choose to believe the Supreme Court meant what it said. See Mathis v. United States, 579 U.S. ___, 136 S. Ct. 2243, 2254 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same . . . .").

The dissent also relies on the decision in Williams v. Pennsylvania, 579 U.S. ___, 136 S. Ct. 1899 (2016). Dissenting Op. at 259–260. But that decision dealt solely with structural error involving a biased judge. It had nothing to do with a brief absence of defense counsel from the courtroom. To the extent that the dissent cites it for the proposition that structural error requires reversal, the answer is that of course it does but there was no structural error in this case.

41

### 3.  The Vines Decision

Except in the now-vacated panel decision in this case, we have not yet decided whether the brief absence of counsel during the presentation of testimony that directly inculpates the defendant is Cronic error.  A couple of decades ago a panel of this Court did decide that the absence of defense counsel while government witnesses gave testimony that did not directly inculpate the defendant was not Cronic error.  Vines v. United States, 28 F.3d 1123, 1128 (11th Cir. 1994).  The case involved a two-defendant, two-day drug trial, and at 4:15 p.m. on the first day counsel for Vines left "for the remainder of the day" for some undisclosed reason.  Id. at 1125.  The opinion does not disclose how much of the trial day remained when counsel left, but it does reveal that during counsel's absence, an FBI agent and another government witness testified.  Id. at 1126.  The FBI agent testified, among other things, about how the manner of shipping that the defendants used in that case "fit the modus operandi of contraband smugglers."  Id.

Vines was convicted on the conspiracy charge and acquitted on the distribution charge, and he argued on appeal from the denial of his 28 U.S.C. § 2255 motion that the absence of his counsel during the testimony of those two government witnesses was a Sixth Amendment violation that entitled him to have his conviction set aside.  Id. at 1126–27.  After noting that the Strickland decision applies only where counsel is present, the Court assumed, without deciding, that

42

the absence of counsel during the taking of testimony is constitutional error.  Id. at 1127–28.  It addressed Vines' argument that the absence of his counsel from the trial was not only a Sixth Amendment violation but also Cronic error giving rise to an irrebutable presumption of prejudice.  Id. at 1127–28.  The Court reasoned that "Cronic's presumption of prejudice applies to only a very narrow spectrum of cases," and concluded that Vines was not one of those rare cases.  Id. at 1128 & n.8 (quotation marks omitted).

In reaching that conclusion, the Court rejected Vines' argument "that under Cronic the taking of evidence is a critical stage of trial per se," and stated that "we decline to give birth to a rule that the taking of evidence is necessarily a critical stage of trial."  Id. at 1128.  After reviewing the record, it found that "no evidence directly inculpating Vines was presented during his counsel's absence."  Id.  The holding of Vines fitted to the facts before the Court was that:  "Where, as in this case, no evidence directly inculpating a defendant is presented while that defendant's counsel is absent, we decline to hold that counsel was absent during a critical stage of trial within the meaning of Cronic."  Id.

While panel decisions do not bind us when we sit en banc, we find persuasive the Vines holding that the taking of testimony or other evidence that only indirectly inculpates the defendant is not a critical stage of the trial.  As the Court said there:  "While trial counsel may exercise poor judgment in absenting

43

himself or herself from a portion of a trial, such flawed judgment does not necessarily infect the entire trial." Id. at 1129. Counsel's absence was neither Cronic error nor some other type of structural error but instead was trial error "capable of quantitative assessment" and subject to the harmless error rule. Id.

That is all that the Vines decision did hold or could hold. It did not hold — and because the facts of that case did not present the issue it could not have held — that the taking of any testimony that does directly inculpate the defendant is a critical stage of the trial for Cronic purposes. See Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("[J]udicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); see also Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1031 (11th Cir. 2003); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000).

### 4. The Decisions of Other Circuits

A handful of other circuits have addressed Cronic issues arising from counsel missing part of a trial. Some of the cases giving rise to those issues are more factually similar to this one than others are. And some of those decisions are more persuasive than others.

### i. The Out-of-Circuit Decisions Roy Relies On

Roy argues that some decisions from other circuits support his bold claim that any inculpatory testimony, however brief, constitutes a critical stage of any

44

trial regardless of the circumstances. See Burdine v. Johnson, 262 F.3d 336 (5th Cir. 2001) (en banc); United States v. Russell, 205 F.3d 768 (5th Cir. 2000); Olden v. United States, 224 F.3d 561 (6th Cir. 2000); Green v. Arn, 809 F.2d 1257 (6th Cir. 1987), vacated on other grounds, 484 U.S. 806, 108 S. Ct. 52 (1987), reinstated, 839 F.2d 300 (6th Cir. 1988). All four of those decisions are readily distinguishable.

In two of them, Russell and Olden, counsel was absent for more than an entire day of trial. The Fifth Circuit decided in Russell that the absence of a lawyer for two days of his client's trial for drug and money-laundering conspiracy was Cronic error requiring a presumption of prejudice. See Russell, 205 F.3d at 769–70; 772–73. During his absence counsel missed the testimony of no fewer than 18 government witnesses — not questions but witnesses — and the admission of "numerous exhibits," all of which went to prove the existence of the money-laundering conspiracy. See id. at 770. Russell's attorney did not hear a single word of the testimony of those 18 government witnesses, nor did he have the chance to cross-examine any of them.

The difference between that case and this one is striking. While counsel in Russell missed two full days and all of the testimony of 18 government witnesses, Roy's counsel did not miss a day, or an hour, or even 10 minutes worth of testimony of a single witness. He missed only seven minutes of the testimony of

45

one government witness; he was present during all but three of the 177 transcript pages of that witness' testimony; and he heard every bit of all of the testimony of the other 12 government witnesses. Not only that, but the Fifth Circuit in Russell rejected the position that Roy takes in this case. It unequivocally stated: "Russell urges this court to adopt a bright line rule that the taking of any evidence at trial in the absence of counsel is prejudicial per se under [Cronic]. Cronic does not so hold and we decline to fashion such a rule." Id. at 771 (citation omitted). We agree.

Another decision Roy relies on is Olden, where the Sixth Circuit concluded that a defense attorney's "excessive absence" during trial amounted to Cronic error. Olden, 224 F.3d at 566, 568–70. Counsel was "absent on numerous occasions during trial," including for two days during which he missed hearing the testimony of at least two prosecution witnesses, which incriminated his client. Id. at 568. That is obviously different from what happened here.

In the other two out-of-circuit decisions that Roy relies on, the courts were unable to determine exactly how long defense counsel had been absent during the trial. In Green, which like Olden was a Sixth Circuit decision, defense counsel was absent for at least 100 minutes of trial, during which the key government witness against his client was cross-examined by another defendant's attorney. See Green, 809 F.2d at 1260–61. How much more than the hour and forty minutes of that

46

important testimony counsel missed could not be determined from the record.[12]

And in Burdine, another Fifth Circuit decision, the court found Cronic error

because the capital defendant's counsel had slept through "a not insubstantial

portion of the 12 hour and 51 minute trial," including during the prosecutor's

presentation of evidence against the defendant.  262 F.3d at 338–40, 348–49.  One

juror testified that he recalled counsel sleeping as many as 10 different times

during the short trial.  Id. at 339.  By contrast, seven minutes is not a substantial

portion of a six-day trial. And one absence, whether of consciousness or

physically, is not 10.  It is also worth noting that the Fifth Circuit explicitly stated

---

[12] There is some ambiguity in the Green opinion about the actual length of defense counsel's absence, but portions of the transcript that are quoted in that opinion indicate that he was gone for at least an hour and forty minutes of the trial.  See Green, 809 F.2d at 1260 (noting that defense counsel for Green's codefendants had begun cross-examining a witness at 2:00 p.m. and by 3:40 p.m. the defendant's trial counsel still had not returned to the courtroom).

Not only that, but Green's counsel may have also missed other portions of the criminal proceedings against her, including an entire hearing on a suppression motion, the government's closing arguments at trial, and the jury asking the judge questions that had come up during its deliberations.  See id. at 1259 n.1.

The Green court did suggest that "[t]he absence of counsel during the taking of evidence on the defendant's guilt is prejudicial per se" and forecloses any inquiry into harmless error.  Id. at 1263.  However, the court undercut that apparently categorical statement when it noted that "some absences by a criminal defendant's attorney might be so de minimis that there would be no constitutional significance."  Id. at 1261.  In any event, the actual holding of the Green decision cannot be that any absence of counsel during any inculpatory testimony requires a presumption of prejudice because those were not the facts of that case, and the holding of a case cannot extend past its facts, as we have repeatedly held.  See, e.g., Anders, 346 F.3d at 1031; Watts, 316 F.3d at 1207; Aguillard, 217 F.3d at 1321.  If the holding of Green were that the absence of counsel during the taking of any evidence of a defendant's guilt is "prejudicial per se," we would disagree for the reasons explained throughout this opinion.

in Burdine that its holding was "limited to the egregious facts found" in that case. Id. at 349.

All four of the cases on which Roy bases his argument do have one thing in common with each other: they are all cases in which a meaningful prejudice analysis would be difficult, if not impossible, and would consume a lot of judicial resources. In both Russell and Olden, for example, the court would have had to pore over two days of inculpatory testimony by multiple witnesses to even begin the prejudice analysis. See Russell, 205 F.3d at 769–70, 772–73; Olden, 224 F.3d at 568–69. And in Green and Burdine, the problem was even worse, because the record in those cases did not disclose exactly when counsel was absent (or in Burdine asleep), which adds a thick layer of speculation on top of that which is inherent in any kind of prejudice determination. See Burdine, 262 F.3d at 339–40; Green, 809 F.2d at 1260–62. When an appellate court knows that counsel's absence was substantial but cannot tell exactly what testimony or other evidence counsel missed, the prejudice inquiry is more difficult and may be impossible.

That is not a problem here. We know exactly when Roy's counsel was absent. We know exactly which 18 questions and answers he missed. We know exactly which of those 18 questions and answers were repeated after he returned to the courtroom. And we know what counsel did, and did not do, after he heard those questions asked and answered. We also know which counts of the

48

indictment those questions and answers were directly related to and which ones they were not. Because we know all of that, and given the brevity of counsel's absence, the prejudice inquiry in this case is not impossible; it is not even difficult. See infra Part VI.

### ii. The Out-of-Circuit Decisions That Are More Analogous and Persuasive

The Second Circuit has refused to presume prejudice from defense counsel's absence in a case that is far more similar to this one than any of those that Roy relies on. See United States v. Kaid, 502 F.3d 43 (2d Cir. 2007). In the Kaid case several codefendants were convicted of conspiring to commit money laundering and of trafficking in contraband cigarettes. Id. at 45. Defense counsel for one of the codefendants, Azzeaz Saleh, had missed 20 minutes of the trial because he misunderstood when the judge planned to resume after a lunch break. Id. at 44–45. The trial began without him, and while he was absent the government presented evidence that was highly inculpatory of Saleh. Id. at 45. Counsel missed the government showing the jury a video of Saleh and his codefendants purchasing the allegedly contraband cigarettes, and counsel missed a witness testifying that at nine separate points the video showed Saleh. Id.

Saleh argued on appeal that he was entitled to a presumption of prejudice because his attorney had been absent during a critical stage of the trial. Id. at 45–46. The Second Circuit unequivocally rejected that argument. Id. at 46–47. It

49

affirmed Saleh's convictions after concluding that he had not shown that he was prejudiced by his counsel's 20-minute absence because (1) counsel had been able to challenge the admissibility of the identification testimony the day before he was absent from the courtroom, and (2) after counsel returned to the courtroom he had been able to cross-examine the witness who had repeatedly identified Saleh in the video. Id. at 45, 47.

The Second Circuit's decision that the presumption of prejudice did not apply in that case is important. The circumstances in Roy's case are even stronger for affirmance, not only because the absence in Kaid was nearly three times as long as the absence in Roy's case, but also because there is no indication in the Kaid opinion that the evidence counsel missed was repeated after counsel returned to the courtroom, as it was in Roy's case. See generally 502 F.3d 43.

The Second Circuit in Kaid is not alone in its analysis or conclusion. In our view, the best reasoned out-of-circuit decision holding that a brief absence of counsel is not structural error is the Eighth Circuit's in the Sweeney case. See Sweeney v. United States, 766 F.3d 857 (8th Cir. 2014). In that case, defense counsel left the courtroom and went to the restroom during the direct examination of a key prosecution witness — a co-conspirator who had flipped and was providing inculpatory testimony against the defendant. Id. at 859. While counsel was out of the courtroom, the cooperating co-conspirator witness answered 43 of

50

the prosecutor's questions (as compared to 18 questions in Roy's case) covering six transcript pages (as compared to three in Roy's case). See id. at 859, 861; Redacted Trial Tr. at 122–29, United States v. Sweeney, No. 06-CR-0249(PJS) (D. Minn. July 22, 2009) (ECF No. 390). That is twice as many transcript pages of testimony and more than twice as many questions and answers as counsel missed in Roy's case.

Sweeney was a 28 U.S.C. § 2255 proceeding, and the certificate of appealability stated the issue as whether "the actual absence of counsel for a brief period of time during the direct testimony of a government witness [was] subject to harmless-error analysis." Id. at 858. The parties agreed, and the Eighth Circuit recognized, that the absence of counsel, which the judge knew about and permitted without Sweeney's consent, was a violation of the Sixth Amendment right to counsel. Id. at 859–60. Sweeney argued "that in light of Cronic, the error is a structural defect that is presumptively prejudicial and requires reversal," while the government countered "that because of the brevity of Sweeney's counsel's absence, it amounted to nothing more than a trial error subject to a harmless-error analysis." Id. at 860.

In its analysis, the Eighth Circuit noted that: "The Supreme Court has divided constitutional violations that occur during a criminal proceeding into two categories: trial errors and structural defects." Id. It looked to, and quoted from,

51

Supreme Court decisions for the definition of those terms: "A 'trial error' is an error that may 'be quantitatively assessed in the context of other evidence presented,' and is subject to harmless-error analysis." Id. (quoting Fulminante, 499 U.S. at 307–08, 111 S. Ct. at 1264). By contrast, a "'structural defect' is something that 'affects the framework within which the trial proceeds, rather than simply an error in the trial process itself' and thus 'defies analysis by "harmless-error" standards.'" Id. (quoting Fulminante, 499 U.S. at 309–10, 111 S. Ct. at 1265) (alterations omitted).

The Eighth Circuit pointed out that "[t]he Supreme Court has recognized that most constitutional errors can be harmless, and that structural defects are the exception and not the rule." Id. (citation and quotation marks omitted). It quoted a Supreme Court's decision holding that "[o]nly structural defects that undermine 'the fairness of a criminal proceeding as a whole require reversal without regard to the mistake's effect on the proceeding.'" Id. (quoting United States v. Dominguez Benitez, 542 U.S. 74, 81, 124 S. Ct. 2333, 2339 (2004)) (alterations omitted). The harmless error rule applies to everything else, or as the Supreme Court put it in the decision the Eighth Circuit quoted, except for defects that undermine the fairness of the entire criminal proceeding, "relief for error is tied in some way to prejudicial effect." Dominguez Benitez, 542 U.S. at 81, 124 S. Ct. at 2339.

The Eighth Circuit also relied on the Supreme Court's holding in Satterwhite that "those 'Sixth Amendment violations that pervade the entire proceeding' can 'never be considered harmless.'" Id. at 860–61 (quoting Satterwhite, 486 U.S. at 256, 108 S. Ct. at 1797) (emphasis in Sweeney). Applied to counsel absences during trial, that holding means that those counsel absences extensive enough to pervade the trial process and undermine the fairness of the trial as a whole amount to Cronic or structural error. All other counsel absences are trial errors subject to the harmless error rule. And the court concluded that "Sweeney's counsel's brief absence was not a 'complete' absence because it only lasted three minutes," and "the brevity of the absence distinguishes this case from the 'complete denial of counsel' discussed in Cronic." Id. at 861 (quoting Cronic, 466 U.S. at 659, 104 S. Ct. at 2047) (emphasis in Sweeney).

In affirming the rejection of Sweeney's Cronic claim, the Eighth Circuit quoted part of the district court's reasoning in that case, which is worth requoting here. This is what the Eighth Circuit by adoption said about why the circumstances in that case (which are materially identical to those in this case) are well-suited for harmless error analysis:

> The fact that the record demonstrates precisely what [Sweeney's counsel] missed while he was out of the room — and the fact that his absence was so brief — allows the Court to confidently assess whether Sweeney was harmed by [his counsel's] absence. Indeed, the Court is far better equipped to conduct a harmless-error analysis in

53

this case than it is in other contexts, in which a substantial amount of speculation is unavoidable.

Id. (quoting the district court) (alterations in original).  The court in Sweeney knew exactly what counsel missed because it had a transcript of the testimony taken while he was gone, just as we do in this case.

The reasoning in Sweeney, which we adopt, dovetails with the Supreme Court's explanation of its decision in Satterwhite.  See 486 U.S. 249, 108 S. Ct. 1792.  The Sixth Amendment error in Satterwhite occurred when a psychiatrist for the State testified at a capital sentencing proceeding based on what the defendant had told him during an examination conducted without the knowledge of his attorney in violation of Estelle v. Smith, 451 U.S. 454, 101 S. Ct. 1866 (1981).  Satterwhite, 486 U.S. at 251–55, 108 S. Ct. at 1795–96.  In determining that the Sixth Amendment violation resulting from admission of the psychiatrist's testimony was not structural error but was instead trial error subject to review for harmlessness, the Supreme Court explained:

> We have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial.  In Milton v. Wainwright, 407 U.S. 371, 92 S. Ct. 2174 (1972), for example, the Court held the admission of a confession obtained in violation of Massiah v. United States, 377 U.S. 201, 84 S. Ct. 1199 (1964), to be harmless beyond a reasonable doubt.  And we have held that harmless error analysis applies to the admission of identification testimony obtained in violation of the right to counsel at a postindictment lineup.  Moore v. Illinois, 434 U.S. 220, 98 S. Ct. 458 (1977); Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951 (1967)

54

(capital case); United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926 (1967).  Just last year we indicated that harmless error analysis would apply in a noncapital case to constitutional error in the use of a psychological evaluation at trial.  Buchanan v. Kentucky, 483 U.S. 402, 425, n.21, 107 S. Ct. 2906, 2919, n.21 (1987).

Id. at 257–58, 108 S. Ct. at 1798 (emphasis added) (citations reformatted).

The Sixth Amendment violation in Roy's case did not occur merely because counsel was late coming back from lunch.  Tardiness does not violate the Constitution.  The Sixth Amendment violation occurred because a government witness answered 18 questions in counsel's absence.  The constitutional error was in admitting that particular evidence, those answers, without counsel being there.  And, as the Supreme Court held in Satterwhite and in five other decisions that it cited, harmless error analysis applies "where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial."  Id. at 257, 108 S. Ct. at 1798.  It applies here.[13]

---

[13] Many state appellate courts have also concluded that the harmless error rule applies to the temporary absence of defense counsel from the courtroom.  See Jackson v. State, 983 So. 2d 562, 574–77 (Fla. 2008) (applying harmless error analysis to trial court's decision to hear testimony from the victim for purposes of sentencing the defendant while defense counsel was absent); Hodges v. State, 116 S.W.3d 289, 292–94 (Tex. Ct. App. 2003) (applying harmless error analysis to defense counsel's absence during presentation of adverse testimony from a detective during the penalty phase of a case); Wilson v. State, 764 So. 2d 813, 815–19 (Fla. 4th DCA 2000) (applying harmless error analysis to defense counsel's absence during jury deliberations and proceedings involving a question from the jury); State v. Scherzer, 694 A.2d 196, 237–40 (N.J. Super. Ct. App. Div. 1997) (applying harmless error analysis where defense counsel was absent "from many pretrial proceedings; a portion of jury voir dire; several days of testimony during trial, including the entire testimony of the State's expert witness . . . ; parts of [the] codefendants' and the prosecutor's summations; a portion of the charge conference; some of the jury's questions during deliberations; and also the reading of the jury's verdict").  In the Hodges

### 5. The Dissent's "Sole Defendant" Theory

The dissent attempts to distinguish the well-reasoned decisions in <u>Kaid</u> and <u>Sweeney</u> on the ground that those cases grew out of trials with more than one defendant, while Roy was the only defendant in this trial. <u>See</u> Dissenting Op. at 244–245. Indeed, at least five times the dissenting opinion appears to argue that the issue is not whether <u>Cronic</u> error occurs when a defendant is without counsel in the courtroom during the presentation of inculpatory evidence in any trial, but instead the issue is whether it is <u>Cronic</u> error for that to happen in a single-defendant trial. <u>See</u> Dissenting Op. at 220 ("no other defendants or defense counsel present"), 243 ("in a single-defendant trial"), at 244 ("none [of the other cases] involved a single defendant deprived of his sole counsel"), at 245–246 ("the sole defendant" in "a single-defendant, single-counsel case"), at 258 ("in the trial of a single defendant represented by a single lawyer").

The reasoning of the Second Circuit in <u>Kaid</u> and the Eighth Circuit in <u>Sweeney</u> applies regardless of the number of defendants on trial. Completely lacking from the dissent's attempt to distinguish <u>Kaid</u> and <u>Sweeney</u> is any convincing explanation for why the issue should turn on whether other defendants

decision, the Texas Court of Appeals stated that it agreed with our decision in <u>Vines</u> that a temporary absence of counsel during part of the trial does not necessarily infect the entire trial and preclude application of the harmless error doctrine. <u>Hodges</u>, 116 S.W.3d at 294 n.7.

represented by other counsel were also being tried. If a defendant's right to counsel is violated by his attorney's brief absence from the courtroom during inculpatory testimony against his client, there is no reason that it should matter if other attorneys representing other defendants were in the courtroom at the time his counsel was not there. The right violated is the right of each defendant to have counsel representing him, not each defendant's non-existent right to have counsel representing his codefendants.

An attorney who represents a co-defendant has an ethical duty to zealously advance the interests of that co-defendant within the bounds of the law, even where those interests conflict with the interests of any other person who is on trial. He ethically may, in keeping with his client's best interests — and in the finest traditions of the Bar — throw another defendant under the bus to help out his client. An attorney has no ethical duty to look after, or care about, the interests of anyone else regardless of whether their attorney is present. As the dissent states elsewhere in its opinion, defense counsel is "both his client's mouthpiece and his client's confidant." Dissenting Op. at 264. An attorney for a co-defendant is not another defendant's mouthpiece and confidant. He is not, as the dissent seems to believe, alternate defense counsel for any or all other co-defendants. Because the presence or absence of other counsel for other defendants is legally and logically

57

irrelevant to the <u>Cronic</u> or structural error issue, the <u>Kaid</u> and <u>Sweeney</u> decisions are not distinguishable on that basis.[14]

Because there is no principled way to limit an application of <u>Cronic</u> to single-defendant trials, a holding in favor of Roy would have far-reaching effects. As the dissenting opinion at the panel stage warned, if Roy's position were adopted:

> Whatever measures a judge takes in response to today's [panel] ruling, it will be practically impossible to prevent presumptive prejudice error in a large, multidefendant, long-running trial. <u>See</u> <u>Green v. Arn</u>, 809 F.2d 1257, 1265 (6th Cir.) (Boggs, J., dissenting), <u>vacated and remanded on other grounds</u>, 484 U.S. 806, 108 S. Ct. 52 (1987), <u>reinstated on remand</u>, 839 F.2d 300 (6th Cir. 1988) ("If a reversal is mandated whenever counsel (even retained) is absent from the courtroom for any significant period, we make such an escape a sure ticket to a new trial. In multi-defendant cases, judges will be required to keep a continual head count . . . lest cagey counsel be able to invoke this new rule."). After the judge, jury, prosecutors, defense attorneys, and others have spent months in a complex trial and verdicts of conviction have been returned, none of it will mean anything for any defendant whose attorney can show that he was absent or dozed off during any of the testimony from any of the many witnesses against his client. That will be true even if the attorney missed only a few of the thousands of questions and answers that directly or indirectly inculpated his client during the long trial. It will not matter, as the [panel] majority insists it does not matter in this case, whether the inculpatory testimony that the attorney missed was repeated in his (conscious) presence. And it will not matter in the

---

[14] As we explain later, the dissent's argument that the structural error inquiry varies depending on whether the absence of counsel occurs in a single-defendant or multi-defendant trial is also inconsistent with its argument that the absence of counsel is structural error because counsel must continually scrutinize the faces and body language of witnesses and jurors. <u>See</u> <u>infra</u> n.19.

least why the attorney was absent or whether the judge noticed the absence.  That is the rule the [panel] majority adopts.

United States v. Roy, 761 F.3d 1285, 1323 (11th Cir.) (Ed Carnes, C.J., dissenting), reh'g en banc granted, opinion vacated, 580 F. App'x 715 (11th Cir. 2014) (citation reformatted).

Of course, even if a holding in favor of Roy could somehow be limited to single-defendant trials, handing out automatic reversals anytime defense counsel misses even a question or two still would not be cost-free.  And the cost could be significant, as the case of Manuel Noriega shows.  He was the sole defendant in his trial, which lasted for seven months.  See United States v. Noriega, 117 F.3d 1206, 1209 (11th Cir. 1997); Boyd M. Johnson, III, Note, Executive Order 12,333:  The Permissibility of an American Assassination of a Foreign Leader, 25 Cornell Int'l L.J. 401, 425 n.157 (1992) (stating that trial lasted for seven months); Noriega Now Alone as Defendant, Chi. Trib., Sept. 5, 1991, 1991 WLNA 3826740.  After hearing evidence for seven months, the jury returned a verdict convicting him of eight counts of racketeering, manufacturing and distributing cocaine, and traveling in foreign commerce to promote an unlawful enterprise.  See Noriega, 117 F.3d at 1209 n.1, 1210.  The position of Roy and the dissent is that if it were later shown that Noriega's counsel had been out of the courtroom for seven minutes, or even half a minute, during those seven months of trial and had missed any inculpatory testimony at all, even if that testimony was repeated after counsel returned, the

verdict would have to be set aside and the seven months of trial repeated with a new jury, even if the government could show beyond any reasonable doubt that counsel's brief absence was harmless.

Unable to deal with the force of this single-defendant example on its position, the dissent attempts to recast it as a "fearful[ ] query." Dissenting Op. at 256. The point of the example is not that Manuel Noriega is a particularly bad character as criminal defendants go. Nor is the point that if the defendant is a really bad actor (such as someone like Roy who sexually molests a minor) we should not do what the Constitution requires. Of course we should do what the Constitution requires, but the question is what does it require and not require. The Noriega example illustrates that if the Constitution required what the dissent insists it does, it would lead to ludicrous results such as repeating a seven-month trial merely because counsel for a sole defendant was out of the courtroom for one-half minute, even though the only testimony taken while he was out was presented again after he returned. The Constitution does not require such results, but the dissent's position would.

### C. The Absence for a Substantial Portion of the Trial Exception

Many of the problems encountered in determining whether to apply a presumption of prejudice to a defense counsel's absence from trial arise because courts try to cram all absence-of-counsel situations into Cronic's Procrustean bed

60

or, to vary the metaphor, fail to heed Cardozo's warning about "the repression of a formula, the tyranny of tags and tickets."  Benjamin N. Cardozo, Mr. Justice Holmes, 44 Harv. L. Rev. 682, 688 (1931).  The formula capable of impeding thought in this area is the critical stage one, and the tag or ticket slapped on the result is the Cronic label.  They are useful (and obligatory) where appropriate to the factual situation, but they are problematic or worse if used where they do not apply.  The law does not countenance, much less require, absurdities.  And it is absurd to say that every absence of counsel during a critical stage, however momentary and whatever the circumstances, requires that a presumption of prejudice be applied.  It is also absurd to say that the only absences that justify a presumption of prejudice are those that extend throughout an entire critical stage, such as a trial.  We don't have to choose either extreme on the spectrum.

When it comes to the absence of counsel from some of a trial, the rule is not "any is all," nor is it "all or nothing."  The Supreme Court has never held that any absence at all of counsel from trial warrants a presumption of prejudice no matter what, and it has never held that only if counsel is absent throughout the entire trial should prejudice be presumed.  Some of our sister circuits have avoided either extreme and the absurdities they lead to by recognizing, at least implicitly, that the Cronic critical stage standard is not the exclusive formula for determining whether to presume prejudice from the absence of counsel.  They have supplemented the

61

critical stage standard with a substantial portion of the trial standard. Under that standard, even if counsel is not absent throughout an entire critical stage, prejudice should be presumed if he is absent for a substantial portion of the trial.

### 1. The Substantial Portion Exception and the Cases from Which It Arose

The substantial portion exception has arisen out of cases in which defense counsel fell asleep during the trial. Courts have recognized that, for Sixth Amendment presumption of prejudice purposes, an attorney who is not consciously present at trial because he is asleep is equivalent to an attorney who is not physically present because he is outside the courtroom. See Burdine, 262 F.3d at 349 ("Unconscious counsel equates to no counsel at all."); United States v. DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987) ("[S]leeping counsel is tantamount to no counsel at all . . . ."); Javor v. United States, 724 F.2d 831, 834 (9th Cir. 1984) ("[U]nconscious or sleeping counsel is equivalent to no counsel at all."). None of the circuits has concluded that counsel dozing off momentarily or sleeping through a few questions and answers is enough to presume prejudice instead of permitting the government to show beyond a reasonable doubt that the lapse was harmless.

Four of the five circuits that have addressed the issue presume prejudice if counsel slept through a substantial portion of the trial. See United States v. Ragin, 820 F.3d 609, 619 (4th Cir. 2016) ("We agree with other circuits and hold that a

defendant's Sixth Amendment right to counsel is violated when that defendant's counsel is asleep during a <u>substantial</u> portion of the defendant's trial [and that a presumption of prejudice is required].""); <u>Muniz v. Smith</u>, 647 F.3d 619, 623 (6th Cir. 2011) (joining the Ninth, Fifth, and Second Circuits that "have held that the denial of counsel with presumed prejudice only occurs once counsel sleeps through a 'substantial portion of defendant's trial'") (brackets omitted); <u>Burdine v. Johnson</u>, 262 F.3d 336, 348-49 (5th Cir. 2001) (en banc) (finding that "defense counsel slept during substantial portions" of the trial and in those circumstances "prejudice must be presumed"); <u>Javor v. United States</u>, 724 F.2d 831, 834–35 (9th Cir. 1984) ("When a defendant's attorney is asleep during a substantial portion of his trial, the defendant has not received the legal assistance necessary [and prejudice must be presumed].").

The other one of the five circuits to address the sleeping lawyer situation, the Second Circuit, did so in <u>Tippins v.Walker</u>, 77 F.3d 682, 685–87 (2d Cir. 1996). There the court declined to use the "substantial portion" standard because it found the word "substantial" to be "unhelpful" in determining when prejudice must be presumed in a sleeping lawyer situation. Yet, in its place the court adopted the closely analogous standard of "repeatedly unconscious" or "repeated and prolonged lapses" in consciousness. <u>Id.</u> at 687, 689. Whether application of a presumption of prejudice turns on counsel having slept during a substantial portion

63

of the trial (as the Fourth, Fifth, Sixth, and Ninth Circuits phrase it) or on his having slept repeatedly for prolonged periods of time (as the Second Circuit phrases it), all five circuits to address the matter agree that more than a short absence of consciousness due to sleep during trial is required for prejudice to be presumed.

But what is a "substantial portion" of the trial for purposes of this standard? The Fourth Circuit offered this guidance:

> While we conclude that the manner in which [trial counsel] slept in the instant case was substantial, we decline to define this term for all cases. Whether a lawyer slept for a substantial portion of the trial should be determined on a case-by-case basis, considering, but not limited to, the length of time counsel slept, the proportion of the trial missed, and the significance of the portion counsel slept through. At the same time, however, while we decline to dictate precise parameters for what must necessarily be a case-by-case assessment, we caution district courts that the scope of our holding today should not be limited to only the most egregious instances of attorney slumber.

Ragin, 820 F.3d at 622 n.11 (emphasis added). The three non-exclusive factors listed — length of time missed, proportion of trial missed, and significance of the missed portion — are all important.

We add to the Fourth Circuit's non-exclusive list of factors for determining whether what counsel missed was a substantial portion of the trial another factor at least as important as those it set out: whether the specific part of the trial that counsel missed is known or can be determined. Do we know what testimony he

did not hear because he was asleep or outside the courtroom? This factor should bear heavily on whether to presume prejudice or give the government an opportunity to show beyond a reasonable doubt the lack of it, because in determining if the defense was prejudiced because of something counsel missed, it helps a lot to know what counsel missed. The Ninth Circuit in Javor noted the difficulty in determining prejudice with "a record which lacked any indication of when Javor's attorney was alert and when he was sleeping." 724 F.3d at 833; see also Tippins, 77 F.3d at 686 ("[I]f counsel sleeps, the ordinary analytical tools for identifying prejudice are unavailable. The errors and lost opportunities may not be visible in the record, and the reviewing court . . . may be forced to engage in unguided speculation.") (quotation marks omitted). To inform our analysis of what it means to be absent for a substantial portion of the trial, we turn to the facts in each of the sleeping lawyer cases to see how substantial, or how repeated and prolonged, the absence of consciousness by counsel was in the four cases where prejudice was presumed and in the one where it was not.[15]

---

[15] The dissenting opinion insists that the substantial portion standard turns on a "rigid comparison" and "mechanical focus," one that looks only at the "minutes and seconds" that defense counsel was consciously or physically absent from the courtroom. See Dissenting Op. at 250. Of course the amount of time counsel was out is relevant. Would the dissent rigidly and mechanically have us ignore the length of time and treat one minute's absence the same as one day's absence? Would it have us treat a few questions missed as equivalent to a few volumes of testimony? Apparently the dissent would, because its position is that even a single inculpatory answer in itself constitutes a critical stage and structural error — that there are hundreds or even

2. Application by Other Circuits of the
Substantial Portion of Trial Standard

We begin with the decision that gave birth to the substantial portion test.  In the Ninth Circuit's <u>Javor</u> decision, defense counsel "was sleeping while testimony pertaining to the petitioner was being adduced."  724 F.2d at 834.  He told a co-defendant's counsel that "he had missed some of the testimony and asked . . . if he had missed anything related to the petitioner."  <u>Id.</u> (ellipses in original).  Not only that but "[t]he trial judge noted that Javor's attorney was often 'dozing' and that other attorneys 'nudged' and 'kicked' him to wake him up."  <u>Id.</u>  Those facts convinced the Ninth Circuit that counsel had been consciously absent during a substantial portion of the trial and prejudice should be presumed.

We have already discussed the Fifth Circuit's decision in the <u>Burdine</u> case.  <u>See</u> <u>supra</u> at 47.  For present purposes, it is useful to recall that in <u>Burdine</u> defense counsel slept repeatedly through "a not insubstantial portion of the 12 hour and 51 minute trial," including during the prosecutor's presentation of evidence against

---

thousands of separate critical stages in every trial.  We would be the first circuit in the country to adopt such an extreme position.

We disagree with the dissent's position and agree with the five other circuits that have adopted the substantial portion standard (counting the Second Circuit which has adopted a materially identical standard).  In doing so we recognize that the standard involves a case-by-case inquiry and consideration of a number of non-exclusive factors.  It is neither rigid nor mechanical.

the defendant.  262 F.3d at 338–40, 348–49.  A juror testified to having seen counsel asleep as many as 10 different times during the trial and for "a good probably at least 10 minutes" on one occasion, and testimony showed that there were "lots of incidents" of him sleeping while the prosecution was questioning witnesses.  Id. at 339.  The deputy clerk, who was in the best position to observe counsel, testified that he "was asleep for long periods of time during the questioning of witnesses."  Id.  The state collateral trial court found that "defense counsel repeatedly dozed and/or actually slept during substantial portions of Burdine's capital murder trial so that defense counsel was, in effect, absent."  Id. at 340 (brackets omitted).  On those facts the Fifth Circuit held that prejudice should be presumed under the substantial portion standard but was careful to limit its holding to "the egregious facts" in that case.  Id. at 349.

In Ragin trial counsel did not dispute that he had slept.  820 F.3d at 622.  In fact, "counsel was asleep for much of Ragin's trial."  Id. at 613.  Throughout the 15-day trial, he slept "frequently . . . almost every day . . . morning and evening for 30 minutes at least at a time."  Id. at 621 (quotation marks and brackets omitted) (ellipses in original).  Some of the time he was seen "resting his head" as he slept.  Id.  Finding "it impossible not to conclude that [he] slept and therefore was not functioning as a lawyer during a substantial portion of the trial," the Fourth Circuit presumed prejudice.  Id. at 622–23.

67

In the Tippins case, the Second Circuit found that "counsel was unconscious for numerous extended periods of time during which the defendant's interests were at stake." 77 F.3d 685. He slept every day of the 12-day trial; he slept during "two-thirds of the testimony" of the confidential informant who was a "critical" prosecution witness; and he slept through "the majority" of the "damaging" testimony of a co-defendant. Id. at 687–90 (brackets omitted). The court reporter described counsel's sleeping as "a continuous thing." Id. at 688. More than one witness actually heard him snoring. Id. at 688–89. It was on those extreme facts that the Second Circuit found that defense counsel had not merely been inattentive but had suffered repeated and prolonged lapses of consciousness because he slept through much of the trial, justifying a presumption of prejudice. Id. at 687–90.

The attorney in the Muniz case "was asleep for an undetermined portion of a single cross-examination," although it was the cross-examination of his own client. 647 F.3d at 624. The "total cross-examination was fairly short, spanning only 26 pages of trial transcript" and "he objected near the end of [it]," leading the Sixth Circuit to conclude that "Muniz's lawyer therefore must have only been asleep for a brief period." Id. Distinguishing cases like Tippins where counsel had slept for substantial portions of the trial, the court held that a presumption of prejudice should not apply in that case. Id.

3. The Relationship of the Cronic Exception
and the Substantial Portion of Trial Exception

68

When counsel is not consciously present — either because he is asleep or physically absent — throughout an entire discrete, critical stage of a criminal proceeding, Cronic requires that prejudice be presumed.  And as we have already explained, see supra at 27–32, a critical stage is either a self-contained proceeding or a discrete and separately identifiable piece of one.  See, e.g., Iowa v. Tovar, 541 U.S. 77, 87, 124 S. Ct. 1379, 1387 (2004) (plea hearing); Gardner, 430 U.S. at 358, 97 S. Ct. at 1204–05 (sentence hearing); Gilbert, 388 U.S. at 272–74, 87 S. Ct. at 1956–57 (post-indictment pretrial lineup); White, 373 U.S. at 59–60, 83 S. Ct. at 1051 (preliminary hearing); Hamilton, 368 U.S. at 54, 82 S. Ct. at 158–59 (arraignment).  We believe that where counsel's absence does not extend throughout an entire critical stage, such as the trial or all of the taking of testimony, the more appropriate test or standard is whether counsel missed a substantial portion of it.  The sleeping lawyer cases illustrate the use of that standard, but it is also appropriate for physical absences during part of a trial.  As at least three circuits have noted, for Sixth Amendment presumption of prejudice purposes cases involving sleeping and physically absent counsel should be subject to the same standard for determining whether to presume prejudice or allow the government an opportunity to show the lack of it beyond a reasonable doubt.  See Burdine, 262 F.3d at 349; DiTommaso, 817 F.2d at 216; Javor, 724 F.2d at 834.  We agree.

Our conclusion that the absence of an attorney from the courtroom for an insubstantial portion of the trial does not justify a presumption of prejudice under the Cronic critical stage exception to the harmless error rule and that the substantial portion of trial standard is the appropriate one for those circumstances is not inconsistent with any Supreme Court decision. The Court has never held that the testimony of one or some witnesses is a critical stage for Cronic purposes, much less that a small part of the testimony of a single witness is. And the Court has never held that prejudice should be presumed if defense counsel is absent from the courtroom for an insubstantial portion of trial or that it should not be presumed if counsel is absent for a substantial portion of the trial. The Supreme Court has never addressed this issue.

The substantial portion of trial standard, and the four non-exclusive factors we have discussed for applying it, not only explains the sleeping lawyer decisions of our sister circuits, which explicitly apply that standard, it also explains the Russell and Olden physical absence decisions that Roy relies on. In Russell, counsel was absent for two days of his client's trial for conspiracy to commit drug trafficking and money laundering, missing the testimony of at least 18 prosecution witnesses and the admission of "numerous exhibits," all of which went to prove guilt. See 205 F.3d at 769–70, 772. Obviously, counsel was absent for a substantial portion of the trial. The Olden case involved counsel's "excessive

70

absence" during trial, including two days during which he missed incriminating testimony of prosecution witnesses. See 224 F.3d at 566, 568–69. Again, that was obviously a substantial portion of the trial. The Green case involved an absence of at least an hour and forty minutes during which a key government witness testified, and any determination of prejudice in that case would be complicated by the fact that exactly what other parts of the trial counsel missed could not be determined. 809 F.2d at 1259–60, 1259 n.1. That is the fourth factor of the substantial portion standard or test, and it weighs in favor of the court's decision to presume prejudice in Green.

We recognize that many of the decisions about partial absences succumb to the tyranny of tags and tickets by putting the "Cronic error" or "critical stage" label on their analysis and conclusions instead of, or in addition to, speaking in terms of whether the attorney was out for a substantial portion of the trial. See, e.g., Ragin, 820 F.3d at 619–20, Burdine, 262 F.3d at 338, 341. Their analysis, however, focuses on whether counsel was mentally or physically absent for a substantial portion of the trial. As the Fourth Circuit has suggested, the substantial portion determination should be made on a case-by-case basis considering, among other factors, the length of time counsel was out, the proportion of the trial missed, and the significance of what he missed. Ragin, 820 F.3d at 622 n.11.

An additional factor to be considered is whether the reviewing court can determine when counsel was out and what he missed. While there is usually no way to tell exactly when a dozing lawyer was "out" during the trial, see, e.g., Burdine, 262 F.3d at 348 n.7, determining when and for how long counsel was physically absent is usually less difficult. The Eighth Circuit underscored that point in its Sweeney decision. See 766 F.3d at 861 ("The fact that the record demonstrates precisely what [Sweeney's counsel] missed while he was out of the room — and the fact that his absence was so brief — allows the Court to confidently assess whether Sweeney was harmed by [his counsel's] absence.") (quoting with approval the district court) (alterations in original); see also Kaid, 502 F.3d at 44–47 (refusing to presume prejudice where court knew exactly what counsel had missed when he returned to courtroom 20 minutes late after lunch). This case shows that as well. We know exactly when Roy's counsel was absent and precisely which questions were asked and answers given during that time. See supra at 6–7.

A final consideration that courts should keep in mind in applying the substantial portion of the trial standard is that we are not talking about whether to presume that there was no prejudice or harm. We are talking about whether to presume that there was prejudice or harm, which would deny the government the opportunity to persuade the court beyond a reasonable doubt that in light of all of

72

the evidence in the case there was no prejudice or harm.  Even without a presumption of prejudice the defendant will be granted a new trial where there is any reasonable doubt about his having been prejudiced or harmed.[16]

### 4.  Application of the Substantial Portion Standard to the Facts of this Case

As we have pointed out far more than once, Roy's counsel missed only seven minutes of a trial that lasted 1,884 minutes or 31.4 hours (not counting recesses and jury deliberations), which is less than one-half of one percent of trial time.  He missed only 18 answers that were given by one of the government's 13 witnesses who collectively gave a total of approximately 2,745 answers, meaning he missed less than one percent of the total.  And we know exactly which questions and answers he missed.  His physical absence was far more momentary and far less substantial than any in the five cases that our sister circuits have decided under the substantial portion standard.  We have no trouble concluding that Roy's counsel did not miss a substantial portion of the trial.

---

[16] The dissent does not face up to this important point, insisting that we are concluding "that directly inculpatory evidence introduced against a defendant in a single-defendant, single-counsel case while defense counsel is absent constitutes harmless trial error."  See Dissenting Op. at 245 (emphasis omitted).  That is not the issue and it is not what we are holding.  What we are holding is that the constitutional violation, like virtually all constitutional violations, is subject to analysis under the harmless error rule.  It will lead to reversal unless the government carries its burden of proving that, when measured in light of all the evidence in the case, the violation was harmless beyond a reasonable doubt.

No presumption of prejudice is due under that exception, just as none is due under the Cronic critical stage exception. That prejudice is not to be presumed does not mean that there was no constitutional violation, and it does not mean there is no possibility of the convictions being reversed. It means, instead, that the harmless error rule applies, and his convictions should be reversed unless the government has carried its burden of showing the error was harmless beyond a reasonable doubt. Which it has. See infra Part VI.

### D. Roy's Speculation Arguments and the Breadth of the Harmless Error Rule

Roy argues that the harmless error rule cannot apply because we cannot be certain whether a brief absence of counsel during trial affected the verdict and courts should never speculate about such things. The most that can be said for that argument is that it is couched in good grammar and sensible syntax, but it is unpinned from precedent and loose from logic.

To begin with, almost every determination about whether a deficiency, error, or defect in counsel's representation or some other aspect of the trial was prejudicial or harmless requires "speculation" in the sense that Roy is using the word. He is using that word to mean "deciding without knowing for certain." Consider what the Supreme Court said about that in the Sears capital case. Defense counsel had found and presented some mitigating circumstance evidence but not all that he could and should have. See Sears v. Upton, 561 U.S. 945, 945–

74

46, 130 S. Ct. 3259, 3261 (2010). Some of the mitigating circumstance evidence that counsel did not find and present might have had an adverse effect or it might have had a net beneficial effect for the defense. See id. at 947–51, 130 S. Ct. at 3261–64. The state collateral court rejected Sears' ineffective assistance claim because he had failed to prove prejudice. Id. at 952, 130 S. Ct. at 3264–65.

In explaining its holding in that case, the state court said that "it is impossible to know what effect a different mitigation theory would have had on the jury." Id. at 952, 130 S. Ct. at 3264 (alterations omitted). Its thinking was that a court could only speculate about prejudice and speculation was not good enough so why try. See id. at 946, 130 S. Ct. at 3261. Reversing the state court, the Supreme Court emphatically rejected the notion that it requires too much speculation to determine whether different evidence or a different theory would have affected a jury's decision in a given case. The Court explained that assessing whether the prejudice prong of an ineffective assistance of counsel claim has been met, whether there is a reasonable probability of a different result but for the error, "will necessarily require a court to 'speculate'" about the effect of the deficiency or error. Id. at 956, 130 S. Ct. at 3266. But speculation in that broad sense, which equates with the lack of certainty, is not impermissible; it is inevitable, the Court noted. See id.

It would be nice if there were a software program into which a trial record could be scanned, an error could be input into the program, and the result would pop up on screen as: "prejudicial" or "harmless." That is not, however, the nature of the enterprise. Prejudice inquiries require the exercise of a court's best judgment. All prejudice or harmlessness determinations require some measure of estimation or of what the Supreme Court in Sears described as permissible "speculation." Every work day all across the country courts decide cases by determining, to the best of their abilities, whether something that defense counsel did, or did not do, prejudiced or harmed the defendant by adversely affecting the result of the trial. If that is speculation, then speculation is rampant in the nation's courts.

We will not do what the Supreme Court reversed the state court for doing in Sears and what Roy would have us do in this case, which is throw up our hands and decline to make a determination about prejudice and harmlessness. See also Sanders, 556 U.S. at 407, 129 S. Ct. at 1704–05 ("We have previously warned against courts' determining whether an error is harmless through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record."). Certainty is illusory in human affairs. If certainty about the lack of an error's effect were required, virtually every error would mandate reversal, and harmless error would be an endangered if not

76

extinct doctrine.  Yet the harmless error doctrine is alive and well.  It serves vital interests and promotes public respect for the criminal process.  See Neder, 527 U.S. at 18, 119 S. Ct. at 1838; Agurs, 427 U.S. at 108, 96 S. Ct. at 2400; see also Johnson, 520 U.S. at 470, 117 S. Ct. at 1550.

As the Supreme Court has repeatedly held, the vast majority of constitutional errors that occur at a criminal trial, including Sixth Amendment violations, should be examined for prejudicial effect and those errors do not require reversal if they are harmless.  And as we have mentioned, in Fulminante the Court listed 16 of its decisions establishing this point, a list which refutes Roy's position 16 times over:

> Since this Court's landmark decision in Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless.  See, e.g., Clemons v. Mississippi, 494 U.S. 738, 752–54, 110 S. Ct. 1441, 1450–51 (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); Satterwhite v. Texas, 486 U.S. 249, 108 S. Ct. 1792 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); Carella v. California, 491 U.S. 263, 266, 109 S. Ct. 2419, 2421 (1989) (jury instruction containing an erroneous conclusive presumption); Pope v. Illinois, 481 U.S. 497, 501–04, 107 S. Ct. 1918, 1921–23 (1987) (jury instruction misstating an element of the offense); Rose v. Clark, 478 U.S. 570, 106 S. Ct. 3101 (1986) (jury instruction containing an erroneous rebuttable presumption); Crane v. Kentucky, 476 U.S. 683, 691, 106 S. Ct. 2142, 2147 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431 (1986) (restriction on a defendant's right to

cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); Rushen v. Spain, 464 U.S. 114, 115–18 & n.2, 104 S. Ct. 453, 454–55 & n.2 (1983) (denial of a defendant's right to be present at trial); United States v. Hasting, 461 U.S. 499, 103 S. Ct. 1974 (1983) (improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause); Hopper v. Evans, 456 U.S. 605, 102 S. Ct. 2049 (1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause); Kentucky v. Whorton, 441 U.S. 786, 99 S. Ct. 2088 (1979) (failure to instruct the jury on the presumption of innocence); Moore v. Illinois, 434 U.S. 220, 232, 98 S. Ct. 458, 466 (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); Brown v. United States, 411 U.S. 223, 231–32, 93 S. Ct. 1565, 1570–71 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); Milton v. Wainwright, 407 U.S. 371, 92 S. Ct. 2174 (1972) (confession obtained in violation of Massiah v. United States, 377 U.S. 201, 84 S. Ct. 1199 (1964)); Chambers v. Maroney, 399 U.S. 42, 52–53, 90 S. Ct. 1975, 1981–82 (1970) (admission of evidence obtained in violation of the Fourth Amendment); Coleman v. Alabama, 399 U.S. 1, 10–11, 90 S. Ct. 1999, 2003–04 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Confrontation Clause).

499 U.S. at 306–07, 111 S. Ct. at 1263 (citations reformatted).  There is no good reason why those 16 types of constitutional violations, some of which involve the right to counsel, are subject to review for harmless error but the violation in this case should not be.  No less "speculation" is required to determine whether any of those errors were prejudicial or harmless than is required to make the same determination about counsel's momentary absence in this case.

This point is evident from the actual holding in Fulminante itself.  The issue was whether erroneous admission of a coerced confession in violation of the Due

Process Clause is reviewable for harmless error or should be presumed prejudicial. Id. at 284–85, 111 S. Ct. at 1251. The Supreme Court recognized that "confessions have [a] profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." Id. at 296, 111 S. Ct. at 1257 (quotation marks omitted). Yet the Court still held that the constitutional error of admitting a coerced confession is subject to harmless error review. Id. at 303, 111 S. Ct. at 1261. If the erroneous admission of a confession that may have had a "profound impact on the jury" does not warrant a presumption of prejudice, neither does the erroneous admission of inculpatory evidence presented during counsel's brief absence from the courtroom. See Satterwhite, 486 U.S. at 257, 108 S. Ct. at 1798 (observing that harmless error review is permitted "where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial").

### E.  The Lost Objections, Hampered Cross-Examination, and Lost Impeachment Arguments

#### 1.  Lost Opportunity to Object to Testimony

Roy contends that because of counsel's seven-minute absence from the courtroom he lost the opportunity to object to the questions that the prosecutor asked while he was out of the courtroom, and that we cannot know if counsel would have objected had he been present, so prejudice must be presumed. The simple answer to that contention is that counsel did not lose the opportunity to

79

object to those questions.  He had the opportunity to object to them when he first heard the same questions asked again immediately after he returned to the courtroom.  Because counsel did not object to any of those questions when he had that opportunity to object, we know that he had no objection he wanted to make to them.  That proves there was no prejudice from a lost opportunity to object, if proof is required.

The second independently adequate reason we reject Roy's contention is that the most a defendant suffers from a lost opportunity to object is that an objection that should have been made was not made.  That loss does not require a presumption of prejudice because courts are fully capable of deciding, and regularly do decide, if an attorney's failure to object to testimony when he might have objected is prejudicial or is harmless.  There are plenty of reported decisions doing just that and no decisions that we could find holding that courts are unable to measure the prejudicial effect of an objection that was not made.  See, e.g., Cox v. McNeil, 638 F.3d 1356, 1364 (11th Cir. 2011) (determining whether counsel's failure to object to testimony of expert witness for the prosecution was prejudicial); Dorsey v. Chapman, 262 F.3d 1181, 1186 (11th Cir. 2001) (same); Hays v. Alabama, 85 F.3d 1492, 1495–96 (11th Cir. 1996) (determining whether counsel's failure to object to the introduction of uncharged criminal offenses was prejudicial); Jones v. Dugger, 928 F.2d 1020, 1023, 1029 (11th Cir. 1991)

(determining whether counsel's failure to object to testimony of prosecution witness was prejudicial); Howard v. Davis, 815 F.2d 1429, 1432 (11th Cir. 1987) (determining whether counsel's failure to object to psychiatrist's testimony was prejudicial); Cape v. Francis, 741 F.2d 1287, 1300 (11th Cir. 1984) (same).

As those and many other decisions show, there is nothing unusual — or unusually difficult — about determining whether a failure to object, or a lost opportunity to object, to testimony was prejudicial or harmless.  In this case the inquiry is particularly easy because the same questions that were asked in counsel's absence were repeated in his presence after he returned to the courtroom, and he made not one objection to any of them.

Faced with all of those decisions in which courts have gauged the prejudicial effect, if any, of an attorney's failure to object to testimony, the dissent laments that:  "I am not so sure that a lost opportunity to object is the same thing as the failure to object — or so easily quantifiable.  It seems to me that a lost opportunity to object is an altogether different problem, one that requires speculation to resolve."  Dissenting Op. at 235 n.5.  But the dissent never tells us why gauging prejudice from a lost opportunity to object is "an altogether different problem" from gauging prejudice from an objection that counsel had an opportunity to make but did not.  The dissent gives no explanation why the difficulty in determining if

81

the absence of an objection was prejudicial varies depending on the reason there was no objection. No explanation is given because none exists.

The harm, if any, caused by the absence of an objection is the same regardless of whether the reason there was no objection is that counsel was absent, or he was distracted, or he was just negligent. Regardless of the reason there was no objection, the jury hears the same testimony and the effect of that testimony is the same. When it comes to an objection that was not made, prejudice is prejudice and harmlessness is harmlessness. The ability of courts to gauge the effect of an objection not being made is the same regardless of why it was not made. Identical cases, involving identical evidence that was admitted without objection, should be treated the same regardless of the reason there was no objection, and where the lack of an objection was harmless the judgment should not be set aside.[17]

### 2. Hampered Cross-Examination and Lost Opportunity to Assert Defenses

---

[17] In support of its position the dissent cites White v. Maryland, 373 U.S. 59, 83 S. Ct. 1050 (1963). That case involved the introduction at trial of the guilty plea that the defendant had entered during a preliminary hearing without representation of counsel. Id. at 59–60, 83 S. Ct. at 1051. The Supreme Court held that a preliminary hearing where a defendant pleads guilty is a critical stage of a trial. Id. Roy was not completely denied counsel throughout a critical stage of the trial, such as a preliminary hearing, and he did not enter a guilty plea while he was without counsel. Entry of a guilty plea by the defendant is not equivalent to the absence of an objection to testimony. Cf. Florida v. Nixon, 543 U.S. 175, 187, 125 S. Ct. 551, 560 (2004) ("A guilty plea . . . is an event of signal significance in a criminal proceeding.") (citation omitted).

82

Roy also contends that we must presume prejudice because his counsel's absence during seven minutes of Deputy Longson's testimony may have hampered counsel's cross-examination, or may have caused counsel not to assert some defense, or may have prevented counsel from presenting some evidence to rebut the testimony that came in during those seven minutes. But courts regularly assess whether a defendant has suffered prejudice from foregone cross-examination, foregone defenses, and foregone evidence. See, e.g., Hinton v. Alabama, 571 U.S. ___, 134 S. Ct. 1081, 1088–90 (2014) (remanding for the district court to determine whether petitioner was prejudiced by counsel's failure to request additional funding in order to hire an adequate expert); Harrington v. Richter, 562 U.S. 86, 110–12, 131 S. Ct. 770, 790–92 (2011) (determining whether petitioner was prejudiced by counsel's failure to present expert testimony on serology, pathology, and blood spatter patterns); Roberts v. Comm'r, Ala. Dep't of Corr., 677 F.3d 1086, 1090–94 (11th Cir. 2012) (determining whether defendant suffered prejudice from his attorney's failure to raise insanity defense); Pietri v. Fla. Dep't of Corr., 641 F.3d 1276, 1280–84 (11th Cir. 2011) (determining whether defendant suffered prejudice from his attorneys' failure to raise voluntary intoxication defense); Jackson v. Herring, 42 F.3d 1350, 1362, 1368–69 (11th Cir. 1995) (determining whether petitioner was prejudiced by counsel's failure to investigate and present mitigating evidence at sentencing).

This kind of prejudice inquiry is old hat for courts.  We do it often, without protesting that it is too difficult or too much trouble.  It is part of our judicial duty.  And again, it is simple to do in this case because the same questions counsel missed were repeated after he came back into the courtroom.  We know what objections he wanted to make to those questions from the objections he made to them when they were asked in his presence:  none.

### 3.  Lost Opportunity to Impeach

Roy also complains that because of counsel's brief absence from the courtroom he did not hear Deputy Longson mistakenly testify that the images of L.B. were taken on March 10, 2005 instead of March 11, 2006.  As we point out elsewhere, the difference is immaterial because L.B. was a minor (under 18 years of age) on both dates (she was 15 years old on the earlier date and 16 years old on the later date).  See supra at 7 n.1; infra at 111–113.  And there was a mountain of other evidence proving beyond a reasonable doubt Roy's guilt of the charges to which those images of L.B. related.  See infra at 112–113.

Roy does not dispute that the victim was a minor regardless of which date for that particular file is used, but instead argues that if counsel had been present and had heard Longson's slip up about the date, he could have used that mistake in an attempt to impeach Longson's testimony; and because he lost the opportunity to impeach, prejudice should be irrebuttably presumed.  The problem for Roy is that

84

courts are fully capable of deciding, and regularly do decide, if an attorney's failure to impeach a prosecution witness with prior inconsistent testimony or other evidence is prejudicial or harmless.  There are legions of decisions doing just that. See, e.g., Strickler v. Greene, 527 U.S. 263, 289–96, 119 S. Ct. 1936, 1952–55 (1999) (determining that petitioner was not prejudiced by loss of opportunity to use withheld documents to impeach a key prosecution witness); Barwick v. Sec'y, Fla. Dep't of Corr., 794 F.3d 1239, 1251–53 (11th Cir. 2015) (denying habeas relief in a capital case because the petitioner had not shown prejudice from his counsel's failure to use a prosecution witness' prior inconsistent testimony in another proceeding to impeach her); Fugate v. Head, 261 F.3d 1206, 1208, 1220 (11th Cir. 2001) (determining that petitioner had not shown prejudice from his attorney's failure to impeach the testimony of the sole eyewitness to the murder with his prior inconsistent statement to police); Nixon v. Newsome, 888 F.2d 112, 116–17 (11th Cir. 1989) (determining, after "[c]onsidering all the circumstances," that petitioner had been prejudiced by his counsel's failure to impeach the key prosecution witness with her prior inconsistent testimony); Jones v. Butler, 778 F.3d 575, 584–86 (7th Cir. 2015) (denying habeas relief on a claim involving counsel's failure to impeach the testimony of a prosecution witness because "[w]e cannot say that [the witness'] testimony would have altered the outcome even if the impeachment had been perfected"); United States v. Travillion, 759 F.3d 281, 290–93, 299 (3d Cir.

85

2014) (denying relief on a claim involving counsel's failure to use a prosecution witness' contradictory statements from an earlier trial to impeach him because the collective evidence against the petitioner showed he was not prejudiced by that failure, and observing that "[t]he right to a fair trial does not translate into the right to a perfect trial"); United States v. Orr, 636 F.3d 944, 951–54 (8th Cir. 2011) (denying relief on a claim involving counsel's failure to impeach a prosecution witness with her cooperation agreement and her prior inconsistent statements because, even though counsel could have "eroded [her] credibility in the jury's eyes by impeaching [her]," in view of the other evidence of guilt "there is not a reasonable probability that [the] impeachment would have manufactured reasonable doubt in the jurors' minds"); Moore v. Marr, 254 F.3d 1235, 1237–38, 1240–41 (10th Cir. 2001) (denying habeas relief on claim involving "counsel's failure to impeach a key prosecution witness" because even if "[the witness] had been impeached we cannot conclude that the outcome would have been different").

All of those decisions, and more like them, foreclose Roy's argument that prejudice should be presumed on the theory that courts are not capable of determining whether the failure to use a particular piece of evidence to impeach was prejudicial or instead was harmless. Courts can and do make that determination if a failure to impeach resulted from counsel error. Yet the dissent worries that courts are somehow not capable of making exactly the same

86

determination if the failure to impeach occurred because counsel was unaware of the testimony or other evidence that could have been used to impeach. See Dissenting Op. at 235 & n.5 ("Lost opportunities matter. . . .  And further, here, it was a lost opportunity to impeach — the effects of which could have pervaded the witness's entire testimony.").

The dissent never explains why the reason that impeachment did not occur matters in gauging the prejudicial effect, if any, of the unused impeachment. What we said earlier about why a failure to object does not affect a court's ability to gauge prejudice applies with equal force to a failure to impeach. Because the impeachment evidence the jury does not hear is the same regardless of the reason it does not hear that evidence, the effect of the jury not hearing that evidence is the same. It follows that the court's ability to gauge the effect of the jury not hearing impeachment evidence is the same as well. What matters is the prejudicial or harmless effect of the lack of impeachment, and all of the decisions we have just cited establish that courts are fully capable of gauging that effect and regularly do so.

Faced with all of those decisions, the dissent simply disagrees, insisting that "[l]ost opportunities matter," and are all that matter, when it comes to a failure to impeach, and if impeachment does not occur because of a lost opportunity — as distinguished from an opportunity that counsel had but failed to take advantage

87

of — prejudice cannot be measured and must be presumed.  See Dissenting Op. at 230, 234–240.  The distinction the dissent would have us make has no logical basis, which coincides with the fact that it is foreclosed by at least three decades of binding precedent.

The Supreme Court and this Court have repeatedly held that when the government suppresses impeachment evidence depriving the defense of the opportunity to impeach a prosecution witness, prejudice is not to be presumed but must be shown by the defendant.  See, e.g., United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375 (1985).  There is a different standard when the government deliberately uses, or fails to correct, perjury that deprives the defendant of the opportunity to use impeachment evidence, but even then there is no automatic reversal and the harmless error rule applies.  See Agurs, 427 U.S. at 103–04, 96 S. Ct. at 2397.

In the Bagley case the government had given the defense affidavits from its "two principal witnesses" attesting that they had not been given any rewards or promises of reward.[18]  Id. at 670, 105 S. Ct. at 3377.  Even though the defense

---

[18] Actually, as the dissenting opinion in Bagley points out, those "two principal witnesses" were the only witnesses against the defendant on the charges for which he was convicted.  473 U.S. at 685, 105 S. Ct. at 3385 (Marshall, J., joined by Brennan, J., dissenting); see also Bagley v. Lumpkin, 798 F.2d 1297, 1299 (9th Cir. 1986) ("At trial [those two witnesses] provided the only testimony on the controlled substance charges."); Bagley, 473 U.S. at 671, 105 S. Ct. at 3377 (noting that the controlled substances charges were the only ones on which the defendant

88

asked for information about any deals, promises, or inducements, the government did not disclose that it had signed a "Contract for Purchase of Information and Payment of Lump Sum Therefor" with the two witnesses. Id. at 669–71, 105 S. Ct. at 3377–78. It had promised to pay the two witnesses as "vendors" an amount described in the contract as "a sum commensurate with services and information provided," and they expected to be paid and were paid. Id. at 671–72, 105 S. Ct. at 3377–78. The government's failure to disclose that evidence to the defense deprived it of the opportunity to impeach the two government witnesses by showing their bias or interest. Id. at 676, 105 S. Ct. at 3380.

The Ninth Circuit set aside the conviction, holding that: "the government's failure to provide requested Brady information to Bagley so that he could effectively cross-examine two important government witnesses requires an automatic reversal." Id. at 674, 105 S. Ct. at 3379 (quoting Bagley v. Lumpkin, 719 F.2d 1462, 1464 (9th Cir. 1983)). The Supreme Court rejected the Ninth Circuit's automatic reversal rule and reversed its judgment. In doing so, the Court acknowledged that impeachment evidence is covered by the Brady rule because it is evidence favorable to the accused that "if disclosed and used effectively . . . may

---

was convicted). And there was no evidence to corroborate the testimony of those two witnesses. Lumpkin, 798 F.2d at 1299 n.1.

89

make the difference between conviction and acquittal." Id. at 676, 105 S. Ct. at 3380.  And the Court recognized that the "possibility of a reward gave [the two witnesses] a direct, personal stake in [Bagley's] conviction." Id. at 683, 105 S. Ct. at 3384.  Not only that but, as the Court pointed out, "the natural effect" of the affidavits that the government did give the defense "would be misleadingly to induce defense counsel to believe that [the two witnesses] provided the information in the affidavits, and ultimately their testimony at trial recounting the same information, without any 'inducements.'" Id. at 684, 105 S. Ct. at 3384.

Even with all of that in the case, the Supreme Court rejected an automatic reversal rule.  It held, instead, that when the government deprives a defendant of the opportunity to impeach a witness by a misleading failure to disclose evidence that could have been used for that purpose, the conviction is to be set aside "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682, 105 S. Ct. at 3383 (borrowing the Strickland prejudice standard).  The requirement of prejudice, the Court explained, is "[c]onsistent with our overriding concern with the justice of the finding of guilt." Id. at 678, 682, 105 S. Ct. at 3381, 3383 (quotation marks omitted).

90

The Bagley rule is still in full force and effect.  Its requirement that a defendant who has been deprived by the government of an opportunity to impeach a witness against him must prove prejudice in order to obtain relief has been reiterated and applied in many decisions.  See, e.g., Strickler v. Greene, 527 U.S. 263, 273–75, 289–96, 119 S. Ct. 1936, 1944–45, 1952–55 (1999) (holding that a defendant deprived of an opportunity to impeach an eyewitness by the government's failure to  disclose documents "that cast serious doubt" on significant portions of her testimony was not entitled to relief, because he "had not shown that there is a reasonable probability that his conviction or [death] sentence would have been different had these materials been disclosed"); Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004) (reiterating and applying, in a case involving the prosecution's failure to disclose impeachment evidence, Bagley's holding that an essential component of a Brady claim is that "prejudice must have ensued") (quotation marks omitted); Gissendaner v. Seaboldt, 735 F.3d 1311, 1322 (11th Cir. 2013) (affirming the denial of habeas relief in a capital case where "[t]he state habeas court reasonably found that further impeachment of [the prosecution's key witness] based on the undisclosed statements contained in the prosecution team's notes would not have created a reasonable probability of a different result in either phase of the trial"); Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1334–35 (11th Cir. 2012) (affirming the denial of habeas relief in a

91

capital case where the prosecution failed to disclose "statements of co-defendants and agreements with defense witnesses, which would have cast doubt on the prosecution's case while bolstering [the] defense," because of a failure "to show 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'") (quoting Bagley, 473 U.S. at 682, 105 S. Ct. at 3383); Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271, 1292–94 (11th Cir. 2012) (affirming the denial of habeas relief in a capital case because it is not "reasonably probable that a different outcome would have resulted if the government had disclosed" impeachment evidence).

There is even more precedent foreclosing the dissent's position. The Supreme Court has not only rejected a presumption of prejudice/automatic reversal rule where the government deprives the defense of an opportunity to impeach by failing to disclose evidence, it has also rejected such a rule when the government deprives the defense of that opportunity by using perjured testimony or failing to correct what it knows is false testimony. Even in those extreme circumstances, the defendant is not entitled to have his conviction set aside if the government shows that the false testimony was harmless beyond a reasonable doubt. See Agurs, 427 U.S. at 97, 103, 96 S. Ct. at 2397 ("[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false

92

testimony could have affected the judgment of the jury.") (footnotes omitted);

Bagley, 473 U.S. at 678–79, 105 S. Ct. at 3381–82 (clarifying or modifying the

Agurs standard to mean that the use of false testimony is material and requires

relief "unless failure to disclose it would be harmless beyond a reasonable doubt")

(emphasis added).

So this is where the law is on the subject of the defense being deprived of an

opportunity to impeach a government witness, including a key witness:  Even

when the loss of the opportunity to impeach results from the government's failure

to disclose evidence, there is no automatic reversal.  The conviction stands unless

the defendant can show prejudice; he must show that there is a reasonable

probability of a different result if the evidence had been disclosed.  And even when

the loss of opportunity to impeach involves the government's deliberate use of

perjured testimony or failure to correct perjured testimony, there is no automatic

reversal.  The conviction still stands if the government shows that the lost

opportunity to impeach caused by its misconduct was harmless beyond a

reasonable doubt.

Given that settled law, what sense would it make to hold, as the dissent

urges, that when the defendant loses an opportunity to impeach because his

attorney was briefly out of the courtroom, reversal is automatic and the harmless

error rule does not apply?  Why should relief be easier to obtain in those

circumstances, which are not the fault of the government, than when the loss of opportunity to impeach involves the government's deliberate use of false testimony, which is "prosecutorial misconduct and, more importantly, involves 'a corruption of the truth-seeking function of the trial process'"? Bagley, 473 U.S. at 680, 105 S. Ct. at 3382 (quoting Agurs, 427 U.S. at 104, 96 S. Ct. at 2397). The answer, of course, is that it should not be easier to obtain relief when the lost opportunity to impeach does not result from serious government misconduct than when it does. The harmless error rule should, and does, apply in both circumstances.

### 4. The Fingerprint Hypothetical

The dissent poses the hypothetical of a homicide trial in which counsel is gone for one minute during which time a government witness testifies that the fingerprint on the murder weapon is the defendant's. The dissent argues that "even if the testimony is repeated and subjected to cross-examination when defense counsel returns, there is no way to measure how much the initial opinion influenced the jury's consideration of the defendant's guilt." Dissenting Op. at 252. "Therein," says the dissent, "lies the problem with applying a harmless-error analysis to an absence of counsel during the admission of inculpatory evidence." Id. at 253. No, not really. What actually lies within that hypothetical, or within variations of it, is proof that the dissent's position is wrong and that harmless error

94

analysis can be applied to temporary absences of counsel during the admission of inculpatory evidence.

The dissent never explains why the determination of prejudice or harmlessness from the fingerprint evidence in that hypothetical case should be different from exactly the same determination in cases involving exactly the same fingerprint evidence admitted as the result of other constitutional violations. In similar situations involving the admission of incriminating evidence brought about by different constitutional violations, the law requires that courts gauge the prejudicial or harmless impact of the evidence, and there is no reason for not doing that here. The ability of courts to determine the prejudicial or harmless effect of evidence does not depend on the nature of the error involving its admission, a point that variations of the hypothetical will demonstrate.

Let the dissent's hypothetical be Scenario One. Scenario Two is exactly the same trial and evidence. Except in this scenario the testimony about the fingerprint on the murder weapon is inadmissible but comes into evidence anyway because defense counsel negligently fails to object even though he is present at all times. It is beyond dispute that in those circumstances reversal is not automatic but occurs only if the defendant can show a reasonable probability of a different result if counsel had objected as all reasonable attorneys would have. See Strickland, 466 U.S. at 691, 694, 104 S. Ct. at 2066, 2068; see also Bates v. Sec'y, Fla. Dep't of

95

Corr., 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) (holding that defense counsel's failure to object to testimony did not warrant a new trial because there was no prejudice from admission of the testimony); Dorsey v. Chapman, 262 F.3d 1181, 1186 (11th Cir. 2001) (same).  The law requires that the district court, and then we as a reviewing court, determine whether the admission of that evidence in Scenario Two, which is the same evidence as in the dissent's hypothetical, was prejudicial. We could not, as the dissent suggests we should, simply quit the task by proclaiming that "there is no way to measure how much the [admission of the evidence] influenced the jury's consideration of the defendant's guilt."  Dissenting Op. at 252.

Scenario Three is also the same trial and evidence.  Except that counsel, who is present at all times, objects to the admission of the evidence about the fingerprint on the murder weapon because it was obtained in violation of the Fourth Amendment, but the judge erroneously admits the evidence when he should have excluded it.  Everyone agrees that the error in admitting evidence seized in violation of the Fourth Amendment is subject to the harmless error rule.  See Chambers v. Maroney, 399 U.S. 42, 52–53, 90 S. Ct. 1975, 1982 (1970); see also Whiteley v. Warden, 401 U.S. 560, 569 n.13, 91 S. Ct. 1031, 1037 n.13 (1971) (finding Fourth Amendment violation not to have been harmless).  The law requires that the district court, and then we as a reviewing court, determine whether

96

the admission of the fingerprint evidence, which is the same evidence as in the dissent's hypothetical, was harmless beyond a reasonable doubt. We could not, as the dissent suggests we should, simply quit the task by proclaiming that "there is no way to measure how much the [admission of the evidence] influenced the jury's consideration of the defendant's guilt." See Dissenting Op. at 252. The Supreme Court did not do that in Chambers or Whiteley.

Scenario Four is, once again, the same trial and evidence. Except the evidence about the fingerprint on the murder weapon is admitted because with the government's knowledge one of its witnesses gives false testimony that prevents counsel, who is present at all times, from discovering a Fourth Amendment violation that would have caused the court to exclude the evidence. The Supreme Court has held that even such a serious error involving prosecutorial misconduct and corruption of the truth-seeking function of the trial is nonetheless subject to the harmless error rule. See Bagley, 473 U.S. at 678–80, 105 S. Ct. at 3381–82; Agurs, 427 U.S. at 103–04, 96 S. Ct. at 2397. The district court, and then we as a reviewing court, would have to determine whether the admission of the evidence was harmless beyond a reasonable doubt. We could not, as the dissent suggests we should, simply quit the task by proclaiming that "there is no way to measure how much the [admission of the evidence] influenced the jury's consideration of the

97

defendant's guilt." Dissenting Op. at 252. The Supreme Court did not do that in Bagley and Agurs.

The dissent believes that its fingerprint hypothetical shows "the problem with applying a harmless-error analysis to an absence of counsel during the admission of inculpatory evidence." Id. at 253. What the fingerprint hypotheticals actually show is why prejudice should not be presumed. The law is clear that if the hypothetical fingerprint evidence came in because of counsel's neglect, or because of a Fourth Amendment violation, or because of prosecutorial misconduct, we would not presume prejudice or automatically reverse the conviction. We would apply the harmless error rule if evidence came in because of a Fourth Amendment violation or because of prosecutorial misconduct, and we would require the defendant to show prejudice if the evidence came in because of trial counsel's neglect. It would be anomalous to presume prejudice and not inquire into harmlessness if exactly the same fingerprint evidence came in while counsel was briefly outside the courtroom.

5. The Lost Opportunity to Observe Witnesses and
Constantly Monitor the Faces of Jurors Argument

The dissent takes the position that if, during the presentation of any inculpatory testimony, defense counsel cannot observe the witness' demeanor and the jurors' facial expressions, irremediable error has been committed and reversal is automatic. See Dissenting Op. at 232–233, 238–240. The conviction must be

reversed, the dissent insists, even if the testimony is repeated in counsel's presence because by then "the element of surprise was gone," id. at 232–233, and counsel did not observe the witness' demeanor and the jurors' faces "in the first instance." Id. at 238.

In support of its proposition that in order to have any hope of rendering effective assistance an attorney must be able to observe a witness' demeanor throughout his testimony, the dissent cites decisions about the value of factfinders being able to observe witness demeanor (although none of the decisions say that the factfinder must do it continuously). Id. at 232–234 (citing Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985), Dyer v. MacDougall, 201 F.2d 265, 268–69 (2d Cir. 1952), and United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995)). But defense counsel is not a factfinder. He is an advocate. Unlike jurors, or judges during bench trials, defense counsel is not charged with the responsibility of finding the facts from the testimony presented. Counsel's role, instead, is to represent his client zealously within the bounds of the law before, during, and after the trial regardless of what he personally believes, or knows, the facts to be.

The dissent presents no decisional authority for its position that in order to render effective assistance trial counsel must watch the faces (and body language?) of jurors as testimony is presented throughout the trial. If the premises of the

dissent's position were accepted, while testimony is being taken counsel should not look at any documents, or at his notes, or turn his head to confer with his client or co-counsel lest he miss an opportunity to search for clues in the facial reactions (including pupil dilation?) of the 12 jurors (plus some alternates).  According to the dissent, if counsel fails to observe the facial expressions and body language of all of the jurors as each and every inculpatory answer is given by a prosecution witness, "the element of surprise [is] gone and any initial reactions to the evidence went with it."  Dissenting Op. at 233.  The dissent tells us that all is lost and permanently lost once the jurors' fleeting facial expressions, or the lack of them, vanish into the mists of time.  We will never know what counsel might have done in this case, the dissent conjectures, if only he had been able to divine from the non-verbal cues of each and every juror what they all thought concerning that less than one-half of one percent of the total trial testimony that they first heard while counsel was out.

Which leads to a question.  The testimony that the jurors heard while counsel was not there to study their faces included the fact that six of the images found on his client's computer were of a young female nude and "bound to a table by her feet with a rope" and with "an orange cloth . . . secured around her neck with silver duct tape."  Is there really any doubt what a reasonable juror's reaction to the facts contained in that testimony would be?  Would any reasonable counsel

have to see the jurors' faces, the first time that testimony comes from the witness box, to know how they felt about it?

And, while we are on the subject, unlike Janus, most lawyers cannot look in two different directions at once. How is a lawyer supposed to keep his eyes trained on the witness giving testimony lest he miss the opportunity to gauge the witness' credibility, and at the same time never stop watching the faces of a dozen or more men and women in the jury box lest he miss a chance to gauge their reaction to that testimony? Which opportunity should he lose forever? When, if ever, can he look down at his notes, or turn his head to confer with his client or co-counsel? And must we bar attorneys who are blind from representing clients in the courtroom? The dissent does not say.[19]

We conclude that the brief absence of counsel from the courtroom during the testimony of Deputy Longson was not structural error, prejudice is not to be presumed, and the harmless error rule applies. We turn now to actually applying the harmless error rule to the facts of this case.

---

[19] It is interesting to note that the dissent's position that to have any hope of rendering effective assistance counsel must constantly scrutinize the faces and body language of witnesses and all of the jurors is inconsistent with the dissent's position that counsel absences during multiple defendant trials may be okay because the attorney for a co-defendant can fill in for a defendant's own counsel. A counsel who is out of the courtroom cannot see the faces or body language of witnesses or jurors regardless of what some other attorney who is in the courtroom is doing.

## VI. Why the Error Was Harmless

In applying the harmless error rule, as we do here, we review the constitutional error to determine whether it was "harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24, 87 S. Ct. at 828.

### A. As to Count 1 (Attempted Child Enticement)

The brief absence of counsel from the courtroom was harmless beyond a reasonable doubt as to Count 1 of Roy's conviction. See id. We know that it was because the testimony that occurred during counsel's absence was not about the Count 1 charge of attempted child enticement in violation of 18 U.S.C. § 2422(b). It was, instead, solely about the Count 2–5 charges of knowingly possessing "any visual depiction" of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), (b)(2).

The Count 1 charge is legally distinct from the Count 2–5 charges, having no element in common with them. The charge in Count 1 is also factually distinct from the others because the child pornography that is charged in Counts 2–5 was not even discovered until Roy's house had been searched after he had already been arrested on the attempted child enticement charge that is in the first count. And the only testimony taken during the seven minutes that counsel was absent was about the Count 2–5 charges of child pornography. No testimony or other evidence about the Count 1 attempted child enticement charge was taken during that time.

102

All of the evidence of Roy's guilt on Count 1 was presented while defense counsel was present in the courtroom; he missed not one word of it.

Roy argues that the six pornographic images of L.B. that were partially discussed for the first time during his counsel's brief absence, all of which were part of the evidence of his guilt under Counts 2–5, were also relevant to Count 1. It was relevant, he says, because he asserted an entrapment defense on Count 1, and the government argued in its closing that the images of child pornography discovered on Roy's various electronic devices showed his proclivity or predisposition for having sex with underage girls. There are two independently adequate reasons why that theory of harm is unconvincing.

The first reason is that those same six pornographic images of L.B. were discussed more and in much greater detail <u>after</u> counsel returned to the courtroom. And those six images were admitted into evidence in counsel's presence and without objection only <u>after</u> they had been discussed more thoroughly following counsel's return to the courtroom. Anything that the missed testimony regarding those six images proved was also proven by the lengthier testimony about the same six images that counsel did not miss.

The other independently adequate reason why Roy's possibility of prejudice through proof of proclivity theory is unconvincing is that those six images of L.B. that were first discussed while counsel was absent were only a fraction of the total

103

number of pornographic still and video images of L.B. and of other underage girls discussed and introduced during the trial.  In addition to those six images of L.B., there were at least three other pornographic images of L.B. plus numerous pornographic video files of her, all taken when she was underage, that were found on Roy's desktop computer.  All of those other images of L.B. were the subject of testimony and were introduced into evidence only after Roy's counsel returned to the courtroom, and all of that was done without any objection.  Counting the videos, the number of pornographic images of L.B. that were discussed only while counsel was in the courtroom far outnumbered the ones of her discussed while he was out (and again after he returned).

Roy's desktop computer also contained multiple pornographic images of underage girls other than L.B.  All of those pornographic images of other minors were testified about, and admitted into evidence, only while Roy's counsel was present; none of them was even mentioned during the brief time he was absent.  In addition, Deputy Longson also testified in the presence of Roy's counsel about the dozens of pornographic images, both of L.B. and of other underage girls, that he had found on Roy's laptop computer and Roy's USB thumb drive and Roy's backup CD-ROM discs.  Every single piece of that still image and video image evidence of Roy's crimes was admitted while his counsel was in the courtroom.  And it was all admitted without objection.  Even without any of the initial

104

testimony about the first six images of L.B. that were mentioned during counsel's brief absence, the jury was presented with overwhelming and irrefutable evidence of Roy's sexual interest in minor girls. His proclivity was beyond dispute.

Not only that, but when the AUSA argued against Roy's entrapment defense at closing, she did not tell the jury to consider only the six images of L.B. on the desktop computer that Deputy Longson had first mentioned while defense counsel was absent. Instead, she asked the jury to consider all of Roy's images and videos of child pornography, including those Roy had on the three electronic devices that were not discussed at all until counsel returned to the courtroom. She said that Roy's intent in traveling to the rendezvous with the fictional daughter and mother that led to the Count 1 charge stemmed from his sexual interest in underage girls, which could be seen from the fact that a couple of days before "he's accessing his [L.B.] folder on the laptop." (Emphasis added.) The L.B. image folder on the laptop was not mentioned while counsel was out of the courtroom. And the AUSA argued later: "We know he's viewing child pornography a few days before on his laptop, ladies and gentlemen. He's got backup CDs of child pornography. He's got thumb drives of child pornography. He's got desktops of child pornography." (Emphasis added.) So the argument referred to child pornography on all four electronic devices specified in Counts 2–5, including that on the three devices

105

(laptop, CD-ROM discs, and thumb drives) that had not been mentioned while counsel was out of the courtroom.

For all of these reasons, the brief absence of Roy's counsel, during which the Count 1 attempted child enticement charge was not mentioned, was harmless beyond a reasonable doubt as to the conviction on that count.

## B.  As to Counts 2–5 (Possession of Child Pornography)

For two primary reasons, we know that the error in this case was also harmless beyond a reasonable doubt as to Counts 2–5, the charges of possession of child pornography.  First, overwhelming evidence, all of which came in while counsel was present, proved the charges against Roy that were the subject of Deputy Longson's testimony during counsel's brief absence.  And second, the testimony that Deputy Longson gave during the seven minutes that Roy's counsel was absent was repeated after he returned to the courtroom.

### 1. All of the Other Evidence of Child Pornography

The first reason that we know counsel's seven-minute absence was harmless is that the testimony he missed concerned only some of the child pornography featuring L.B. and none of the child pornography featuring other minors.  Roy could have, and beyond a reasonable doubt would have, been convicted of each of the Count 2–5 possession of child pornography charges even if no image of L.B. had ever been mentioned or indeed had ever even existed.  That is because to

106

convict him of the four child pornography possession counts, each of which alleged that he possessed child pornography on a particular electronic storage device, all the prosecution had to show was that he had at least one image of child pornography on each of the four devices. See 18 U.S.C. § 2252(a)(4)(B). It proved much more than that.

The evidence taken while Roy's counsel was present in the courtroom proved beyond a reasonable doubt that Roy had multiple images and videos of child pornography on each of the four storage devices specified in Counts 2–5. The unrefuted evidence proved that, as charged in Count 2, Roy had on his desktop computer five separate pornographic images of minor children other than L.B. that had been downloaded from the Internet.[20] Those five images were more than enough to prove Roy guilty beyond a reasonable doubt of the Count 2 charge. And all of the evidence about those five pornographic images of other minors that were on Roy's desktop computer came in only while counsel was present in the courtroom.

The evidence that was submitted while counsel was in the courtroom also overwhelmingly proved that Roy possessed child pornography on his laptop

---

[20] Roy also had three other still images and several videos taken of L.B., which were child pornography, stored on his desktop computer, but it is at least arguable that those images were first mentioned while Roy's counsel was absent. We will assume as much and disregard the other images of L.B. on the desktop, because even if we don't count them, the pornographic images of other children on the desktop proved that Roy was guilty of the Count 2 charge.

107

computer (separate from his desktop computer), as charged in Count 3.  On the laptop, in addition to copies of some or all of the pornographic photos and videos of the underage L.B., there was a folder called "Girls."  It is undisputed that the "Girls" folder contained more than 220 images, all of which were introduced into evidence and at least some of which were child pornography.  In particular, Deputy Longson testified about five images of child pornography from that laptop, which were admitted into evidence from the "Girls" folder.  Any one of those five images, or any one of the other images of child pornography stored in the "Girls" folder, or any one of the pornographic images or videos of L.B. on Roy's laptop computer, was enough to prove Roy guilty beyond a reasonable doubt of the Count 3 charge involving that device.  And all of the evidence about the child pornography on Roy's laptop computer (including the evidence about the images of L.B. on it) came in while counsel was present in the courtroom.

Count 4 charged Roy with possessing at least one depiction of child pornography on a USB thumb drive.  Along with copies of the pornographic images and videos of the underage L.B., there were five images of child pornography featuring minors other than L.B. that were admitted into evidence from Roy's USB thumb drive.  Those five images alone were more than enough to prove Roy guilty beyond a reasonable doubt of the Count 4 charge. And every bit

of that evidence about the child pornography stored on Roy's thumb drive came in while counsel was present in the courtroom.

As to Count 5, Deputy Longson testified that the three CD-ROM discs that were the subject of that charge "absolutely" contained child pornography, including duplicate or backup copies of the L.B. videos and images along with pornographic "images of . . . minors that are not" L.B. that were also on the laptop and desktop computers. Doc. 141 at 154, 165. Those images of child pornography were more than enough to prove Roy guilty beyond a reasonable doubt of the Count 5 charges. And every bit of that evidence about the child pornography on Roy's compact discs came in while counsel was present in the courtroom.

Roy's counsel was in the courtroom for the presentation of all of that evidence proving Roy's guilt of the Count 2–5 charges. He objected to none of it. His sole comment during that testimony was to ask whether he could review Government's Exhibit 76, a 110-page compilation of the images from the "Girls" folder, before it was admitted into evidence. Id. at 145. Beyond a reasonable doubt, Roy's counsel's absence during seven minutes in which none of the evidence we have recounted in this section was submitted did not harm him on the Count 2–5 charges. It could not have.

2. The Repetition of the Missed Testimony After Counsel Returned

The second, equally compelling reason that counsel's absence was harmless beyond a reasonable doubt on the Count 2–5 charges is that the facts covered in the testimony that Deputy Longson gave while Roy's counsel was out of the courtroom were covered again soon after Roy's counsel returned.

Longson testified in counsel's absence about a folder called "2006-03-11" he had found on Roy's desktop computer. The folder was made by a user of the computer and contained six pornographic images. See Doc. 141 at 106–07. He testified that the photographic images had been taken with a "Kodak v530 zoom digital camera" and that they showed a "nude white female who was bound to a table by her feet with rope," with her "head covered with an orange cloth which was secured around her neck with silver duct tape." Id. He also testified that he had brought to court a disc containing videos of child pornography he found on Roy's computer and that he had made some screenshot images from those videos. Id. at 107–08.

Then, after Roy's counsel returned to the courtroom, Longson repeated the testimony that he had given in counsel's absence. He testified about those same images again after counsel returned, and only then were they admitted into evidence. See id. at 108 (images "were located and recovered from the desktop computer"); id. at 109–10 (folder was stored under "user profile Alex"); id. at 110

110

(images were located in a "file" named "2006-03-11" and showed a "white female who is bound to a table by her feet with a . . . rope" and wearing "an orange hood across her head with silver duct tape secured around the neck"); id. at 131 (the camera that made the still images was a "Kodak v530 zoom digital camera"); id. at 119–21 (discussing the pornographic videos of the then-underage L.B. found on Roy's computer, and the still images Longson made from them).

Roy's counsel did not object to the admission of any of those images of child pornography. Nor did he object to any of the testimony describing their discovery, their location, or their provenance. With a single exception discussed below, every bit of inculpatory testimony that had been given during counsel's brief absence was repeated, and a lot more was added, after counsel returned. We know that Roy was not prejudiced by counsel's absence because the same evidence would have come in even if those 18 questions and answers had never occurred in his absence — and it did come in after he returned. We know counsel would not have made any objections to any of that testimony or evidence if he had been present during the seven minutes immediately after the lunch break because he did not object to the same testimony and evidence when it was repeated soon after he returned to the courtroom.[21]

_____

[21] Roy suggests that if counsel had been present to hear the 18 questions he missed, he could have objected to some of the questions as leading. That theory of prejudice utterly fails for two

111

To be sure, as we have mentioned, there is one immaterial difference between Longson's testimony while Roy's counsel was absent and his testimony after Roy's counsel came back. See supra at 7 n.1. While testifying during counsel's absence, Longson correctly identified the date on the "2006-03-11" folder but incorrectly stated that the images in that folder were created "on March the 10th, 2005, at 6:49 p.m." Doc. 141 at 107. He repeated that assertion two answers later, reiterating that those images were "created initially by the camera" on "March the 10th of 2005 at 6:49 p.m." Id. After Roy's counsel returned, Longson correctly testified that the images had been created on March 11, 2006, which is what the date on the folder showed. See id. at 110–11.

Longson's mistake during counsel's absence did not prejudice Roy. It was immaterial because there was no dispute that L.B. was born on May 9, 1989. That means she was under the age of 18, and therefore a minor, on March 11, 2006 (when she was 16 years old) just as she was on March 10, 2005 (when she was 15

reasons. First, any competent lawyer can rephrase leading questions, and the transcript of the trial leaves no doubt that the AUSA in this case was competent. It also shows that on at least a dozen occasions during the trial when an objection for leading was sustained, the AUSA rephrased questions and succeeded in getting the testimony she wanted into evidence.

Second, when many of the same questions were asked in defense counsel's presence after he returned to the courtroom, they too were leading but counsel did not object. Roy cannot explain why his counsel did not object to the leading nature of questions asked after he returned to the courtroom but would have objected if he had been present when the same questions were asked in the same fashion earlier.

years old).  See 18 U.S.C. § 2252(a)(4)(B) (prohibiting knowing possession of visual depictions of a "minor engaging in sexually explicit conduct"); id. § 2256(1) (defining "minor" as "any person under the age of eighteen years").  A defendant who possesses child pornography is just as guilty of the crime if the child is 16 years old as he is if the child is 15 years old.  The defining line for the crime is the 18th birthday.  And, in any event, the immaterial error was corrected in Longson's later testimony.[22]

There is one other point to be made about the harmlessness of counsel's absence when Deputy Longson stated that L.B. was 15 when the pornographic images of her in the "2006-03-11" folder were taken.  The jury not only would have convicted Roy regardless of whether it believed L.B. was 16 or 15 when those particular pornographic images of her were taken, it also could and would have convicted Roy even if it believed L.B. had been 18 or 80 when the images were taken.  If none of the images of L.B. existed, or even if L.B. herself never existed, Roy's guilt of the Count 2–5 charges would still have been proven by all

---

[22] About Longson's mistake in his initial testimony concerning the date those particular images were created, the dissent argues that "[t]he significance of such an error is particularly obvious" because Roy did not have any contact with L.B. until August of 2005, which was after the date that Longson mistakenly stated in his initial testimony.  See Dissenting Op. at 235.  All that fact makes "particularly obvious" is that the March 10, 2005 date that Longson initially stated was mistaken, which is something no one disputes.  But neither does anyone dispute that if March 11, 2006 is the correct date, which the physical evidence and Longson's later testimony prove, Roy committed the crime with which he is charged because L.B. was still a minor on that date and the images of her are pornographic.

113

of the child pornography depicting children other than L.B. that was found on his desktop computer, on his laptop computer, on his thumb drive, and on his three backup CD-ROM discs.  See supra Section VI.B.1.

## C.  The Problem Juror

In an attempt to get out from under the piles of evidence against him, Roy argues that the jury's inability to reach a verdict soon after deliberations began establishes that the jury "did not find the evidence overwhelming," and "may have questioned" the government's case.  Not really.

Here is what the record shows.  The jury retired to deliberate at 12:43 p.m. on Thursday, June 14, 2012.  At 6:30 p.m. that evening, the jury reported that it was unable to reach a verdict.  Roy's counsel suggested an Allen charge.  See Allen v. United States, 164 U.S. 492, 501–02, 17 S. Ct. 154, 157 (1896).  After further discussion, though, and without an Allen charge being given, the jury foreman reported that they would "like to recess for the night and try again in the morning."  The court then gave the Allen charge anyway and let the jurors go home for the night without further deliberations.

The problem the jury was having surfaced the next morning before deliberations resumed.  One of the jurors went to the courthouse early, sought out a clerk, and complained about how the deliberations had been going.  In the presence of counsel for both sides, the judge questioned the juror.  When the judge asked

114

him if he wished to continue to deliberate, the juror said that given the way "the verdict is being deliberate [sic] in the jury room, no sir." When the judge asked again, the juror stated: "Sir, I want to continue, but the way that it's — the vulgar way that it's being done, foul way, whatever word you can use, that they are — that is being used in the jury room to come to a verdict is — I think borders on against the law." When the judge explained to the juror that the choice was for him to either rejoin the jury or the judge could remove him if he was unable to continue, the juror said he wanted to consult with a lawyer. He explained that he wanted a lawyer "to speak to, to see what rights I have as an American citizen," and "I need to know what my legal rights are when things happen within that jury box that's only known to the jurors but borders on a violation of the laws."

After discussing it, the AUSA and Roy's counsel agreed that they wanted the problematic juror dismissed and both stated that they preferred to proceed with the remaining 11 jurors instead of calling in the alternate juror and restarting deliberations. Roy himself agreed to proceed with 11 jurors. The complaining juror was removed from the jury, which resumed deliberations. Only 37 minutes after the jury resumed deliberations that morning, it reached a verdict convicting Roy of all five counts charged in the indictment.

This is not, as Roy asserts, the picture of a "deadlocked jury" wrestling with the evidence. It is, instead, the picture of one juror who was disrupting the

115

deliberations and whose statements and actions were troubling enough for both sides to agree that he needed to be removed so that the jury could deliberate to a verdict. Which is what the jury did soon after the problem juror was removed.

### D. The Theory that the Jury Violated Its Oath and Disobeyed Its Instructions

Unable to point to any realistic possibility of prejudice from trial counsel's brief absence, the dissent proffers an unsubstantiated hunch that the reason the jury convicted Roy of the crimes he committed is not because of all the unrefuted evidence against him on each and every count, even though that massive amount of unrefuted evidence would have convinced any reasonable jury of his guilt beyond any doubt. Instead, the dissent's alternate world view is that the jury may have convicted Roy only because it noticed that his counsel was a few minutes late getting back to the courtroom after one break during one of the six days of trial and unreasonably held that against Roy. Or, posits the dissent, the jury may have thought that the judge noticed counsel's absence (even though there is nothing in the record to indicate that he did) and unreasonably held against Roy the judge's failure to intervene on his behalf. See Dissenting Op. at 236–240.

There is nothing to indicate that the jury noticed the absence of Roy's counsel. More fundamentally, there is no basis whatever for assuming that if the jury had noticed, it would have held counsel's one momentary absence against Roy, treating it as evidence of his guilt. The dissent implies that, if the jury noticed

116

that defense counsel was absent, it may have concluded that counsel thought Roy was so guilty there was no point in him being in the courtroom, or perhaps it somehow may have done "irreparable damage to the jury's perspective of defense counsel." Id. at 236. The answer to that conjecture run wild is that there is no reason at all to think any reasonable juror would draw any adverse inferences, and there are plenty of reasons to believe that a reasonable juror would not.

To begin with, the jury saw that counsel vigorously defended Roy during 99.6 percent of the trial, missing only seven minutes because he was late returning to the courtroom on one of the many breaks that occurred during the six day trial. The jury knew that defense counsel believed in his role as Roy's advocate because it saw and heard him tenaciously defend Roy in his opening statement, throughout the trial, and in his closing argument. The jury saw and heard counsel cross-examine nine government witnesses, including the one who was on the stand when he returned to the courtroom; counsel cross-examined that witness for 45 pages of the transcript. The jury saw and heard counsel call his own competing expert witness to testify on Roy's behalf. It saw and heard counsel object to questions asked by the prosecutor and make a vigorous closing argument. Throughout the trial, the jury saw and heard counsel, in Cronic terms, "subject the prosecution's case to meaningful adversarial testing," Cronic, 466 U.S. at 659, 104 S. Ct. at

117

2047. The jury could not reasonably have concluded that defense counsel did not believe in what he was doing as Roy's advocate.

The same is true of the dissent's conjecture that the jury or jurors may have noticed that the judge was aware of counsel's brief absence and somehow inferred from the judge's inaction that he thought Roy was guilty. Dissenting Op. at 239. There is not one whit of support for that theory in the record. There is nothing to indicate that the judge knew counsel was absent during those seven minutes, nor is there anything to indicate that, if he did, the jury somehow was aware that he did. In fact, the record shows that the jury had good reason to believe the judge did not notice counsel's absence when court resumed. This is what the judge had instructed the jury when court recessed at the end of the first day of trial:

> We will get started Monday at 9:00 o'clock. So if you are unfamiliar with coming into the Fort Pierce area that time of day, I ask that you give yourself a few extra moments and get here before 9:00 o'clock, 8:45, 8:50 or so, so we can get started on time. If we are missing just one of us, you, me, the lawyers, we can't get started. So in order to keep the case on track time-wise and [as a] courtesy to your fellow jurors, I would ask that you be here sometime before 9:00 o'clock so we can get started promptly at 9:00.

(Emphasis added.) Having been told by the judge on the first day that he would not resume trial following a recess without the lawyers being present, the only reasonable inference the jury could have drawn from the judge resuming the trial without one of the attorneys being present following the lunch break on the second day is that the judge did not realize the attorney wasn't there.

118

Nor is there any reason to believe, as the dissent conjectures, that if the judge did notice counsel's absence, and if the jury somehow knew he noticed it, the jury would infer from the judge's failure to act that he must have thought Roy was guilty.  If one is engaging in conjecture, it is just as likely the jury could have inferred that the judge did not think that particular testimony required counsel's presence, or if it were required, the judge thought that the testimony could be repeated in counsel's presence, which is exactly what happened immediately after counsel walked into the courtroom.

All of those reasons are enough to dispose of the dissent's unsupported theory of an illogical jury.  But there is more reason to reject it.  The standard oath taken by every juror before a federal trial begins requires that the juror swear or solemnly affirm that he or she "will well and truly try, and a true deliverance make in, the case now on trial, and <u>render a true verdict according to the law and the evidence</u>, so help you God" (emphasis added).[23]  The dissent's position is that instead of believing that the jurors adhered to their solemn oath to render their verdict "according to the law and the evidence," ample though the evidence was,

---

[23] The Benchbook for United States District Court Judges states the oath as follows:

"Do each of you solemnly swear [or affirm] that you will well and truly try, and a true deliverance make in, the case now on trial, and render a true verdict according to the law and the evidence, so help you God?"  Federal Judicial Center, <u>Benchbook for U.S. District Court Judges</u> 269 (6th ed. 2013), <u>available at</u> http://www.fjc.gov/public/pdf.nsf/lookup/Benchbook-US-District-Judges-6TH-FJC-MAR-2013-Public.pdf/$file/Benchbook-US-District-Judges-6TH-FJC-MAR-2013-Public.pdf.

119

we should instead indulge the baseless assumption that the jurors disobeyed their oath and convicted Roy because of what they may have imagined defense counsel or the judge thought, assuming that the jurors noticed what there is nothing in the record to indicate that they noticed.

And then there are the instructions the jury was given.  After the jury was sworn but before the trial began, the judge gave opening instructions that, among other things, charged the jury that:

> It will be your duty to find from the evidence what the facts are.  You and you alone are the judges of the facts.  You will then have to apply to those facts as the law, as the Court will give it to you, and you must follow that law whether you will agree with it or not.

> Nothing the Court may say or do during the course of the trial is intended to indicate nor should be taken by you as an indication of what your verdict should be.

At another place in those opening instructions, the judge reminded the jury that: "You are to decide the case solely on the evidence presented here in the courtroom."

After all of the evidence was in, the court gave the jury closing instructions.  Near the beginning of those instructions, the court charged the jury that "Your decision must be based only on the evidence presented here."  Later, the court expounded on that:

> As I said before, you must consider only the evidence that I have admitted in the case.  Evidence includes the testimony of witnesses and the exhibits admitted.  But anything the lawyers say is

120

not evidence and isn't binding on you. And you shouldn't assume from anything that I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts. Your own recollection and interpretation of the evidence is what matters.

The court also went into detail explaining to the jury how it should go about considering the evidence and deciding what weight to give particular evidence and which witnesses to believe. The court instructed the jury on the elements of the crimes and charged it that the defendant could be found guilty only if those elements were proven beyond a reasonable doubt. The instructions could not have been clearer that: "The Government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the Defendant not guilty."

It is impossible to reconcile the dissent's theory that the jury may have based its verdict on something other than the evidence admitted at trial and the law that the judge instructed it on with the specific and detailed instructions that the jury was given. The theory works only if we assume the jurors violated their oaths, disobeyed their instructions, and acted in a lawless fashion. The law is that we cannot assume that and must instead assume exactly the contrary.

More than 30 years ago the Supreme Court explained that

the crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed.

121

Marshall v. Lonberger, 459 U.S. 422, 438 n.6, 103 S. Ct. 843, 853 n.6 (1983)

(quotation marks omitted).  For that reason, the Supreme Court has repeatedly held

that we must presume that juries follow their instructions.  See, e.g., Kansas v.

Carr, 577 U.S. __, 136 S. Ct. 633, 645 (2016) ("We presume the jury followed

these instructions . . . ."); Evans v. Michigan, 568 U.S. ___, 133 S. Ct. 1069, 1080

(2013) ("[A] jury is presumed to follow its instructions."); Blueford v. Arkansas,

566 U.S. ___, 132 S. Ct. 2044, 2051 (2012) (same); Weeks v. Angelone, 528 U.S.

225, 234, 120 S. Ct. 727, 733 (2000) (same); Zafiro v. United States, 506 U.S. 534,

540, 113 S. Ct. 933, 939 (1993) ("[J]uries are presumed to follow their

instructions."); CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841, 129 S. Ct. 2139,

2141 (2009) ("[A]s in all cases, juries are presumed to follow the court's

instructions."); United States v. Olano, 507 U.S. 725, 740, 113 S. Ct. 1770, 1781

(1993) ("[We] presum[e] that jurors, conscious of the gravity of their task, attend

closely the particular language of the trial court's instructions in a criminal case

and strive to understand, make sense of, and follow the instructions given them.");

Richardson v. Marsh, 481 U.S. 200, 206–07, 107 S. Ct. 1702, 1707 (1987) ("This

accords with the almost invariable assumption of the law that jurors follow their

instructions, which we have applied in many varying contexts.") (citation omitted);

Tennessee v. Street, 471 U.S. 409, 415, 105 S. Ct. 2078, 2082 (1985) (stating that

"the question is reduced to whether, in light of the competing values at stake, we

122

may rely on the crucial assumption that the jurors followed the instructions given them by the trial judge," and answering that question in the affirmative) (quotation marks omitted); Francis v. Franklin, 471 U.S. 307, 324 n.9, 105 S. Ct. 1965, 1976 n.9 (1985) (recognizing "the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions").

We have obediently followed and repeated the Supreme Court's direction that we presume juries follow their instructions. United States v. Lopez, 649 F.3d 1222, 1237 (11th Cir. 2011) ("We presume that juries follow the instructions given to them."); United States v. Siegelman, 640 F.3d 1159, 1184 (11th Cir. 2011) (same); United States v. Townsend, 630 F.3d 1003, 1013–14 (11th Cir. 2011) (same); United States v. Almanzar, 634 F.3d 1214, 1223 (11th Cir. 2011) (same).

Despite the overwhelming evidence of Roy's guilt, the dissent questions whether the jury may have found him guilty because of inferences about counsel's brief absence or the court not stopping the proceedings if it noticed counsel's absence. See Dissenting Op. at 236–240. Those are the wrong questions. The right question, as all of the cited decisions of the Supreme Court and this Court establish, is this one: What was the jury instructed to base its verdict on? That is the right question because "[t]he presumption that juries follow their instructions is necessary to any meaningful search for the reason behind a jury verdict." United States v. Brown, 983 F.2d 201, 203 (11th Cir. 1993).

123

The jury was instructed to base its verdict on the law contained in the instructions the judge gave it and the evidence in the form of testimony and exhibits admitted during the trial.  It was instructed that what the lawyers said and what the judge said or did was not evidence, and that it was to decide the facts solely on the basis of the evidence presented in the courtroom.  The jury was also instructed that it could not and should not convict Roy unless the prosecution had carried its burden of proving his guilt beyond a reasonable doubt.  We can, should, and must presume that the jury followed those instructions and convicted Roy solely because his guilt was proven beyond a reasonable doubt by the evidence. [24]

The dissent's contrary theory also violates the principles the Supreme Court instructed us about when it discussed how courts should go about determining whether an error resulted in prejudice sufficient to justify setting aside a judgment:

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.  A defendant has no entitlement to the luck of a lawless

---

[24] In one case where defense counsel slept "frequently . . . almost every day . . . morning and evening for 30 minutes at least at a time" throughout the entire 15-day trial, the jurors discussed during deliberations their observations of the attorney "resting his head."  Ragin, 820 F.3d at 613, 621–22. (internal marks and brackets omitted).  But it was never clarified whether any juror had held counsel's dozing off against the defendant.  Id. at 621 n.6.  In any event, even if a juror did do so in the Ragin case, that would not justify assuming that the jurors in this case violated their oath and the instructions they were duty bound to follow.

decisionmaker, even if a lawless decision cannot be reviewed. <u>The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.</u>

<u>Strickland</u>, 466 U.S. at 694–95, 104 S. Ct. at 2068 (emphasis added); <u>see also</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 90–91, 83 S. Ct. 1194, 1198 (1963) (rejecting "[a] sporting theory of justice" that assumes the jury might have violated the judge's ruling and instructions). Following the Supreme Court's instructions to us, we must assume that the jury followed its instructions and oath.

### E. Summary

The harmlessness analysis in this case is not difficult. The error that occurred when the trial resumed before counsel returned from lunch was harmless beyond a reasonable doubt because overwhelming evidence offered while counsel was present went to and proved the charges in Counts 2–5, which were the only counts relevant to the testimony given during counsel's absence. And the same questions were repeated and not objected-to after counsel returned to the courtroom. There is no reasonable doubt that counsel's brief absence was harmless.

### VII. Conclusion

We end, as we began, by acknowledging that although Alexander Roy received a fair trial he did not receive a perfect one. Whatever the circumstances surrounding it, and regardless of who knew what and when they knew it, we do not

125

condone the taking of any inculpatory testimony in the absence of defense counsel. It is constitutional error, which should be avoided. But neither would we condone, much less participate in, scuttling the harmless error rule. As we have explained, the rule plays an important role in, and serves vital interests of, our judicial system. To reverse Roy's conviction based on his counsel's brief absence during initial presentation of only a small part of the overwhelming evidence against his client would require us to enlarge exceptions to the harmless error rule to the point where they would be large enough to consume much of the rule. Doing that would run counter to decisions of the Supreme Court, this Court, and the better reasoned decisions of other circuits.

The dissent expresses the view that "we must vigilantly ensure we are adhering to our obligation" and "commitment to the Constitution" where the defendant has committed "disturbing" crimes. Dissenting Op. at 257. And it espouses the view that the more disturbing the crimes the defendant committed the greater our obligation to adhere to the law because "the constitutional processes that the Framers put into place are there to protect everyone, including people accused of the gravest and most serious crimes." Id. We disagree with any suggestion, if it be such, that someone charged with sexual crimes against minors is entitled to more constitutional protections than someone charged with kiting

126

checks. The constitutional protections are the same for all regardless of their crimes.

We do agree, of course, that "[t]he Sixth Amendment guarantee of the right to counsel does not apply on a sliding scale based on the gravity of the defendant's offense." Id. at 258. But neither does the application of the harmless error rule vary inversely with the seriousness of the crime. Countless other convicted defendants whose trials were less than perfect have been denied automatic reversal and a presumption of prejudice. This defendant, although he is entitled to the full protections of the law, is not entitled to special treatment. Because the Sixth Amendment violation that occurred during his trial was harmless beyond a reasonable doubt, his conviction is due to be affirmed.

The judgment of the district court is **AFFIRMED**.

TJOFLAT, Circuit Judge, specially concurring:

The Court holds that the presentation of inculpatory testimony to the jury in defense counsel's absence deprived the accused of the right to the assistance of counsel in violation of the Sixth Amendment.[1]  Normally, a defendant appealing his conviction on the ground that he was deprived of a constitutional right would tell us who caused the deprivation.  He would point to, as relevant here, the trial judge or his own attorney, since each owed him a duty not to interfere with his right to the assistance of counsel.[2]

In this appeal, however, Roy points to no wrongdoer in particular.  He doesn't blame the trial judge, because the trial judge did nothing to prevent his attorney from being present when the prosecutor resumed his direct examination of a witness whose testimony, defense counsel well knew, would be inculpatory.  Blaming the trial judge—"to say that the trial judge [had to] step in," find the attorney, and remind him of his obligation to his client and to the court, *Mickens v. Taylor*, 535 U.S. 162, 179, 122 S. Ct. 1237, 1247, 152 L. Ed. 2d 291 (2002) (Kennedy, J., concurring)—would be a major departure from precedent.  It was not the trial judge's, but defense counsel's, responsibility to appear in court on time.

---

[1]  The relevant portion of the Sixth Amendment, the Counsel Clause, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.

[2]  I omit the prosecutor in resolving the causation issue because the direct examination of Deputy Longson could not have resumed without the trial judge's approval.

128

But for defense counsel's neglect of duty, the constitutional error the Court has created would not have occurred.

But Roy does not put the blame on defense counsel. Defense counsel was obligated under the Sixth Amendment as set out in *Strickland v. Washington*, 446 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to provide Roy with effective professional assistance. This obligation governed defense counsel's conduct out of court as well as in court. In his opening brief in this appeal, Roy could have argued that counsel breached his Sixth Amendment *Strickland* obligation by failing to appear in court on time and thereby allowing inculpatory testimony to be taken in his absence.[3] But he did not.

Roy did not present the argument for two reasons. First, the argument would have failed because, as the Court's opinion comprehensively illustrates, defense

---

[3] Roy could have argued that counsel's failure to appear in court on time constituted ineffective assistance under *Strickland*'s performance standard and that but for the deficient performance, there is a reasonable probability that the outcome of the trial would have been different. Although we rarely entertain ineffective-assistance claims on direct appeal—because the reason for counsel's allegedly deficient performance has not been established factually—we could have entertained Roy's ineffective-assistance argument by assuming that counsel's failure to appear on time constituted deficient performance under *Strickland* and then determining from the trial transcript whether such failure prejudiced Roy's defense. The Court has already made that determination, finding that what transpired in counsel's absence was harmless beyond a reasonable doubt.

It should be noted that, in theory, Roy could claim that his attorney's performance following his return to the courtroom was deficient under *Strickland* and that such deficiency was outcome determinative. Roy has not presented that claim, but he could do so by moving the District Court for relief under 28 U.S.C. § 2255. The filing of the motion would operate as a waiver of Roy's attorney–client privilege. Thus, Roy and his attorney would be subject to examination under oath about counsel's litigation strategy and how, according to Roy, counsel's conduct fell short of *Strickland*'s performance standard.

counsel's brief absence did not prejudice Roy's defense.  Second and relatedly, in making the argument under *Strickland*, Roy would be identifying *defense counsel* as the relevant actor responsible for allegedly violating his constitutional rights.[4] But by identifying defense counsel as the relevant constitutional actor, Roy would thereby lose the opportunity to argue for a more-favorable standard of review under a new rule of constitutional law.[5]

The Court vindicates Roy's decision to forgo *Strickland* by creating a new constitutional rule for the protection of the right to assistance of counsel.  Under this new rule, a Sixth Amendment violation occurs if "inculpatory testimony [is] . . . taken from a government witness without the presence of at least one counsel representing the defendant, regardless of whether the judge or the [prosecutor]

---

[4]  Both Roy and the Government agree that *Strickland* does not govern, but that, nonetheless, there was a Sixth Amendment violation.  The parties' agreement, however, does not cabin our authority to apply the correct legal standard.  "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99, 111 S. Ct. 1711, 1718, 114 L. Ed. 2d 152 (1991).

[5] At this point, I pause to note the various standards of review Roy's claim could be assessed under the majority's approach, my approach, and the dissent's approach.  Under the majority's new rule, *Chapman*'s harmless-error standard applies: the Government bears the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967).  Under the dissent's view, *Cronic* should govern this claim, prejudice is presumed, and reversal would be automatic. *See United States v. Cronic,* 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Under my view, *Strickland* should govern this claim, and therefore the defendant would bear the burden of establishing both deficient performance and resulting prejudice to such an extent that there is reasonable probability of a different result absent counsel's errors. *Strickland*, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068.

noticed that counsel was not there"[6] (the "New Rule").  Ante at 18.  Because the

defendant need not prove that the trial judge or defense counsel breached a Sixth

Amendment obligation owed to the defendant, the New Rule is a no-fault rule—at

least for purposes of this case.  In future cases, the New Rule will operate as a fault

rule based on the trial judge's conduct because trial judges have now been placed

on notice that in absence-of-counsel cases, as opposed to all other ineffective-

assistance cases, *Strickland* is no longer the governing law.

I write separately for several reasons.  First, the New Rule cannot exist side

by side with *Strickland*.  It would be nonsensical to entertain on direct appeal in

this case two arguments, one asserting that defense counsel did not breach a Sixth

Amendment obligation in causing inculpatory testimony to be taken in his absence,

and the other asserting that defense counsel breached his Sixth Amendment

obligation under *Strickland* in causing inculpatory testimony to be taken in his

absence.[7]  The Court avoids the problem by eliminating the latter argument by

effectively removing defense counsel's actions from the Sixth Amendment inquiry

---

[6]  The Court adds a caveat to the New Rule in language preceding what I have quoted. The caveat is that the New Rule is violated "absent evidence of an attempt to deliberately inject error into the record and without a waiver from the defendant."  Ante at 18.  As I point out in part III, this language will have no practical effect on the operation of the New Rule.  The defendant's right to assistance of counsel will be infringed whenever the prosecution elicits inculpatory testimony in defense counsel's absence.

[7] I say it is nonsensical, because even if the defendant argued that his counsel violated *Srtickland*, under the New Rule, *Strickland*'s prejudice analysis is completely displaced by *Chapman*'s harmless-error analysis.

131

altogether.   The Court does so by relying—in cursory fashion—on *Vines v. United States*, 28 F.3d 1123, 1127 (11th Cir. 1994), a dubiously reasoned case that provides, at best, a shaky foundation for the Court's new rule.  Moreover, in the course of displacing *Strickland*, the Court disregards the Supreme Court's recent pronouncements in *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, l91 L. Ed. 2d 464 (2015), and *Wright v. Van Patten*, 552 U.S. 120, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008), both of which suggest the correct framework for assessing Roy's claim—it is a claim for ineffective assistance of counsel, and *Strickland* should govern.

Second, in holding *Strickland* inapplicable, the Court materially alters the scheme the Supreme Court has established to protect the right to the assistance of counsel throughout the Eleventh Circuit.  In the absence-of-counsel context, defense counsel is no longer involved in the scheme.  In the void created by counsel's irrelevance, the trial judge effectively assumes counsel's obligation to protect the defendant's right to the assistance of counsel, such that the trial judge is now held accountable for the harm defense counsel may have caused his client if inculpatory testimony is taken during defense counsel's absence.

Finally, I fear that the Court's New Rule is not only misguided as a matter of logic and precedent, but it will also cause much mischief when put into operation. The New Rule changes the standard of review this Court applies by not only

132

replacing *Strickland* with *Chapman*, but also by effectively setting aside plain-error review when defense counsel fails to object to the introduction of inculpatory testimony taken in his absence—notwithstanding the Court's attempt to sidestep that issue. Nor will the Court's hinted-at suggestions for cabining the scope of the New Rule be possible to implement in practice. I take each of these points in sequence.

## I.

## A.

The Court's statement "*Strickland* assumes the presence of counsel and is therefore inapplicable in the absence of counsel context" is drawn verbatim from *Vines v. United States*, 28 F.3d 1123, 1127 (11th Cir. 1994). The quoted statement in *Vines* is followed by this statement: "*Strickland* is therefore inapplicable in this case." *Id.* Both statements are based on a passage in *Siverson v. O'Leary*, 764 F.2d 1208 (7th Cir. 1985), which *Vines* quotes in a footnote. The footnote reads in its entirety:

> The crucial premise on which the *Strickland* formula rests—that counsel was in fact assisting the accused during the proceedings and should be strongly presumed to have made tactical judgments . . . is totally inapplicable when counsel was absent from the proceedings and unavailable to make any tactical judgments whatsoever.

*Vines*, 28 F.3d at 1127 n.7 (quotation marks omitted) (quoting *Siverson*, 764 F.2d at 1216).

133

The *Vines* panel read *Siverson* as holding that a habeas petitioner's ineffective-assistance claim—based on his attorney's absence—was not a *Strickland* claim.  *See id.* at 1127 & n.7.  All that *Siverson* held, however, was that the *Strickland* presumption, "[t]he crucial premise," that counsel's absence might be considered sound trial strategy, is inapplicable.  *Siverson*, 764 F.2d at 1216.  "[C]ounsel's absence . . . was not a considered decision 'based on strategy,' but was instead merely conduct 'grounded in negligence.'"  *Id.* at 1215 (citing *Crisp v. Duckworth*, 743 F.2d 580, 587 (7th Cir. 1984)).

The *Siverson* and *Vines* courts reviewed the ineffective-assistance claims on collateral attack.[8]  *Vines*, 28 F.3d at 1125; *Siverson*, 764 F.2d at 1210.  What is important to note in these two cases is that the allegedly deficient assistance of counsel brought about by counsel's absence was caused, as a factual matter, by the trial judge and defense counsel, acting together, because the trial judge gave defense counsel permission to be absent.  When *Siverson* and *Vines* are closely examined, we find in each that the trial judge's conduct, though described by the courts in considerable detail, was not examined under the Sixth Amendment as a claim that the trial judge interfered with the petitioner's right to the assistance of counsel, because that claim was not made.  *See Vines*, 28 F.3d at 1125–26;

---

[8] The claim in *Siverson* was brought under 28 U.S.C. § 2254, and the claim in *Vines* was brought under 28 U.S.C. § 2255.  *Vines*, 28 F.3d at 1125; *see Siverson*, 764 F.2d at 1210, 1212.

134

*Siverson*, 764 F.2d at 1210–12.  The claim actually presented was that defense counsel's absence constituted ineffective assistance of counsel.  *Vines*, 28 F.3d at 1125; *Siverson*, 764 F.2d at 1210.

The *Siverson* court judged counsel's conduct using *Strickland*'s performance standard.  *Siverson*, 764 F.2d at 1213–15.  Counsel was found to be negligent and his performance constitutionally deficient.  Nevertheless, the writ was denied.  Rather than considering the consequences of the attorney's conduct under *Strickland*'s prejudice standard, the *Siverson* court found the conduct harmless under the stricter standard set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967), whereby the prosecution is required to demonstrate that a constitutional error was harmless beyond a reasonable doubt.  *Id.* at 1215–18.  The *Vines* panel, in turn, acknowledged explicitly that it had an ineffective-assistance claim before it, but based on its reading of *Siverson*, held *Strickland*'s prejudice analysis inapplicable to the factual scenario in question.  *Id.* at 1125, 1127.  In doing so, the panel treated defense counsel's conduct as constitutionally irrelevant.  What mattered was that trial testimony was taken in his absence.  The ineffective-assistance claim thus morphed into an assumption that presenting trial testimony in defense counsel's absence, in and of itself, violates the

Sixth Amendment.  The presumed violation went for naught, however, because the

*Vines* panel held that there was no prejudice shown. [9]  *Id.* at 1130–31.

B.

A close examination of *Siverson* reveals why the *Vines* panel's reliance on

*Siverson* was misguided.  The defendant in *Siverson* stood trial on several counts,

including robbery and aggravated battery.  *Siverson*, 764 F.2d at 1210.  After the

trial concluded and the jury retired to consider its verdict, defense counsel left the

courtroom and went home, leaving a telephone number at which he could be

reached.  *Id.* at 1210–11, 1212, 1214.  He remained away throughout the jury's

deliberations and the return of the verdict.  *Id.* at 1210.  During that time the

defendant was forced to represent himself along with the assistance of his mother.

*See id.* at 1211–12.

After the jury returned a verdict finding the defendant guilty on three counts,

the defendant appealed his convictions to the Illinois Appellate Court.  *Id.* at 1212.

Among his assignments of error was the absence of his attorney, which, he said,

---

[9] The *Vines* panel used yet another standard for assessing potential prejudice, that announced by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), several years after *Siverson* and *Strickland* were decided.  Under *Brecht*, a habeas petitioner on collateral review bears the burden of demonstrating that a constitutional error at trial "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637, 113 S. Ct. at 1722 (quotation marks omitted) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).

constituted ineffective assistance of counsel.[10]  *Id.*  The Illinois Appellate Court

denied the claim and affirmed his convictions.[11]  *Id.*  The defendant then petitioned

the District Court for the Central District of Illinois for a writ of habeas corpus,

presenting the same ineffective-assistance claim he had raised in state court.  *Id.*

After holding an evidentiary hearing, the District Court granted the petition,

concluding that defense counsel's absence did not satisfy "minimum professional

standards."  *Id.* at 1212–13; *Siverson v. O'Leary*, 582 F. Supp. 506, 510 (C.D. Ill.

1984) (citation omitted), *rev'd*,  764 F.2d 1208.[12]  The State appealed the District

Court's decision to the Seventh Circuit.

Prior to the Seventh Circuit's resolution of the appeal in *Siverson*, the United

States Supreme Court decided *Strickland*.  Accordingly, the Seventh Circuit began

its analysis by assessing defense counsel's conduct under *Strickland*'s performance

---

[10]  The defendant did not, however, assign as error the trial judge's approval of counsel's absence.

[11]  The Illinois Appellate Court denied the ineffective-assistance claim:

> [C]ounsel's presence in the later stages of the trial would not have altered the outcome. And assuming the validity of the defendant's other claims of incompetence on the part of his attorney, we do not find that they, even taken together, would have affected the outcome of the trial.

*Siverson v. O'Leary*, 582 F. Supp. 506, 510 (C.D. Ill. 1984) (alteration in original) (quotation marks omitted) (quoting *People v. Siverson*, No. 15975, slip op. at A-3 (Ill. App. Ct. July 23, 1980)), *rev'd*, 764 F.2d 1208.

[12] The District Court's decision came 90 days before the Supreme Court decided *Strickland* and *Cronic*.  Applying the governing pre-*Strickland* case law, the District Court found that defense counsel's absence deprived the defendant of effective assistance of counsel at a "vital stage of the proceedings" and could not "conclude that the presence of defense counsel would not have affected the outcome of the case."  *Id.* at 511.

standard. *Siverson*, 764 F.2d at 1213. The court determined that defense counsel's "complete absence during the jury deliberations and the return of the verdicts at petitioner's trial constituted ineffective assistance of counsel in violation of the Sixth Amendment." *Id.* at 1213–14. The court summed up its analysis of counsel's performance by stating that "[b]ecause the Constitution demands that defense counsel at least provide assistance to the defendant during the critical stages of the trial, we must conclude in this case that Siverson's counsel 'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* at 1215 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

Moving on to the prejudice analysis, however, the Seventh Circuit declined to resolve the issue under the *Strickland* formulation. *Id.* at 1216–17. It also refused to presume prejudice under *Cronic*. *Id.* It held instead

> that the proper standard for determining the prejudice resulting from the erroneous absence of Siverson's counsel during jury deliberations and the return of the verdict is the same standard that was applied to similar errors prior to *Strickland*: whether the error was harmless beyond a reasonable doubt under *Chapman*.

*Id.* at 1217.[13]  In conclusion, I think it obvious that the *Vines* panel misread *Siverson* as holding that the *Strickland* performance standard is inapplicable in judging attorney conduct "in the absence of counsel context."  *Vines*, 28 F.3d at 1127.  Indeed, the *Siverson* court without a doubt applied *Strickland*'s performance standard in assessing the professional reasonableness of counsel's behavior in leaving his client to fend for himself.  *Siverson*, 764 F.2d at 1215.  That said, I move to a discussion of *Vines*.

## C.

In *Vines*, two defendants stood trial on the counts of conspiring to possess cocaine with intent to distribute and possession of cocaine with intent to distribute. *Vines*, 28 F.3d at 1125.  At some point after the trial was underway, Vines's lawyer informed the trial judge that he needed to leave the courtroom for the afternoon. *Id.*

After discussing the matter with the attorneys, the trial judge informed the jury that defense counsel had been excused for the afternoon, that the defendant had waived defense counsel's presence, and that the witness who would be testifying in defense counsel's absence would not be providing testimony relating

---

[13] *Siverson* was decided shortly after *Strickland* was handed down by the Supreme Court. It seems that the absence of counsel and the possibility of a constitutional violation influenced the Seventh Circuit's determination that *Chapman* was the appropriate standard for its prejudice analysis, rather than *Strickland*.  Regardless, we now, of course, use *Strickland*'s own standard for evaluating prejudice to resolve ineffective-assistance claims.

139

to the defendant. *Id.* at 1125–26; *id.* at 1132–33 (Birch, J., dissenting). Two prosecution witnesses testified during defense counsel's absence. *Id.* at 1126 (majority opinion).

The jury acquitted the defendant of the conspiracy charge, but found him guilty of possession with intent to distribute. *Id.* He appealed his conviction, including in his grounds for reversal the claim that his attorney's absence while the two witnesses testified constituted ineffective assistance of counsel. *Id.* We affirmed his conviction without considering the ineffective-assistance claim on direct review, deferring consideration of that claim for collateral review. *Id.* (citing *United States v. Casas*, 897 F.2d 535 (11th Cir. 1990) (mem.)). The defendant then asserted this claim in a motion filed under 28 U.S.C. § 2255. *Id.*

The motion was referred to a magistrate judge. *Id.* The judge declined to hold an evidentiary hearing and recommended that motion be denied on the ground that the defendant had waived his right to counsel, that no presumption of prejudice was warranted, and that counsel's absence had not prejudiced his defense. *Id.* The District Court denied the motion for the reasons stated by the magistrate judge, and the defendant appealed. *Id.* On appeal, this Court held, based on *Siverson*, that *Strickland* was inapplicable because defense counsel was not present when the testimony of the two witnesses was elicited. *Id.* at 1127.

140

Though *Strickland* required defense counsel "to bring to bear such skill and knowledge as will render the trial a reliable adversary testing process," *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065, the *Vines* panel held that *Strickland* did not apply, full stop. *Vines*, 28 F.3d at 1127. Therefore, counsel's performance—as opposed to counsel's absence—could not, as a matter of law, have provided the District Court a constitutional basis for granting the writ and setting aside the defendant's conviction. This was so even though, as a matter of fact, counsel caused the testimony to be taken in his absence.[14]

"Having concluded that Vines's temporary absence of counsel claim cannot be analyzed under *Strickland*," the court proceeded to resolve the appropriate analytical framework for reviewing Vines's claim that his Sixth Amendment right to counsel was violated because his counsel was absent during the taking of testimony. *Id.* at 1128. The court assumed, without deciding, that the defendant had established constitutional error by showing that his trial counsel was absent during the taking of testimony. *Id.*

---

[14] In theory, the defendant could have claimed that the trial judge, in approving defense counsel's request and continuing the trial in his absence, interfered with his right to the assistance of counsel in violation of the court's obligation under the Sixth Amendment. Such a claim would have been cognizable on direct appeal because the record evidencing the claim was complete, so an evidentiary hearing would not be needed. But the defendant did not raise the issue on direct appeal. The claim was therefore procedurally defaulted and, as such, would not have been cognizable in the § 2255 proceeding he brought absent a showing of cause for the default and resulting prejudice. *See Martinez v. Ryan*, 566 U.S. __, __, 132 S. Ct. 1309, 1316, 182 L. Ed. 2d 272 (2012).

141

After concluding that defense counsel's absence did not constitute structural error for purposes of *Cronic*, *id.* at 1129, the court treated the violation as if it were a trial error subject to harmless-error analysis review under *Brecht*,[15] because it determined that the presumed violation "may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless."[16]  *Id.* at 1129–30 (quotation marks omitted) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S. Ct. 1246, 1264, 113 L. Ed. 2d 302 (1991)).[17]  With that statement, the court proceeded to assess the harm defense

---

[15]  As mentioned above, on collateral attack a habeas petitioner bears the burden of demonstrating that a constitutional error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637, 113 S. Ct. at 1722 (quoting *Kotteakos*, 328 U.S. at 776, 66 S. Ct. at 1253).

[16]  Instead of searching the record for harmless error as the Court does here—that is, without assuming hypothetically what counsel would have done had he been present—the *Vines* panel effectively assumed that defense counsel was present while witnesses were testifying and failed to perform as a reasonably competent lawyer would have performed under the *Strickland* standard. *Vines*, 28 F.3d at 1130–31.  Having assumed as much, the *Vines* panel then determined that defense counsel's deficient performance caused the defendant no prejudice.

[17]  The panel rejected the defendant's argument that prejudice should be determined under the "irrebuttable presumption" set forth in *Cronic* as follows:

In order to apply *Cronic* . . . , we must conclude that Vines's claim falls under one of the three circumstances *Cronic* enumerates as an exception to the *Strickland* standard.  Vines was not completely denied counsel.  Rather, Vines's counsel was temporarily absent during a portion of the actual trial.  Vines does not contend that his trial counsel failed to subject the prosecution's case to meaningful adversarial testing.  Thus, in order for Vines to be entitled to a presumption of prejudice, we must conclude that Vines was denied counsel at a critical stage of trial within the meaning of *Cronic*.  . . . Where, as in this case, no evidence directly inculpating a defendant is presented while that defendant's counsel is absent, we decline to hold that counsel was absent during a critical stage of trial within the meaning of *Cronic*.  Accordingly, we conclude that Vines's counsel was not absent during a critical stage of trial and Vines is therefore not entitled to a presumption of prejudice under *Cronic*.

142

counsel may have caused when, in violation of his *Strickland* obligation, he was absent for a period of time during trial.  The court found no harm.  *Id.* at 1130–31.

In sum, all the *Vines* panel did to justify its conclusion that *Strickland* does not apply "in the absence of counsel context,"  *id.* at 1127, was cite the *Siverson* passage described above  *Id.* at 1127 & n.7.  As a result, *Vines* could hardly be said to have provided a solid foundation for the New Rule.

### D.

The *Vines* panel, however, did not have the benefit of recent Supreme Court decisions that provide the appropriate framework for assessing defense counsel's temporary absence at trial.  But we do.  Consequently, I am unable to see how the majority's holding squares with *Wright v. Van Patten*, 552 U.S. 120, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008), and *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, l91 L. Ed. 2d 464 (2015).[18]  Both cases involved the absence of defense counsel during an important part of the criminal prosecution, at the plea hearing in *Van Patten* and during trial in *Woods*.  And in both cases, the Supreme Court held that the relevant state court did not render a decision that was "contrary to, or

---

*Vines*, 28 F.3d at 1128 (footnote omitted).

[18]  Both *Van Patten* and *Woods* were brought and disposed of under 28 U.S.C. § 2254.

involved an unreasonable application, of" Supreme Court precedent in assessing

defense counsel's conduct under *Strickland*.  28 U.S.C. § 2254(d)(1).

In *Van Patten*, the defendant pled no contest to first-degree reckless

homicide.  552 U.S. at 121, 128 S. Ct. at 744.  The defendant's attorney was not

physically present during the plea hearing, but participated by speakerphone.  *Id.*

After he was sentenced, the defendant moved the trial court to withdraw his no-

contest plea and vacate his conviction.  *See State v. Van Patten*, No. 96-3036-CR,

1997 WL 277952, at *1 (Wis. Ct. App. May 28, 1997).  He alleged that his "Sixth

Amendment right to counsel was violated when his attorney discussed the plea

offer with him by telephone and appeared at the hearing by telephone, resulting in

his incomplete understanding of the charges against him and the constitutional

rights he was waiving with his plea."  *Id.*  The court denied his motion.  The

defendant appealed, and the Wisconsin Court of Appeals affirmed.  Assessing the

defendant's Sixth Amendment claim under *Strickland*, the Wisconsin Court of

Appeals concluded that "[t]he record does not support, nor does Van Patten's

appellate brief include, any argument that counsel's performance was deficient or

prejudicial."  *Id.* at *3.[19]   The defendant then sought discretionary review in the

---

[19] The Wisconsin Court of Appeals opinion contains no reference to *Cronic* or presumed prejudice.  I assume that the defendant cited *Cronic* for the first time in his initial § 2254 petition.

Wisconsin Supreme Court, which was denied. *State v. Van Patten*, 576 N.W.2d 280 (Wis. 1997).

The defendant thereafter petitioned the District Court for the Eastern District of Wisconsin for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The District Court, adopting the recommendation of a magistrate judge, denied the writ. The defendant appealed. The Seventh Circuit concluded that the District Court got it wrong. *Van Patten v. Deppisch* (*Van Patten I*), 434 F.3d 1038, 1042 (7th Cir. 2006). The court granted the writ, reasoning that the District Court should have held that the Wisconsin Court of Appeals misapplied Supreme Court precedent by assessing the defendant's Sixth Amendment claim under *Strickland* instead of under *Cronic*. Put another way, the Seventh Circuit decided that the "state appellate court arrived at a decision contrary to the Supreme Court's precedent when it analyzed the case under *Strickland*" rather than *Cronic*, reasoning that "[w]hen a defendant is denied assistance of counsel at a stage where he must assert or lose certain rights or defenses, the error 'pervade[s] the entire proceeding.'" *Id.* at 1043 (second alteration in original) (quoting *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S. Ct. 1792, 1797, 100 L. Ed. 2d 284 (1988)).

145

The Supreme Court reversed,[20] concluding that its precedent had never

clearly established that *Cronic* should replace *Strickland* in such a factual context.

*Van Patten*, 522 U.S. at 125–26, 128 S. Ct. at 746–47.  The Court described

*Cronic*'s role vis-à-vis *Strickland*'s role in assessing ineffective-assistance claims

at the plea-hearing stage, proclaiming that "*Strickland* [] ordinarily applies."  *Id.* at

124, 128 S. Ct. at 745–46.  The Court declared that *Cronic* applies when

"circumstances [exist] that are so likely to prejudice the accused that the cost of

litigating their effect in a particular case is unjustified," noting as an example the

complete denial of counsel.  *Id.* at 124–25, 128 S. Ct. at 746 (alteration in original)

(quotation marks omitted) (quoting *Cronic*, 466 U.S. at 658, 104 S. Ct. at 2046).

After stating that its cases provided "no categorical answer to th[e] question"

whether a court should apply *Cronic*'s presumption of prejudice when defense

counsel participates in a plea hearing by speakerphone, the Court analyzed the

Wisconsin Court of Appeals' decision in *Van Patten I*.  *Id.* at 125, 128 S. Ct. at

746.  The Wisconsin Court of Appeals held counsel's performance by

speakerphone to be constitutionally effective; neither the magistrate judge, the

District Court, nor the Seventh Circuit disputed this conclusion; and the Seventh

---

[20] The Supreme Court had previously vacated the Seventh Circuit's opinion to reconsider in light of a recent case.  *See Schmidt v. Van Patten*, 549 U.S. 1163, 127 S. Ct. 1120, 166 L. Ed. 2d 888 (2007).  On remand, the Seventh Circuit reinstated its earlier opinion. *Van Patten v. Endicott* (*Van Patten II*), 489 F.3d 827, 828 (7th Cir. 2007).

Circuit itself stated that "[u]nder *Strickland*, it seems clear Van Patten would have no viable claim." *Id.* at 125, 128 S. Ct. at 746–47 (quoting *Van Patten I*, 434 F.3d at 1042). As for the decision of the Wisconsin Court of Appeals, the Supreme Court held that "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Id.* at 126, 128 S. Ct. at 747 (alterations in original) (quoting *Carey v. Musladin*, 549 U.S. 70, 77, 127 S. Ct. 649, 654, 166 L. Ed. 2d 482 (2006)).

The facts in *Woods* are closer to those in the present case than are the facts in *Van Patten*. In *Woods*, five defendants were each charged with one count of first-degree felony murder and two counts of armed robbery. 575 U.S. at __, 135 S. Ct. at 1375. While two of these defendants pled guilty to second-degree murder, three defendants stood trial. *Id.* Pertinent to the alleged ineffective-assistance claim on habeas review, the petitioner's defense counsel was not present in the courtroom when the prosecution introduced testimony and evidence concerning phone records showing calls between cell phones belonging to the defendants. *Id.* Having heard previously from defense counsel that he did not object to the introduction of the phone records—with defense counsel announcing that "I don't have a dog in this race. It doesn't affect me at all."—the trial court allowed the testimony and evidence to be taken in the attorney's absence. *Id.* Defense counsel returned to the courtroom approximately ten minutes later, at which point he

147

advised the judge that he had no objection to the testimony having been taken in his absence. *Id.*

The jury convicted the petitioner, and following sentencing,[21] he first appealed his convictions to the Michigan Court of Appeals, arguing that his attorney's absence during a critical stage of his trial denied him his Sixth Amendment right to effective assistance of counsel, under *Cronic*, with prejudice to be presumed. *People v. Donald*, No. 275688, 2008 WL 1061551, at *1–2 (Mich. Ct. App. Apr. 10, 2008). The Court of Appeals disagreed, and applying *Strickland*, held that "there [i]s no reasonable probability that the outcome of the trial would have been different had counsel been present during the initial portion of the testimony," and thus the defendant was not deprived of his right to effective assistance of counsel. *Id.* at *2.

After the Michigan Court of Appeals affirmed his convictions and the Supreme Court of Michigan denied review of his application for leave to appeal that judgment, the defendant sought federal habeas relief under 28 U.S.C. § 2254, contending that the Michigan Court of Appeals misapplied *Cronic*. *See Donald v. Rapelje*, No. 09-cv-11751, 2012 WL 6047130 (E.D. Mich. Dec. 5, 2012); *People v. Donald*, No. 275688, 2008 WL 1061551, at *4 (Mich. Ct. App. Apr. 10, 2008);

---

[21] The petitioner was sentenced to life imprisonment on the felony-murder conviction and to concurrent prison terms of 10.5 to 20 years on the armed-robbery convictions. *Woods*, 575 U.S. __, 135 S. Ct. at 1375.

*People v. Donald*, 76 N.W.2d 87 (Mich. 2008).  The District Court agreed, holding that the "[t]he Michigan Court of Appeals' decision was contrary to existing Supreme Court precedent with respect to *Cronic*."  *Id.* at \*14.  The court also held that the Michigan Court of Appeals erred in its "unreasonable application of the facts as to *Strickland*."  *Id.*

The Sixth Circuit affirmed.  *See Donald v. Rapelje*, 580 F. App'x 277 (6th Cir. 2014).  It held that at the time the Michigan Court of Appeals decided the petitioner's Sixth Amendment claim, Supreme Court holdings clearly established that "the complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice."  *Id.* at 283–84 (quotation marks and citations omitted).  Moreover, the Sixth Circuit observed: "The absence or denial of counsel need not be caused by the government to trigger a presumption of prejudice under *Cronic*.  A presumption of prejudice applies even where 'the constraints on counsel . . . are entirely self-imposed.'"  *Id.* at 283 (quoting *Cronic*, 466 U.S. at 662 n.31, 104 S. Ct. at 2048 n.31).  "[B]y applying *Strickland*, rather than *Cronic*, the Michigan Court of Appeals 'applie[d] a rule that contradicts the governing law set forth in [Supreme Court] cases.'"  *Id.* at 285 (second and third alterations in original) (quoting *Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918, 150 L. Ed. 2d 9 (2001)).

On certiorari review, the Supreme Court stated that the issue was whether the Michigan Court of Appeals' decision to assess defense counsel's absence, under *Strickland* instead of *Cronic*, was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" the Court's holdings. *Woods*, 575 U.S. at __, 135 S. Ct. at 1376 (quotation marks omitted) (quoting 28 U.S.C. § 2254(d)(1)). The Court addressed the issue by observing, first, that "[i]n the normal course, defendants claiming ineffective assistance of counsel must satisfy the familiar framework of *Strickland v. Washington*, . . . which requires a showing that 'counsel's performance was deficient' and 'that the deficient performance prejudiced the defense.'" *Id.* at __, 135 S. Ct. at 1375 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). Under *Cronic*, however, "courts may presume that a defendant has suffered unconstitutional prejudice if he 'is denied counsel at a critical stage of his trial.'" *Id.* at __, 135 S. Ct. at 1375–76 (quoting *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047). A critical stage is one that "held significant consequences for the accused." *Id.* at __, 135 S. Ct. at 1376. "According to the Sixth Circuit, these statements should have compelled the Michigan court to hold that the phone call testimony was a 'critical stage' and that counsel's absence constituted *per se* ineffective assistance." *Id.* The Court disagreed. *Cronic*'s presumed-prejudice standard was inapplicable for three reasons. First, "[w]ithin the contours of *Cronic*, a fairminded jurist could conclude

150

that a presumption of prejudice is not warranted by counsel's short absence during testimony about other defendants where that testimony was irrelevant to the defendant's theory of the case." *Id.* 135 S. Ct. at 1377–78. Second, "*Cronic* applies in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified,'" *id.* at __, 135 S. Ct. at 1378 (quoting *Cronic*, 466 U.S. at 658, 104 S. Ct. at 2046), and this was not such a case. Third, the Michigan Court of Appeals' decision was not "an unreasonable application of [the Supreme Court's] cases," including *Strickland. Id.* at __, 135 S. Ct. at 1377.

In *Van Patten* and *Woods*, like the case at hand, counsel's absence was entirely self-imposed. At issue before the Supreme Court in *Van Patten* and *Woods* was not whether *Strickland*'s performance standard applied in determining whether counsel's absence was deficient, for the parties and the courts below agreed that it did apply. Rather, the issue was whether *Strickland* or *Cronic* provided the prejudice standard. The Court held that the state appellate courts' applications of the *Strickland* prejudice standard did not involve an "unreasonable application[] of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Although the Supreme Court was reviewing the state appellate courts' decisions with § 2254 deference, based on its decisions in *Van Patten* and *Woods*, I

151

cannot imagine the Court holding *Strickland* wholly inapplicable in the context here.  If Roy believed he had a meritorious denial-of-counsel argument, he should have proceeded as the defendants in *Van Patten* and *Woods* did by asserting that he was denied effective assistance of counsel because defense counsel breached his *Strickland* obligation.

## II.

The New Rule fundamentally alters the traditional scheme for assessing a violation of an accused's Sixth Amendment right to the assistance of counsel.  This Court today finds no one in particular at fault for violating Roy's Sixth Amendment right.  As will be discussed, the upshot of this remarkable fact is that we can no longer apply elementary doctrines like plain-error review and invited error sensibly to this claim.  Furthermore, the actor best positioned to avoid New Rule violations will be the trial judge, and thus, the New Rule materially alters his obligations at trial in future cases.

"[T]he right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments."  *Herring v. New York*, 422 U.S. 853, 857, 95 S. Ct. 2550, 2553, 45 L. Ed. 2d 593 (1975).  "The right to the assistance of counsel has thus been given a meaning that ensures to the

defense in a criminal trial the opportunity to participate fully and fairly in the adversary factfinding process." *Id.* at 858, 95 S. Ct. at 2553. Under *Herring* and before today, Roy could obtain relief from his convictions only if he established that the trial judge or defense counsel denied his attorney that opportunity to participate fully and fairly.[22]

But Roy is not required to establish that anyone denied his attorney the opportunity to participate fully and fairly in the factfinding process in order to make out a Sixth Amendment violation. All he had to show was that inculpatory testimony was taken in defense counsel's absence—fault is irrelevant. The New Rule is thus a no-fault rule. But that is so for the purposes of this case only. In all future cases, the New Rule will be a fault rule. And the fault will lie with the trial judge.

In future cases, the New Rule, in operation, will hold the trial judge answerable for the self-imposed restriction defense counsel's absence places on his client's right to the assistance of counsel. In doing that, the New Rule will distort the scheme the Supreme Court has established for protecting the right to the assistance of counsel and, I submit, will be beyond our ken to administer.

---

[22] I omit from my discussion the actions of other government actors such as the prosecutor because, even if the prosecutor had initiated questioning the witness on his own without defense counsel present, the prosecutor could not have done so without the trial judge's approval.

153

Prior to today under the circumstances presented here, a trial judge could not be held responsible for infringing a defendant's right to the assistance of counsel unless the judge actually denied defense counsel "the opportunity to participate fully and fairly" in the trial process.[23] *Id.* Suppose that when the trial resumed in this case and the prosecutor began examining Deputy Longson, the judge was aware that Roy's lawyer was not present and that his absence might constitute ineffective assistance. Would the judge have a Sixth Amendment obligation to stop the examination and have the lawyer summoned to the courtroom so he could protect his client's interests? Would allowing the examination to proceed deny Roy's attorney "the opportunity to participate fully and fairly in the trial process"? Stated another way, would it deny Roy his right to the effective assistance of counsel? Justice Kennedy suggested the answer to these questions is no in his concurring opinion in *Mickens v. Taylor*.

The Sixth Amendment protects the defendant against an ineffective attorney. . . . It would be a major departure to say that the trial judge must step in every time defense counsel appears to be providing ineffective assistance, and indeed, there is no precedent to support this proposition. As the Sixth Amendment guarantees the

---

[23] Note that in *Van Patten* and *Woods*, the claims were *not* that the denial of the assistance of counsel occurred at the hands of the trial judge. Rather, as the Sixth Circuit put it in *Woods*, "the constraints on counsel . . . [we]re entirely self-imposed" by defense counsel. *Donald v. Rapelje*, 580 F. App'x 277, 283 (6th Cir. 2014) (quoting *Cronic*, 466 U.S. at 662 n.31, 104 S. Ct. at 2048 n.31.

154

defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge.

535 U.S. 162, 179, 122 S. Ct. 1237, 1247, 152 L. Ed. 2d 291 (2002) (Kennedy, J., concurring) (citing *Strickland*, 466 U.S.at 685–86, 104 S. Ct. at 2063.[24]

The New Rule will be "a major departure" in trials that begin once our decision today is announced. The trial judge will be on notice that if inculpatory testimony is presented while defense counsel is absent, a constitutional error will have occurred. The judge will have constructively caused the error by failing to prevent it. He could have ensured counsel's appearance, but failed. On appeal, the defendant will seize on this failure to argue that his conviction should be reversed. Whether or not the defendant prevails will depend on the standard of review this Court uses to assess the harm he suffered because inculpatory testimony was received in his lawyer's absence.

Traditionally, the standard for review for trial-court error on direct appeal depends on whether the defendant called the error to the trial judge's attention in a

---

[24] The Court holds holds that "inculpatory testimony . . . taken from a government witness" gives rise to a Sixth Amendment violation. I suggest that under the Court's opinion any evidence incriminating the defendant that is made part of the record during his attorney's absence would create a Sixth Amendment violation.

timely objection so that the error might be avoided.  If the defendant objects, the district court overrules the objection, and we conclude that the court has erred, we consider whether the error was harmless under Rule 52(a) of the Federal Rules of Criminal Procedure[25] or *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), for a constitutional error.  If the defendant fails to object and we conclude that the court erred, we would consider whether the error constituted plain error under Rule 52(b).[26]  In these "absence of counsel" cases, I assume that counsel would not have objected to an error that occurred during his absence and conclude, as explained below, that that Rule 52(b) would be inapplicable and that *Chapman* would provide the standard of review.

The constitutional error the New Rule creates will occur in one of two scenarios.  The first involves defense counsel's absence without the court's

---

[25] *See* Fed. R. Crim. P. 52(a) ("**Harmless Error**. Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

[26] *See* Fed. R. Crim. P. 52(b) ("**Plain Error**. A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *Molina-Martinez v. United States*, 578 U.S. __, __, 136 S. Ct. 1338, 1343, __ L. Ed. 2d __ (2016) ("First, there must be an error that has not been intentionally relinquished or abandoned.  Second, the error must be plain—that is to say, clear or obvious.  Third, the error must have affected the defendant's substantial rights, which in the ordinary case means he or she must 'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different.  Once these three conditions have been met, the court of appeals should exercise its discretion to correct the forfeited error if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" (alteration in original) (citations omitted) (first quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76, 124 S. Ct. 2333, 2336, 159 L. Ed. 2d 157 (2004) and then quoting *United States v. Olano*, 507 U.S. 725, 736, 113 S. Ct. 1770, 1779, 123 L. Ed. 2d 508 (1993))).

permission, as in this case.  The second involves defense counsel's absence with the court's permission, as in *Vines*.

In the first scenario, defense counsel fails to call the New Rule violation to the trial judge's attention after returning to the courtroom and discovering what transpired during his absence.  The defendant is convicted and on appeal he cites the New Rule violation in arguing that his conviction should be reversed.  Although the error had not been preserved for appellate review, we do not review the error under the plain-error doctrine.  The error had already occurred, and the trial judge was powerless to undo it.  Hence, an objection would have served no useful purpose; it would have been an exercise in futility.  Our review of the harm caused by the inculpatory testimony is conducted under the *Chapman* standard, not the plain-error doctrine.[27]

In the second scenario, instead of bringing the potential error to the trial judge's attention through an objection, defense counsel seeks permission for an anticipated absence.  The defendant is convicted and on appeal he cites the New Rule in arguing that his conviction should be reversed.  The Government, in

---

[27] I note that the Government has not taken the position on appeal that the invited-error doctrine should foreclose Roy's claim.  That is, in absenting himself, Roy's attorney invited the constitutional error he now asserts, the Government acknowledges, and the Court recognizes.  In my view, the Court's opinion would not foreclose the Government from invoking the doctrine in a case presenting the first scenario.

response, argues that the invited-error doctrine forecloses the defendant's argument.[28]  This response presents the following conundrum.

If the invited-error doctrine is held inapplicable, the defendant will have his cake and eat it too.  He will receive the benefit of the bargain he authorized his lawyer to strike with the court;[29] at the same time, he will give the opportunity to challenge as Sixth Amendment error the taking of inculpatory testimony during defense counsel's absence.  Allowing the defendant to have his cake and eat it too would run counter to both common sense and the weight of precedent.  For this reason, we would be inclined to hold the doctrine applicable.

---

[28]  As we  have explained before,

"The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *Alabama Great Southern R. Co. v. Johnson*, 140 F.2d 968, 970–71 (5th Cir. 1944).  For example, a defendant can invite error by introducing otherwise inadmissible evidence at trial or by submitting an incorrect jury instruction to the district judge that is then given to the jury. Generally, an appellate court will not review an error invited by a defendant, on the rationale that the defendant should not benefit from introducing error at trial with the intention of creating grounds for reversal on appeal.

*United States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998).  *See also Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981).

The invited-error doctrine can be invoked to foreclose appellate consideration of a constitutional error.  *See, e.g.*, *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005).

[29]  We must assume that the bargain benefited—or was at least neutral to—the defendant because he consented to it after having been fully informed of the consequences that could result from his lawyer's absence.  Among other things, in determining whether the defendant consented to the bargain, the court would have explained that if inculpatory testimony were taken in counsel's absence, a constitutional violation would have occurred, and that, if convicted, he could appeal his conviction and assert the violation as a ground for reversal.

If we held the doctrine applicable, though, a constitutional violation occurred with impunity. Since *Strickland* is inapplicable in the absent-attorney context under the New Rule's reasoning, the defendant could not claim in a motion filed under 28 U.S.C. § 2255 that his attorney's ineffective assistance, in failing to anticipate the harm that could result from the introduction of inculpatory testimony in his absence, caused the violation.

In sum, if we held the invited-error doctrine inapplicable, we would subject the court to ridicule. If we held it applicable, we would have allowed a constitutional violation to occur without redress. The conundrum I have described is the result of our alteration—presumably, for the absence-of-counsel context alone—of the scheme the Supreme Court has established to ensure the Sixth Amendment's guarantee of the assistance of counsel. The majority attempts to minimize the mischief that alteration will cause by hinting that the New Rule will not apply if the defendant waives counsel's absence. *See* ante at 18. As I explain below in positing the effect the New Rule will have on the trial of criminal cases— especially multi-defendant cases—this caveat will turn out to be inoperative.

### III.

The immediate reaction of the District Judges of the Eleventh Circuit will be to reconsider the ways in which they monitor the presence of defense counsel throughout every stage of a criminal prosecution. After reading what happened in

159

this case, they will take whatever steps are necessary to ensure that, during every aspect of trial, defense counsel will be present at all times.  Despite close monitoring, however, there will be times when the court becomes unaware of an attorney's absence—especially in a multi-defendant case.[30]  Although the absence may be of short duration, it will result in a constitutional violation if, during the absence, inculpatory testimony were taken.

There will also be times when counsel seeks leave of court to attend to matters elsewhere, as was the case in *Vines* and in *Woods*.  After receiving the prosecutor's assurances that no testimony, or other evidence, would be presented during counsel's absence that would potentially incriminate his client and having obtained the defendant's permission for defense counsel's absence, the trial judge granted defense counsel's request.

In creating the New Rule, the Court hinted that the New Rule would not be violated if the defendant were to waive defense counsel's absence.  Ante at 18.  By waiving the presence of defense counsel, the defendant would thereby relinquish the right to raise a New Rule violation on appeal.

---

[30]  I vividly recall trying a 19-defendant drug-trafficking conspiracy when sitting by designation in Brunswick, Georgia, in the early 1980s.  Keeping track of the movement of 19 lawyers in the packed courtroom was no small task.  I am sure there were moments when a lawyer stepped out of the courtroom for any number of reasons—to go to the restroom, to ask the Marshal whether a witness subpoena had been served, or to make a telephone call.

160

That a defendant may waive the right to the presence of counsel for some period while he is standing trial raises a question the Court's opinion doesn't seem to answer:  Can the trial judge find a waiver based on counsel's representation that his client agreed to counsel's absence or does the trial judge have to address the defendant directly and explain what will likely take place in counsel's absence, pointing out the disadvantages of not having counsel at his side?

The Fifth Circuit, drawing on the Supreme Court's seminal decision in *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), and the Circuit's decision in *Ford v. Wainwright*, 526 F.2d 919 (5th Cir. 1976),[31] answered that question in *United States v. Russell*, 205 F.3d 768 (5th Cir. 2000).  As *Russell* explained, the trial judge must determine whether the defendant is willing to waive the right to counsel:

> The right to counsel must be waived affirmatively and such waiver must be understandingly, intelligently, and voluntarily done.  A waiver cannot be established through presumed acquiescence.  Furthermore, it is the "responsibility, obligation and duty of the Trial Judge" to make this "serious determination of waiver," and "such determination should appear plainly on the record."  The trial court should assist in protecting the defendant's rights, at a minimum, by insuring that the defendant is aware of and understands the right to have counsel present, by explaining the meaning and consequence of waiving the right to counsel . . . and making sure that such waiver . . . is on the record.

---

[31] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981).

161

*Id.* at 771 (citations omitted) (quoting *Ford*, 526 F.2d at 922).

Assuming that the trial judge adheres to this standard in deciding whether or not the defendant has waived his right to the assistance of counsel during his attorney's absence, I consider the likelihood that the court would find a waiver in either of two scenarios. One is depicted in this case, *Roy*, in which defense counsel absented himself without the court's permission. The other scenario is depicted in *Vines* and *Woods*, in which defense counsel left the trial with the court's permission and the defendant's consent.

A waiver in the *Roy* scenario has to be found, if at all, after the fact, following counsel's absence. To find a waiver, the court must find that prior to counsel's absence, the defendant, having been fully informed of the untoward consequences he might suffer as the trial proceeds in counsel's absence, intelligently and voluntarily waived his right to counsel during that absence.

Four "parties" have an interest at stake: the trial judge, the prosecutor, the defendant, and defense counsel. The trial judge wants to obtain a waiver, for if upheld on appeal, the waiver would nullify the constitutional error as a ground for reversing the defendant's conviction, thereby avoiding a new trial. The prosecutor

wants a waiver for the same reason.[32]  The defendant, if informed that a constitutional error has been committed that would inure to his benefit on appeal in the event he is convicted, is likely to invoke the attorney–client privilege and decline to answer the judge's questions, which ask him to reveal what, if anything, his attorney told him before absenting himself.  Defense counsel, although *not* answerable under *Strickland* for the harm his absence caused his client, *is* answerable under *Strickland* for informing his client about the constitutional error that had occurred during the absence and that a waiver would not be in his client's best interest.  In short, in the *Roy* scenario, the trial judge and the prosecutor want a waiver; the defendant and his attorney do not.

To avoid having to establish in the defendant's appeal of his conviction that the constitutional error was harmless beyond a reasonable doubt, the prosecutor asks the trial judge to determine whether the defendant waived his right to counsel prior to his attorney's absence.[33]  Assuming the judge may be willing to undertake the task he would likely decide to question the defendant in open court rather than, without the prosecutor, in camera.  To enable the judge to proceed, the defendant has to waive the attorney–client privilege.  That cannot occur until the defendant

---

[32] The prosecutor evidenced this concern in this case, after Roy's attorney returned to the courtroom. Although the prosecutor could not have anticipated the New Rule, he obviously anticipated a potential *Strickland* claim based on counsel's absence.

[33] In the case at hand, the prosecutor attempted to minimize the prejudicial effects of defense counsel's absence by repeating his questions he had asked Deputy Longson during counsel's absence and obtaining the answers Longson had given.

has had an opportunity to confer with his lawyer.  The lawyer's advice is key.  The lawyer recommends that the defendant not waive the attorney–client privilege.  A waiver of the attorney–client privilege could lead to the waiver of the right to counsel during counsel's absence, and that waiver would, in the event of a conviction, eliminate any absence-related constitutional error as a ground for reversing the conviction on appeal.[34]  The lawyer recommends against waiving the attorney–client privilege for another reason:  the defendant's answers to the court's questioning might work against counsel's defense strategy.

In sum, in the *Roy* scenario, an inquiry into whether the defendant waived his right to the assistance of counsel prior to counsel's absence is fraught with problems—some obvious, some hidden.  I predict that the District Judges of this Circuit will forego the inquiry altogether.

Turning to a waiver in the *Vines–Woods* scenario, my reading of the tea leaves is that it will be a rare occasion, indeed, when the trial judge grants defense counsel a leave of absence.  I cannot imagine granting counsel leave in a trial involving only one defendant.  During counsel's absence, the defendant would simply sit still and remain silent, defenseless.  And I can only imagine granting

---

[34] Under the New Rule, *Strickland*'s performance standard would govern counsel's conduct following his absence and therefore the advice he gives his client as to whether he should waive the attorney–client privilege. I suggest that to avoid an ineffective-assistance claim on collateral attack, counsel would advise the defendant not to waive the privilege.

counsel leave in a multi-defendant trial in extraordinary circumstances. Multi-defendant trials invariably involve a charge of conspiracy, which means that practically all of the evidence is admissible against all of the defendants as relevant to prove the crime. The trial judge, when inquiring of a particular defendant as to whether the defendant is willing to waive the right to his attorney's presence, would have to be clairvoyant to inform the defendant of exactly what would transpire during his attorney's absence. Testimony inculpating the accused could come in unexpectedly through a co-defendant's cross-examination of a witness, or it could come in the form of an exhibit introduced into evidence or marked for identification and published to the jury. A waiver of counsel's presence that would cover the unknown or unanticipated would be, to put it mildly, of dubious validity.

A waiver found under these circumstances would do away with the Sixth Amendment violations that occurred in counsel's absence. If convicted, the defendant will raise the violations as grounds for reversal in his opening brief on appeal. The Government will assert the waiver in its answer brief, and the defendant in his reply brief will argue that the waiver was invalid. Our job will be to wrestle with the waiver's validity or, alternatively, to search the record to

165

determine whether the constitutional violations were harmless beyond a reasonable doubt.[35]

Yes, it will be a rare occasion, indeed, when a trial judge grants defense counsel permission to absent himself from the trial proceeding. Thus, the Court's caveat hinting that the possibility of defendants' waiving the presence of counsel may mollify the effects of the New Rule rings hollow.

## IV.

The New Rule modifies *Strickland*'s application in the Eleventh Circuit. After today, a defendant will be unable to claim that his attorney's absence from the courtroom during trial fell below the standard for effective assistance of counsel set forth in *Strickland*.

The New Rule relieves *defense counsel* of his Sixth Amendment obligation under *Strickland* when absenting himself from trial. The result is that, during counsel's absence, the client is left standing trial alone without the right to defend himself, which he would possess if he had chosen to represent himself. Although he placed his client in that situation, defense counsel is not accountable under

---

[35] Based on the procedural posture of claims that will be brought under the New Rule on direct review, the difficulty of assessing a purported waiver's validity may prove to be beyond our review in the overwhelmingly majority, if not all, such cases. As Judge Birch's dissenting opinion in *Vines* suggests instead, harmless-error review under *Chapman* will be the norm, if not the entire ball game. *See Vines*, 28 F.2d at 1137–38 (Birch, J., dissenting) ("I conclude that the waiver issue has not been reviewed properly in the district court. Therefore, the record in this case does not enable us to determine if Vines's waiver of his right to counsel was knowing, intelligent and voluntary. A remand should be required to make this determination.").

*Strickland* for any prejudice his client suffered during his absence. Instead, the responsibility for the prejudice lies with the *trial judge*.

The responsibility lies with the trial judge because the New Rule transfers to the trial judge defense counsel's obligation under *Strickland* not to absent himself from the trial proceeding and leave his client defenseless. The trial judge is held responsible, as if he had committed a constitutional error, for any prejudice the defendant suffers during counsel's absence. If the defendant is convicted and appeals, the trial judge will be held accountable for the prejudice, if any, in the form of a reversal, unless the Government can convince this Court that the prejudice was harmless beyond a reasonable doubt.

In conclusion, today's decision rearranges the Supreme Court's scheme for protecting the right to the assistance of counsel in the absence-of-counsel context, and that context alone. The framework *Strickland* fashioned is modified, supplanted by a new constitutional rule that imposes accountability on the trial judge without fault. As applied going forward, the New Rule becomes fault based and effectively instructs trial judges that if a defendant's lawyer is absent at any time during the prosecution, they will have committed constitutional error.[36]

---

[36] In promulgating the New Rule, we are acting as if we were exercising our supervisory powers, but doing so unnecessarily. As the Supreme Court observed in *United States v. Hasting*, "Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since by definition, the conviction would have been obtained

167

Eighty years ago, Justice Brandeis, concurring in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring), observed that the Supreme Court "will not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* at 347, 56 S. Ct. at 483 (quotation marks and citation omitted). In this case, the New Rule is unnecessary to affirm Roy's convictions. I would decline Roy's invitation, which the Government joins, to modify *Strickland*'s application and create a new Sixth Amendment rule, because any error that may have occurred was harmless beyond a reasonable doubt. In affirming his convictions, I would explicitly state that Roy is free to pursue a *Strickland* ineffective-assistance claim in the District Court in a motion filed under 28 U.S.C. § 2255.

---

notwithstanding the asserted error." 461 U.S. 499, 506, 103 S. Ct. 1974, 1979, 76 L. Ed. 2d 96 (1982). In this case, since the alleged error is harmless beyond a reasonable doubt, this Court need not make the constitutional rulings it is making.

WILLIAM PRYOR, Circuit Judge, concurring:

Although I agree that we should review for harmless error and that the error in this appeal is harmless, we have unnecessarily complicated this appeal. This appeal does not require that we create a new test to identify structural defects. Nor does it require that we adopt wholesale a multi-factor test that other circuits designed to address the different problem of a sleeping lawyer. I concur in full in Parts I, II, III, IV, VI, and VII of the majority opinion. I also concur in Parts V.A, V.B, V.D, and V.E, except for the characterization of *Cronic* as an exception to the harmless error rule instead of a kind of constitutional violation. I do not join Part V.C.

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. The Supreme Court issued two decisions on the same day interpreting this clause: *Strickland v. Washington*, 466 U.S. 668 (1984), and *United States v. Cronic*, 466 U.S. 648 (1984). *Strickland* held that ineffective assistance of counsel, defined as performance that is both objectively unreasonable and actually prejudicial, violates the Sixth Amendment. 466 U.S. at 688, 692. *Cronic* clarified that some circumstances require no showing of actual prejudice to establish a Sixth Amendment violation, namely those "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at

169

658. For example, we presume prejudice for (1) the "complete denial of counsel" "at a critical stage of . . . trial," (2) the "entire[] fail[ure] to subject the prosecution's case to meaningful adversarial testing," and (3) what amounts to a sham appointment of counsel, as in *Powell v. Alabama*, 287 U.S. 45 (1932). *Cronic*, 466 U.S. at 659–61. *Strickland* is about the ineffective assistance of counsel, and *Cronic* is about what amounts to no assistance of counsel at all.

The majority treats *Cronic* as an "exception to the harmless error rule," *see, e.g.*, Maj. Op. at 26, when it actually describes "a narrow exception to the two prong *Strickland* test." *Vines v. United States*, 28 F.3d 1123, 1127 (11th Cir. 1994); *see also Castillo v. Fla., Sec'y of Dep't of Corr.*, 722 F.3d 1281, 1286–87 (11th Cir. 2013). Both *Strickland* and *Cronic* address whether a constitutional violation occurred, not an exception to an ordinary standard of review. *See Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

I agree with the majority that a violation of the Sixth Amendment occurred at Roy's trial. I agree with the majority that "we are not treating this as an attorney error case. . . . Nor do the parties treat it as one." Maj. Op. at 19 n.7. This conclusion makes sense because "*Strickland* assumes the presence of counsel." *Vines*, 28 F.3d at 1127. I also agree that Roy's appeal does not present the kind of extraordinary circumstances discussed in *Cronic* that would entitle him to a presumption of prejudice. Counsel's absence for seven minutes of testimony in a

170

week-long trial, where the testimony was then repeated without objection during counsel's presence, is neither a complete denial of counsel for a critical stage nor an entire failure to provide meaningful adversarial testing. Nevertheless, I also agree with the majority that "it is a violation of the Sixth Amendment for inculpatory testimony to be taken from a government witness without the presence of at least one of the defendant's counsel," Maj. Op. at 18, because the defendant has briefly been denied "the Assistance of Counsel for his defence," U.S. Const. Amend. VI.

Because the denial of Roy's constitutional right to the assistance of counsel is neither the kind described in *Strickland* nor in *Cronic*, we must decide whether this violation is a trial error or a structural defect. Most constitutional errors are trial errors: those that "occur during presentation of the case to the jury" and have an effect that can "be quantitatively assessed in the context of other evidence presented in order to determine whether they were harmless beyond a reasonable doubt." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (alterations adopted) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991)). Other constitutional errors are structural defects, which "defy analysis by harmless-error standards because they affect the framework within which the trial proceeds." *Gonzalez-Lopez*, 548 U.S. at 149 (alteration adopted) (internal quotation marks omitted) (quoting *Fulminante*, 499 U.S. at 309–10). Structural defects are those

171

"whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).

Roy's appeal does not present a structural defect. The brief absence of counsel does not present the sort of pervasive, framework-shifting violation that makes the denial of counsel of choice or the total denial of counsel structurally defective. *Gonzalez-Lopez*, 548 U.S. at 150. As thoroughly explained by the majority, the temporary absence of Roy's counsel did not have "consequences that are necessarily unquantifiable and indeterminate" that "unquestionably qualif[y] as 'structural error.'" *Id.* (quoting *Sullivan*, 508 U.S. at 282). There was no systemic breakdown in the adversarial process, and we can easily measure Roy's prejudice.

I agree with the majority that the error here was harmless beyond a reasonable doubt. Future violations of the Sixth Amendment based on the temporary absence of counsel can be easily avoided: I would hope that no district court in this Circuit would ever begin or resume a trial without defense counsel being present. If a lawyer is late, a district court can employ other remedies to solve that problem.

172

JORDAN, Circuit Judge, concurring:

For me, the record drives the resolution of this case and renders largely academic the debate about what constitutes a "critical stage" of a trial.  I therefore join the court's opinion except for Parts V.B and V.C.3, both of which discuss what is or is not a "critical stage."  The portions I join contain what I consider to be the court's two most important holdings: that there was a Sixth Amendment violation due to defense counsel's absence from a brief portion of the trial, and that this constitutional error was harmless.

To recap, while Mr. Roy's counsel was absent from the courtroom for seven minutes, Deputy Longson answered a number of questions posed to him by the prosecutor.  Once counsel had returned, however, Deputy Longson repeated the testimony he had given in counsel's absence.  There was one difference in the testimony, as the court's opinion explains, but that difference was not material.  So counsel heard essentially everything he had missed during his brief absence, chose not to object to what he heard upon his return, and had the opportunity to cross-examine Deputy Longson concerning the repeated testimony.

Because there was, in practical terms, a do-over after counsel returned to the courtroom, this case is amenable to harmless error review, and there is no need (or institutional reason) to presume prejudice.  We can, without much difficulty, assess the impact (or lack thereof) of counsel's absence, as was done in *Sweeney v.*

173

*United States*, 766 F.3d 857, 860–61 (8th Cir. 2014), and *United States v. Kaid*, 502 F.3d 43, 45-47 (2d Cir. 2007).

Another way to approach this case is to think about what might have happened had Mr. Roy's counsel objected, immediately upon his return to the courtroom, to evidence being presented in his absence. The district court, I think, would not have been compelled to grant an immediate mistrial, and could have remedied the Sixth Amendment violation in a number of ways. For example, the district court could have told the jurors what happened, stricken the testimony introduced in counsel's absence, instructed the jurors to disregard that testimony, and allowed the prosecutor to elicit that testimony again. Or the district court could have excused the jury, allowed the court reporter to read back the testimony that counsel had missed, and permitted counsel to lodge any objections he wished. Either of these two options, in my opinion, would have allowed counsel to be prepared to question Deputy Longston and rendered the constitutional error harmless. Here, the repetition of the missed testimony following counsel's return to the courtroom accomplished essentially the same thing.

But where the absence of counsel is longer, and/or where the missed testimony is not substantially repeated or available for review prior to cross-examination, the constitutional analysis (and the result) might well be different. *See, e.g.*, *United States v. Russell*, 205 F.3d 768, 769–70, 772–73 (5th Cir. 2000);

174

*Olden v. United States*, 224 F.3d 561, 566, 568–70 (6th Cir. 2000).  The same goes for when both the defendant and his counsel are missing from the courtroom while inculpatory testimony is presented, as the defendant's absence adds an important wrinkle to the analysis.  *Cf. Snyder v. Comm. of Massachusetts*, 291 U.S. 97, 107–08 (1934) ("So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."); *United States v. Bowe*, 221 F.3d 1183, 1189 (11th Cir. 2000) (articulating the same standard under the Fifth Amendment).  I do not read the court's opinion to suggest otherwise.

175

ROSENBAUM, Circuit Judge, concurring in part and concurring in the result:

In my view, the Majority opinion's ultimate determinations that the error in Roy's case is subject to harmless-error review and that the error here was, in fact, harmless beyond a reasonable doubt are correct. But I respectfully disagree with the Majority opinion's framework for evaluating cases raising claims involving counsel's absence during the taking of directly inculpatory evidence in single-defendant trials.

Though the Majority opinion correctly acknowledges that the absence of counsel during the taking of directly inculpatory evidence can be structural error, *see* Maj. Op. at 61-72, it rejects the notion that counsel's absence can constitute the type of structural error known as *Cronic*[1] error if counsel is not gone for the entirety of a "critical stage" of trial. Instead, the Majority asserts that we need a new substantial-portion-of-the-trial standard, derived without reference to *Cronic*, to assess whether structural error has occurred when counsel is absent for only part of trial. I cannot agree with this conclusion. If a defendant suffers deprivation of counsel that is "so likely to prejudice the accused that the cost of litigating [its] effect in a particular case is unjustified," *United States v. Cronic*, 466 U.S. 648, 658 (1984), then *Cronic* error has occurred, regardless of whether the deprivation lasted for an entire "critical stage" of trial. As a result, we must presume prejudice.

---

[1] *United States v. Cronic*, 466 U.S. 648 (1984).

176

The Majority's development of a new standard to supplement *Cronic* solves a non-existent problem. Contrary to the Majority opinion's contention, *Cronic*'s language does not impose a repressive "formula" that makes the opinion inapplicable in cases where counsel is absent for only part of trial. *See* Maj. Op. at 60. The Majority opinion proceeds on the incorrect assumption that *Cronic* error occurs only when "defense counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing' in the trial or where 'the complete denial of counsel' at a 'critical stage of [the] trial'" happens. *See id.* at 22-23 (quoting *Cronic*, 466 U.S. at 659). But these formulations are merely demonstrative examples of "circumstances [involving denial of counsel] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified"—*Cronic*'s ultimate standard for structural error. *Cronic*, 466 U.S. at 658.

In evaluating a deprivation-of-counsel error, we must not lose sight of our ultimate goal—to safeguard the adversarial process that gives a trial its basic character. The Supreme Court did not intend *Cronic* to provide an exhaustive list of specific circumstances giving rise to a presumption of prejudice. Rather, the decision and the Supreme Court's later jurisprudence on structural error demonstrate that *Cronic* error includes any denial-of-counsel error that renders a trial presumptively unreliable because of a breakdown of the adversarial process.

177

*See id.* at 656-58. Simply put, when the absence is long enough to create a high probability that the accused fundamentally did not receive the trial promised to him under the Constitution, structural error occurs, and we need not conduct any search for actual prejudice. This type of error, of course, can occur when counsel is absent for only part of a critical stage of trial.

Nor are the differences between the Majority opinion's approach and an analysis under *Cronic* merely semantic. The Majority opinion's departure from *Cronic* imparts at least two undesirable consequences. First, the new standard that the Majority opinion announces today—the substantial-portion-of-the-trial standard—violates the Supreme Court's instruction to use a categorical, rather than case-by-case, approach to determining whether an error is structural. Indeed, the Majority opinion's test expressly *requires* case-by-case application and the weighing of subjectively judged factors. *See* Maj. Op. at 70-71. This type of inquiry defeats the purpose of review for structural error—to identify and weed out circumstances highly likely to result in "fundamental unfairness" where finer-tooth review will often be impractical or judicially uneconomical. It will also necessarily cause inconsistent determinations about when structural error occurs in absent-counsel cases.

The Majority opinion's substantial-portion-of-the-trial standard also does not sufficiently appreciate the fundamental nature of the absence-of-counsel error. So

it relegates even lengthier absences to trial-error status, even though the role that counsel plays at trial warrants that all but the briefest of absences in a single-defendant trial constitute structural error.

Instead of the Majority opinion's approach, we must evaluate whether counsel's absence in a single-defendant trial justifies a presumption of prejudice without regard to whether the defendant was actually prejudiced in a given case. We do that by making a probability assessment of when, in general, counsel's absence becomes long enough that it is likely to result in a breakdown in the trial structure; create the appearance of unfairness to the jury and the public; affect counsel's trial strategy; and make the potential for prejudice to the defendant high and the costs of litigating the actual effects of the denial, if even possible, not worthwhile. When that happens, the defendant has suffered structural error under *Cronic*.

Contrary to the Majority opinion's suggestion, these factors allow hardly any wiggle room for the absence of counsel before trial error crosses the threshold of structural error and requires prejudice to be presumed. So structural error must be the rule, not the exception as the Majority opinion makes it, in absent-counsel cases.

I write separately to explain where the line must be drawn in the course of determining whether *Cronic* error has occurred and why it must be ascertained

179

without respect to whether prejudice has, in fact, occurred in a given case. The general rule must be that counsel's absence in a single-defendant trial is structural error under *Cronic* when it renders a trial presumptively unreliable because of a breakdown of the adversarial process—a rule that correlates with counsel's absence for more than ten minutes or 1% of the trial.

## I.    Trial error and structural error differ in important ways.

Constitutional errors fall into two categories: trial error and structural error.[2] Trial error happens "during the presentation of the case to the jury[] and . . . may therefore be quantitatively assessed in the context of other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991). When trial error occurs, we evaluate it by determining whether the government has proven that the error was harmless to the outcome, beyond a reasonable doubt. *Id*. "[M]ost constitutional errors" fall into the category of trial error. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (internal quotation marks omitted).

---

[2] In *United States v. Gonzalez-Lopez*, 548 U.S. 140, 159 (2006) (Alito, J., dissenting), four dissenting Justices took issue with the Court's division of constitutional error into the all-inclusive categories of trial error, which always is subject to harmless-error review, and structural error, which always results in automatic reversal. While the Court stated that its conclusion that denial of the right to counsel of choice constitutes structural error "relie[d] neither upon such comprehensiveness nor upon trial error as the touchstone for the availability of harmless-error review," the Court nonetheless responded to the dissenters' objection by opining that "it is hard to read [its precedent] as doing anything other than dividing constitutional error into two comprehensive categories." *Id.* at 149 n.4.

180

Structural error, in contrast, "affect[s] the framework within which the trial proceeds, rather than [being] simply an error in the trial process itself." *Fulminante*, 499 U.S. at 310. This type of error "necessarily render[s] a trial fundamentally unfair." *Rose v. Clark*, 478 U.S. 570, 577 (1986). For this reason, when structural error occurs, we do not give the government a chance to try to demonstrate beyond a reasonable doubt that the defendant was not prejudiced; instead, we assume prejudice without actually assessing the record for it. *See generally Gonzalez-Lopez*, 548 U.S. at 148.

Failure to provide the "basic protections" at trial, *id.*—an impartial judge, the correct standard of proof, an impartial jury, and the assistance of counsel, *see Neder v. United States*, 527 U.S. 1, 9 (1999)—results in structural error because when any of these safeguards is missing, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose*, 478 U.S. at 577-78 (citation omitted).

The effects of the structural error can be difficult or even impossible to quantify. *Gonzalez-Lopez*, 548 U.S. at 149 n.4. And even when they can be assessed, structural error involves "'circumstances . . . that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is

181

unjustified.'"  *See Wright v. Van Patten*, 552 U.S. 120, 124 (2008) (quoting *Cronic*, 466 U.S. at 658).

Trial error and structural error differ in another important way as well. While we assess harmless error on a case-by-case basis, an error that qualifies as structural error does so categorically. As the Supreme Court has explained, "a constitutional error is either structural or it is not," so we do not evaluate the specific impact of a given iteration of constitutional error upon a jury's verdict when we determine whether the error constitutes structural error. *Neder*, 527 U.S. at 14.

## II.    Denial of counsel during some of the taking of inculpatory evidence in a one-defendant trial can rise to the level of *Cronic* error.

Structural error can arise in different ways in the context of the denial of the Sixth Amendment right to counsel, but the touchstone for the analysis in all cases asks whether the denial has resulted in circumstances "so likely to prejudice the accused that the cost of litigating [its] effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658. In *Cronic*, the Supreme Court identified some specific circumstances that would meet this standard to demonstrate how courts should think about the problem.

The "[m]ost obvious" variety of *Cronic* error arises when "the accused is denied counsel at a critical stage of . . . trial." *Cronic*, 466 U.S. at 659. Perhaps this manifestation of *Cronic* error can occur when counsel is absent for a non-*de*

182

*minimis* part of a "critical stage" of trial.[3]  But even if it cannot, counsel's absence during a non-*de minimis* part of trial causes a "breakdown of the adversarial process," which constitutes "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 657-58.  I explain each of these manifestations of *Cronic* error, in turn, below.

> A.   *The denial of counsel during only part of a "critical stage" can rise to the level of* Cronic *error.*

>> 1.   <u>A "critical stage" is a discrete and readily identifiable, critically important unit of trial.</u>

I agree with the Majority that a "critical stage" cannot consist of a single question and answer or even several questions and answers from a single witness. Maj. Op. at 28.  Rather, for the reasons the Majority opinion describes, a "critical stage" must be a discrete and readily discernible part of the trial.  *See id.* at 30-31.

A "critical stage" of trial also "h[olds] significant consequences for the accused.  *Bell v. Cone*, 535 U.S. 685, 696 (2002).  For example, in discussing *Cronic* error that arises when "the accused is denied counsel at a critical stage of

---

[3] As I discuss later in this concurrence, *Cronic* speaks in terms of circumstances that result in an "actual breakdown of the adversarial process" and that are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  466 U.S. at 657-68.  The absence of counsel for a very brief period does not effect these consequences, so the denial of counsel during part of a critical stage of trial that *Cronic* speaks of must be more than *de minimis*.

. . . trial," the Supreme Court has identified as "critical stages," among others, arraignment, *Hamilton v. Alabama*, 368 U.S. 52, 54 (1961), the preliminary hearing, *White v. Maryland*, 373 U.S. 59, 60 (1963), closing argument, *Herring v. New York*, 422 U.S. 853, 865 (1975), and recess, *Geders v. United States*, 425 U.S. 80, 91 (1976).

Here, the Majority opinion does not dispute that Roy was denied counsel while the trial court admitted directly inculpatory evidence in his counsel's absence.   Nor does the Majority opinion appear to contend that the taking of directly inculpatory evidence is not, as a whole, a "critical stage" of trial within the meaning of *Cronic*.   And it could not.

As Judge Wilson points out, it is hard to envision a stage of trial that holds more "significant consequences" for the defendant, *Bell*, 535 U.S. at 696, than the taking of directly inculpatory evidence.  *See* Wilson Op. at 240-43; *see also Perry v. Leeke*, 488 U.S. 272, 287 (1989) (Marshall, J., dissenting) ("'[I]t is difficult to perceive a more critical stage . . . than the taking of evidence on the defendant's guilt.'") (quoting *Green v. Arn*, 809 F.2d 1257, 1263 (6th Cir. 1987)).   In the absence of inculpatory evidence, conviction is a legal impossibility because the defendant is presumed innocent until a jury finds that the government has presented sufficient *evidence* to establish guilt beyond a reasonable doubt.   That cannot be said of other stages of trial, such as closing argument.   And though a jury

184

can return a guilty verdict without hearing closing argument by the prosecution, we have nonetheless held that closing arguments constitute a critical stage of trial. *See Hunter v. Moore*, 304 F.3d 1066, 1069-70 (11th Cir. 2002).

2. The denial of counsel during only part of a "critical stage" can rise to the level of *Cronic* error.

Though the Majority opinion does not dispute that the taking of inculpatory evidence meets the definition of a "critical stage" of trial, it asserts that the Supreme Court's decision in *Cronic* "limited the presumption of prejudice to cases where defense counsel" was absent "during an *entire* 'stage of [the] trial.'" Maj. Op. at 22, 29, 32 (emphasis added) (quoting *Cronic*, 466 U.S. at 659)). But while the Majority opinion rejects the idea that counsel's absence for less than an entire critical stage can constitute *Cronic* error, the Majority opinion nonetheless acknowledges that structural error can occur in those circumstances. *See id.* at 32-34, 60-61.

The Supreme Court has never held that the absence of counsel for part, but not all, of a critical stage of trial does not constitute structural error. First of all, it is not even clear that *Cronic*'s language supports the Majority opinion's reading of *Cronic* to so limit the presumption of prejudice. The opinion speaks of the denial of counsel "*at* a critical stage of . . . trial," 466 U.S. at 659 (emphasis added), not "throughout" a "critical stage." And the denial of counsel for part of a critical stage is nonetheless the denial of counsel "*at* a critical stage."

185

But more significantly, this language offers but one angle from which a court can approach the problem of defining structural error in denial-of-counsel cases. In no case where the Supreme Court *has* found structural error concerning the right to counsel has the Court held that the absence of counsel for the entirety of a critical stage is a necessary prerequisite for a finding of structural error. Instead, the cases to which the Majority opinion refers, and some of the Supreme Court's descriptions of them, reflect only that those cases happened to concern facts involving the absence of counsel throughout the entire critical stage at issue.[4]

Although the Supreme Court has never considered a case like Roy's, the Supreme Court has, at least once, effectively found structural error where the defendant suffered a deprivation of counsel for less than the entirety of what appears to be a "critical stage" of the proceedings. In *Geders v. United States*, 425 U.S. 80 (1976), the defendant was in the middle of his trial testimony when, despite defense counsel's objections, the court prohibited the defendant from conferring with his counsel during a seventeen-hour overnight recess that occurred in the ten-day trial. *Id.* at 88.

Without considering specific prejudice in Geders's case in any way, the Supreme Court reversed the defendant's conviction because the order "impinged

---

[4] *See, e.g.*, *Holloway v. Arkansas*, 435 U.S. 475 (1978) (counsel labored under conflict of interest throughout entire proceeding); *White*, 373 U.S. at 59-60 (counsel absent for an entire preliminary hearing); *Hamilton*, 368 U.S. at 52 (counsel absent for entire arraignment).

upon [the defendant's] right to the assistance of counsel guaranteed by the Sixth Amendment." *Id.* at 91. As the Court explained,

> recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier. At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events.

*Id.* at 88. So *Geders* demonstrates that *Cronic* error can occur when a deprivation of counsel lasts for only part of a "critical stage."

The Majority opinion attempts to distinguish *Geders* in two ways. Neither is persuasive.

First, the Majority notes that the opinion never used the terms "critical stage" or "stage" in its analysis. Maj. Op. at 33. That's true. *Cronic* had not been decided at that time, so *Geders* mentions neither "critical stages" nor "structural error." But the Supreme Court has since indicated that it views *Geders* as part of its structural-error—and particularly the *Cronic* variety of its structural-error—jurisprudence.

Indeed, in *Cronic* itself, the Supreme Court specifically described its reasoning in *Geders* as having "found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused *during a critical stage* of the proceeding." *Cronic*, 466 U.S. at 659 n.25

187

(emphasis added). The fact that the Court did not use the terms "critical stage" or "stage" in *Geders* itself therefore does not somehow make *Geders* any less of an example of a deprivation of counsel that is presumptively prejudicial despite lasting through only part of a critical stage.

The Court's ruling in *Strickland v. Washington*, 466 U.S. 668 (1984), reinforces this point about the relationship between *Geders* and *Cronic*. *Strickland* incorporates by reference *Cronic*'s citation to *Geders* when it says, "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." 466 U.S. at 692 (citing *Cronic*, 466 U.S. at 659 n.25 (citing *Geders*, 425 U.S. at 80)). The Majority opinion cites this sentence from *Strickland* and emphasizes the word "altogether" to support its theory that the *Cronic* exception applies only when counsel is absent for an entire "critical stage." *See* Maj. Op. at 26-27.

But *Geders* plainly does not fit that bill. In light of this fact and the specific issue that *Strickland* considered (ineffectiveness of counsel, not counsel's actual absence for any length of time), the quoted *Strickland* sentence does not support the proposition that any presumptively prejudicial denial of counsel must last throughout an entire critical stage to be structural error. Rather, the Court in *Strickland* merely contrasted absent-counsel cases under *Cronic* with the situation

188

where counsel is present and functioning throughout the trial but may be ineffective in some way.

Second, the Majority opinion characterizes *Geders* as "one of a line of decisions presuming prejudice where a defense attorney was prevented from, or impeded in, rendering assistance of counsel to his client because of an unconstitutional statute or court order." *Id.* at 33-34 (citing *Perry*, 488 U.S. at 279-80). This description is accurate as far as it goes, but it does not justify the Majority opinion's subsequent conclusion that *Geders* is simply a government-impediment case. Nor does it support the Majority opinion's position that "[t]he . . . statutory or court-ordered interference exception to the prejudice requirement that was applied in *Geders* . . . does not apply in this case," *id.* at 34, even setting aside for the moment the fact that *Cronic* itself cites *Geders* in support of its critical-stage analysis. *See Cronic*, 466 U.S. at 659 n.25.

Rather, *Geders* demonstrates that government impediment will nearly always, if not always, occur in some form in cases involving *Cronic* error. Among other descriptions, the Supreme Court has summarized *Geders* as a case "where [it] found a Sixth Amendment error without requiring a showing of prejudice" because *Geders* involved a criminal defendant "who had actually . . . been denied counsel by government action." *Bell*, 535 U.S. at 696 n.3.

189

That also happened in Roy's case. Starting trial and taking directly inculpatory evidence when the defendant's counsel is absent—even inadvertently—likewise deprives a defendant of assistance of counsel through "government action." It makes no difference whether the court,[5] the prosecution,[6] or defense counsel bears blame for counsel's absence.[7] "Our Constitution places in the hands of the *trial judge* the responsibility for safeguarding the integrity of the jury trial," *United States v. Gainey*, 380 U.S. 63, 68 (1965) (emphasis added), which includes "the duty of seeing that the trial is conducted with solicitude for the

---

[5] Here, the court began trial a minute earlier than the scheduled recess ended. Counsel certainly should have been present at that point, and efficiency and promptness are praiseworthy qualities in a district court. Nevertheless, if blame were relevant—it's not for the reasons I have mentioned—a court that starts trial before the end of a scheduled recess, when counsel in a single-defendant trial is absent, is not entirely without fault in the deprivation.

[6] Nevertheless, "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law." *Berger v. United States*, 295 U.S. 78, 88 (1935). Consequently, the prosecutor has an independent responsibility to ensure that trial does not proceed when defense counsel is not present.

[7] That is not to say that counsel who is late may not be sanctioned. It is certainly fair and appropriate for a judge to expect attorneys to be on time. When an attorney is late, the resulting delay unnecessarily takes up the court's precious time and unfairly impinges on the jury's time. Of course, sometimes circumstances beyond an attorney's control can occur. Nothing in the record indicates that defense counsel in Roy's case was chronically late for trial or regularly returned late from recesses. If it did, sanctions of some type might well be in order. But even if they were, "[t]here are other ways to deal with the problem . . . short of" denying the defendant his counsel during the taking of directly inculpatory evidence. *Cf. Geders*, 425 U.S. at 89. For example, the court could monetarily sanction counsel outside the presence of the jury, or, if counsel is court-appointed, the court could remove counsel from the approved Criminal Justice Act list. But counsel's tardiness alone cannot justify denial of a *defendant's* right to counsel. Of course, if a defendant affirmatively schemes to introduce reversible error through his counsel's absence, that is a different matter and may constitute a waiver of the right. The record contains no evidence that that is the situation here.

190

essential rights of the accused," *Glasser v. United States*, 315 U.S. 60, 71 (1942), *superseded on other grounds by statute as recognized in Bourjaily v. United States*, 483 U.S. 171, 181 (1987).  Necessarily, then, "[t]he trial court should protect the right of an accused to have the assistance of counsel." *Id.*

This makes perfect sense:  the court alone enjoys control over the trial proceedings, including when to start, stop, and resume trial.  And trial simply cannot proceed without the court's actions in allowing it to do so.  After all, the government, or even the defense, cannot call a witness to the stand and begin questioning when the trial judge is not present.  Because of the judge's essential role in convening trial, when a court conducts trial in defense counsel's absence, government action has necessarily deprived a defendant of his right to counsel during trial.  Inevitably, then, government impediment likely will always be relevant in absent-counsel cases.

But government impediment alone is not enough to explain why the error in *Geders* was structural.  If it were, the error in Roy's case would be structural without regard to the length of his counsel's absence from trial.  Indeed, the Majority probably would agree we should not conclude, based on *Geders*, that any government interference with the right to counsel always triggers structural error under any circumstances for essentially the same reasons the Majority opinion concludes that counsel's absence for less than a "substantial portion of the trial" is

191

not structural.  *See Strickland*, 466 U.S. at 686 (noting that "[g]overnment violates the right to effective assistance when it interferes in *certain* ways," but not necessarily all ways, "with the ability of counsel to make independent decisions about how to conduct the defense") (emphasis added).  Consequently, *Geders* supports the notion that structural error—including *Cronic* error—can occur when an error lasts for only part of a critical stage.

In sum, the absence of counsel during part of a "critical stage" can constitute *Cronic* error.

> B.    *"[A]n actual breakdown of the adversarial process" results in* Cronic *error because the breakdown amounts to "circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."*

The question remains:   how long of an absence during the taking of inculpatory evidence can be tolerated before the absence results in "circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified"?

Unfortunately, as far as I can tell, no magical formula can tell us in every given case precisely where the breaking point is.  But that does not mean we cannot meaningfully draw a probability line.  After all, when we speak of structural error, we are talking about probabilities, not certainties.  We must therefore conduct a probability assessment without respect to the particular facts of a given case because errors qualify as structural categorically.  *See Neder*, 527 U.S. at 14.

192

1.    <u>In the most basic and literal way, the denial of counsel in a single-defendant case during the taking of directly inculpatory evidence undermines the adversarial process itself.</u>

To conduct our probability assessment, we begin by reviewing why the Supreme Court delineated a category of structural errors in the first place: to make certain that the constitutional framework of procedural protections necessary for a fair trial remains intact. The Court was careful to note this broader goal in *Cronic* itself, in the specific context of the right to counsel: "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." 466 U.S. at 658. So a presumptively prejudicial error is one that is highly likely to have "some effect . . . on the reliability of the trial process." *Id.*

In other words, it is one that is highly likely to "affect[] the framework within which the trial proceeds." *Fulminante*, 499 U.S. at 310. When we speak of this "framework," we refer at a minimum to the anatomical features of the basic trial the Constitution envisions, unless a defendant chooses otherwise: an impartial jury, properly instructed on the prosecution's burden of proving the defendant guilty beyond a reasonable doubt, *see Sullivan v. Louisiana*, 508 U.S. 275 (1993); an impartial judge, *see Rose*, 478 U.S. at 577 (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)); and, of course, the "Assistance of Counsel for . . . defence," U.S. Const.

193

amend. VI; *see Cronic*, 466 U.S. at 653 n.7 (1984) (citing *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)).

The significance of *Cronic*—and the defining feature of "*Cronic* error"—lies in identifying a particular way in which denial of counsel so seriously affects the defendant's ability to receive a fair trial that prejudice must be presumed. Under *Cronic*, a denial of counsel requires the presumption of prejudice when "an actual breakdown of the adversarial process" occurs during trial. *Id.* at 657-58. "[I]f the process loses its character as a confrontation between adversaries," *id.* at 656-57, then the framework for trial envisioned by the Constitution collapses. *See Fulminante*, 499 U.S. at 310; *see also Framework*, The American Heritage Dictionary of English Language (4th ed. 2000) (defining "framework" as a "structure for supporting . . . something else").

So our line must account for the crucial role that counsel plays in our trial framework. At no time is this role more important than during the taking of inculpatory evidence. Indeed, the taking of inculpatory evidence is perhaps the most critical part of the trial. Wilson Op. at 241-43. Only evidence can convict an accused. So any tolerable absence cannot be too great before a trial loses its structural integrity as a "trial" under our Constitution. *See Cronic*, 466 U.S. at 656-59.

When counsel is absent for any non-*de minimis* period during the taking of evidence, it is also, no doubt, obvious to the jurors and any spectating members of the public as well. This problem likewise causes dangerous cracks in our trial's foundation because it conflicts with the court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings *appear fair* to all who observe them." *Gonzalez-Lopez*, 548 U.S. at 152 (emphasis added) (internal quotation marks omitted); *see* Wilson Op. at 263 (quoting *Indian v. Edwards*, 554 U.S. 164, 177 (2008) (citation omitted)).

A lengthy absence of counsel may, as Judge Wilson points out, *see id.* at 236-37, cause the jury to develop its own ideas about the significance of defense counsel's absence from trial—that defense counsel may not believe in the defendant's case, that the court thinks so little of the defendant or his counsel that it does not deem it worthwhile to wait for counsel before beginning, that the case itself is unimportant and not worthy of the formality otherwise attached to criminal trials, or that any number of other unfair ideas justify resuming trial in the absence of defense counsel. While I do not suggest that juries do not follow instructions to consider only the admitted evidence, that does not mean that factors such as these have no subconscious effect on their thinking. Indeed, I see no reason why these unfair prejudices would be any less threatening to the rights of the accused than the

195

ones that the Federal Rules of Evidence explicitly seek to avoid. *See, e.g.*, Fed. R. Evid. 403.

Nor does the fact that a record of what happened while our judicial structure caved in on itself during the absence of counsel somehow remedy this framework problem. *See* Maj. Op. at 64 (suggesting that the fact that what counsel missed in his absence can be determined "should bear heavily on whether to presume prejudice"). So in order to account for the trial-framework problem, any absence must be brief to avoid rising to the level of *Cronic* error.

Yet *Cronic*'s use of the phrase "an actual breakdown of the adversarial process" contemplates more than the momentary unavailability of counsel. As *Cronic* explains, "The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." 466 U.S. at 656. And "meaningful adversarial testing" can occur at trial even if counsel is absent for a brief period.

Indeed, some absences may be so short that they cannot fairly be viewed by any measure as affecting the framework within which the trial proceeds because defense counsel is present to provide assistance throughout literally nearly all of trial. To take an extreme example, if counsel misses five seconds of testimony, the trial structure itself does not collapse. Rather, the trial maintains its character as an adversarial proceeding. Little occurs in counsel's absence, and we can easily

196

evaluate the significance of the five seconds' worth of testimony taken. A jury is similarly unlikely to draw negative inferences from such an absence. Presuming prejudice under these circumstances makes little sense. The same is true of slightly longer absences, up to a few minutes. For the reasons I have discussed, though, soon after that, counsel's absence necessarily begins to cause "an actual breakdown of the adversarial process," since our trial framework can withstand one of its structural pillars missing for only so long before it starts to crumble irreparably. *See Cronic*, 466 U.S. at 657-58.

> 2. Evaluating the effects of counsel's absence during the taking of inculpatory evidence at a single-defendant trial becomes challenging or impossible the longer the absence persists.

Second, we must draw our line at a point before the absence has lasted long enough to interfere with our ability to assess its effects. *See Gonzalez-Lopez*, 548 U.S. at 149 n.4 (noting that "the difficulty of assessing the effect of the error" is a basis for identifying structural error). As with the trial framework's tolerance of counsel's absence, that point arrives soon after the absence begins.

Although the Majority opinion concludes that the harm resulting from counsel's absence is limited to the erroneous admission of evidence, *see* Maj. Op. at 54-55 (quoting *Satterwhite v. Texas*, 486 U.S. 249, 257-58 (1988)), that conclusion does not recognize either the harm to the trial framework that I have discussed above or the harm to the full scope of counsel's representation that can

197

occur when more than a brief absence happens.[8]  Judge Wilson eloquently makes these points in his Dissent.  *See* Wilson Op. at 238-40.

As Judge Wilson notes, *see id.*, counsel's responsibility during trial does not consist solely of keeping out objectionable evidence.  Defense counsel orchestrates the entire defense, of which challenging objectionable evidence is but a single part.

---

[8] The Majority opinion's reliance on *Fulminante*, 499 U.S. at 306-07, and cases it cites to demonstrate that the erroneous admission of evidence is subject to harmless-error review is flawed for the same reasons.  *See* Maj. Op. at 76-77.  The kinds of error at issue in *Fulminante* and the cases it cites tell us nothing about whether the absence of counsel *during part of trial* constitutes structural error.  Not one of the opinions identified in *Fulminante* indicates that counsel was not present at the actual trial, when the challenged evidence against the defendant was admitted.  So when the errors in those cases occurred, the structural framework of the trial was intact and counsel was aware of and able to confront the fallout from the erroneous admission of evidence, unlike when an absence of counsel occurs in a single-defendant trial during part of the taking of directly inculpatory evidence.  The Majority opinion's reliance on *Florida v. Nixon*, 543 U.S. 175 (2004), *Bell*, 535 U.S. at 688, and *Cronic*, 466 U.S. 648, suffers from a similar problem:  counsel was present at trial when the challenged actions occurred.  In fact, it was counsel's actions during his presence at trial that were at issue in those cases.  Similarly, counsel was present at trial when the errors happened in all of the other cases the Majority opinion cites in support of its position that harmless-error analysis applies to the absence-of-counsel error in all but those cases where counsel was absent for a substantial portion of the trial.  *See* Maj. Op. at 82-93 (citing *Hinton v. Alabama*, __ U.S. __, 134 S. Ct. 1081 (2014) (per curiam); *Harrington v. Richter*, 562 U.S. 86 (2011); *Banks v. Dretke*, 540 U.S. 668 (2004); *Strickler v. Greene*, 527 U.S. 263 (1999); *United States v. Bagley*, 473 U.S. 667 (1985); *Jones v. Butler*, 778 F.3d 575 (7th Cir. 2015); *Barwick v. Sec'y, Fla. Dep't of Corr.*, 794 F.3d 1239 (11th Cir. 2015); *United States v. Travillion*, 759 F.3d 281 (3d Cir. 2014); *Gissendaner v. Seaboldt*, 735 F.3d 1311 (11th Cir. 2013); *Roberts v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1086 (11th Cir. 2012); *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271 (11th Cir. 2012); *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320 (11th Cir. 2012); *United States v. Orr*, 636 F.3d 944 (8th Cir. 2011); *Pietri v. Fla. Dep't of Corr.*, 641 F.3d 1276 (11th Cir. 2011); *Moore v. Marr*, 254 F.3d 1235 (10th Cir. 2001); *Fugate v. Head*, 261 F.3d 1206 (11th Cir. 2001); *Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995); *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989)).  Indeed, "[h]armless-error analysis . . . *presupposes* a trial, at which the defendant, *represented by counsel*, may present evidence and argument before an impartial judge and jury."  *Rose*, 478 U.S. at 578 (emphases added).  So the error that happens when counsel is absent *at trial* when evidence is entered in error is different in quality and type than the kind that happens when counsel is present.

198

Among other things, in the heat of trial, defense counsel must make necessary adjustments to the defense strategy in real time, in light of the happenings in court; tailor cross-examination of witnesses, in part, to the witnesses' testimony on direct examination during trial; evaluate on an ongoing basis the advisability of putting on and the contents of any defense case, including presenting the defendant to testify on his own behalf; determine whether to address and, if so, how to account during closing argument for evidence admitted during trial; respond to questions and concerns of his client; clear up any misunderstandings his client may have; and detect and respond to cues from the jury's demeanor. *Cf., e.g.*, *Van Patten*, 552 U.S. at 127 n.* (Stevens, J., concurring). When counsel is absent, no one is doing any of these things, and, if the absence extends for much more than a few minutes, all of these functions can be impeded even upon counsel's return.

The Majority opinion's conclusion that the harm incurred during counsel's non-*de minimis* absence is limited to the erroneous admission of evidence also ignores the realities of trial. Trial is not like a brick wall, made up of many fungible parts that can be easily interchanged and reordered with necessarily the same end result. Trial is a living, developing thing. *See Geders*, 425 U.S. at 86 ("A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none[;] . . . complexities and contingencies [are] inherent in

199

the adversary process."). What happens or does not happen at one point of a trial can deeply affect the proceedings that follow.

As a result, in a single-defendant trial, the harm from a non-*de minimis* absence of counsel is not confined to a simple erroneous admission of evidence at trial. Rather, the erroneous admission of evidence in counsel's absence is but one manifestation of the harms counsel's absence inflicts in such circumstances, much like a cough is often but one symptom of tuberculosis. Considering only the effect of erroneously admitted evidence during counsel's non-*de minimis* absence is a lot like treating a tuberculosis patient with nothing more than cough drops.

Nor does the Majority opinion's observation that many of the errors that might result from counsel's non-*de minimis* absence are themselves subject to harmless-error review (including lost objections, "hampered cross-examination," and lost impeachment arguments) remedy the assessment problem. Maj. Op. at 73-93. Rather, this error-by-error piecemeal analysis misses the forest for the trees: as counsel's absence grows longer, we cannot know the precise brew of constitutional error that's been allowed to ferment. The Majority opinion would have us hold the balance of error in equipoise and analyze each particular type of error on its own. But as the absence grows longer, there is no control for the other types of error that occurred because of counsel's absence. We cannot assess the magnitude of a particular type of error in light of the rest of the evidence, as we must in harmless-

error review, because in these circumstances, counsel's absence injected an

unknowable *concoction* of error into the trial.

Notably, the speculation in which we must indulge when a non-*de minimis*

absence occurs is not the type of guided speculation we engage in under, for

example, *Strickland*,[9] when we evaluate whether counsel's ineffective choice may

---

[9] While we may assess the effect of ineffective counsel, evaluating the effect of counsel's absence when it rises to the level of *Cronic* error is another matter altogether. When counsel is present but allegedly ineffective, a transcript of what she did or did not do exists. So we can compare the choices she actually made against the broad spectrum of alternatives a reasonably competent attorney could have pursued. And we have a record of what counsel actually did during the entire trial—including not only how counsel responded to the erroneous admission of evidence but also how counsel conducted the rest of the trial after the error occurred. Put simply, we have the tools to allow us to evaluate the effects of the error on the actual defense, in light of a trial record created when the proceedings met the structural definition of a constitutional "trial." As explained above, however, that is not the case when counsel in a single-defendant trial is absent. Comparison of *Cronic* and *Strickland* is also useful for another reason: it vividly demonstrates some of the other differences between the non-*de minimis* absent-counsel error that makes *Cronic* error structural error and the ineffective assistance of counsel that makes *Strickland* error trial error. In *Strickland*—significantly, issued on the same day as *Cronic*—the Supreme Court set up a dichotomy between cases involving the "[a]ctual or constructive denial of the assistance of counsel altogether," *see supra* at 187, which fall within *Cronic*'s purview, and those where counsel was present throughout trial but arguably ineffective, which the teachings of *Strickland* govern. 466 U.S. at 692-93. We presume prejudice in cases involving the "[a]ctual or constructive denial of the assistance of counsel altogether" because prejudice is "so likely that case-by-case inquiry into prejudice is not worth the cost." *Id.* at 692. And violations in this group of cases "involve impairments of the Sixth Amendment right that are easy to identify and  . . . easy for the government to prevent." *Id.* In contrast, cases where counsel was present but arguably ineffective concern alleged errors that the government is not responsible for, is often not able to identify while they are occurring, and is not able to prevent. *Id.* at 693. And unlike error arising from the absence of counsel, alleged errors of ineffective assistance "cannot be classified according to likelihood of causing prejudice" because they come in so many varieties. *Id.* As the Court explained, "an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* As a result, ineffective assistance cannot be defined precisely enough to put defense attorneys on notice of the conduct to avoid. *Id.* But the court and the prosecution can easily identify and avert the taking of directly inculpatory evidence in the absence of defense counsel in a single-defendant trial by simply electing not to proceed without defense counsel present.

have prejudiced the defendant's case.  Instead, no record exists regarding what counsel did or did not do, and we have nothing to compare to the vast range of choices a reasonably competent attorney could have made.  We must entirely imagine the many options available to competent counsel throughout the duration of counsel's absence—a task that would be sure to miss some viable alternatives.  Then we must use our imaginations to guess how each possible choice might have caused counsel to modify his approach to the rest of the defense at trial.  This is pure speculation, three or four times removed from the circumstances contemplated in *Strickland*.

Then—and only then—do we arrive at the next part of the speculation:  how counsel's imagined Neverland[10] performance may have affected the outcome of the trial.  This is like trying to guess how going back in time would affect the space-time continuum.[11]  But our Constitution does not abide a world of imagined

---

[10] J.M. Barrie, *Peter Pan*, http://www.literatureproject.com/peter-pan/peter-pan_1.htm (last visited Apr. 13, 2017) (on file with the Eleventh Circuit Clerk's Office).

[11] *See Back to the Future* (1985); *Back to the Future Part II* (1989); *Back to the Future Part III* (1990).  As Christopher Lloyd's character Dr. Emmett Brown explained in describing the range of possible consequences, going back in time could have virtually no effect on future events, or it could "cause a chain reaction that would unravel the very fabric of the space time continuum, and destroy the entire universe!"  *Back to the Future Part II*, as quoted at http://www.imdb.com/title/tt0096874/quotes (last visited Apr. 13, 2017) (on file with the Eleventh Circuit Clerk's Office).  For a more technical explanation of the space-time continuum, *see* https://einstein.stanford.edu/content/relativity/q411.html (last visited Apr. 13, 2017) (on file with the Eleventh Circuit Clerk's Office).

lawyers in alternative universes when it comes to a right so dear as that of "Assistance of Counsel for [an accused's] defence."

Rather, our system can tolerate only a brief absence before our ability to evaluate the effects of the absence enter this speculative realm. Nevertheless, some absences are so brief—a few seconds or even minutes—that the effects are not necessarily incapable of being evaluated. The types of prejudice that might occur under these circumstances—a particularly prejudicial line of questioning, the introduction of an especially prejudicial exhibit, an unfair characterization, etc.— are different in kind than the subtler, more insidious harms introduced by the longer absence of counsel in a single-defendant trial and are therefore susceptible of harmless-error review. Counsel's viable options for dealing with what occurred in his absence under such circumstances are likewise far more limited than once the absence extends much more than a few minutes. A very brief absence allows us to identify what counsel's options might be upon her return without resorting to rank speculation. But the universe of options expands exponentially as the period of absence grows.

So while cutting out the localized cancer of a very brief absence is possible, the effects of an absence metastasize throughout the trial in ways that are no longer readily identifiable once the length of absence lasts longer than a few minutes. As a result, unlike with a very brief absence, the likelihood of prejudice from an

203

absence that lasts more than a few minutes substantially increases, and the ability to identify the resulting prejudice markedly decreases. This factor likewise supports drawing a line that differentiates absences that are just a few minutes from those lasting longer.

> 3.    <u>Because the taking of directly inculpatory evidence in counsel's absence in a single-defendant trial quickly becomes highly likely to result in prejudice, and detecting the absence of counsel in a single-defendant trial is extremely easy, the point where it is not worth litigating the effects of this category of error in a given case must come not long after counsel's absence begins.</u>

The miniscule costs associated with setting the threshold for structural error in absence-of-counsel cases shortly after counsel's absence begins in a single-defendant trial also warrants drawing a line not long after counsel's absence begins.

For the reasons I have already described, counsel's absence in a single-defendant trial during the taking of directly inculpatory evidence will quickly introduce a significant and unquantifiable mix of prejudice into a single-defendant trial. Yet absent defense counsel during the taking of inculpatory evidence in a single-defendant trial is an error that is "easy to identify" and therefore "easy for the government [including the court and the prosecution] to prevent"—not coincidentally another hallmark of structural error. *Strickland*, 466 U.S. at 692.

204

The utter lack of any defense counsel at the start of trial proceedings should be immediately obvious to both the judge and the prosecution.

First, we are not speaking of some trivial technical requirement. We are talking about a fundamental constitutional right that should be—and no doubt is— always at the tops of the minds of the trial judge and the prosecution during trial: the right to counsel. Indeed, as I have noted, the court has an affirmative obligation to protect a defendant's right to counsel during trial. *See supra* at 189- 90 (citing *Gainey*, 380 U.S. at 68; *Glasser*, 315 U.S. at 71).

Second, we are not looking for a needle in a haystack. Visually, the absence of counsel is stunningly obvious. Detecting the absence of sole counsel in a single- defendant trial is as straightforward as looking at the defense table. When no defense counsel is present in the courtroom, only one person sits at the defense table—the defendant—and counsel's absence is conspicuous.

Third, judges can and often do ask counsel for both parties whether they are ready to proceed before bringing in the jury. Even if a judge and prosecutor do not notice the absence of counsel before the inquiry, the lack of a response from defense counsel at that time would certainly alert them to counsel's absence.

But perhaps the greatest indication that the error is "easy to identify" consists of the fact that neither the Majority opinion nor the parties are able to cite a *single case* other than Roy's where directly inculpatory evidence was taken in the

205

absence of sole counsel in a one-defendant trial.  Simply put, this error is so obvious that it quite literally almost never happens.[12]  And because district courts and the prosecution are so well attuned to the need for counsel's presence in a single-defendant trial that they are highly likely to notice counsel's absence immediately or, at worst, very shortly after trial resumes, drawing the structural-error line not long after counsel's absence begins in a single-defendant trial imposes virtually no costs.

    4.    <u>Consideration of all of the factors that cause counsel's absence during a single-defendant trial to merit a presumption of prejudice supports drawing the line between trial error and structural error at counsel's absence that lasts for more than ten minutes or 1% of the combined "critical stages" of trial.</u>

All of the factors in determining when a presumption of prejudice is appropriate in absent-counsel cases have at least one thing in common:  they all point to a very low threshold of tolerance for absence of counsel during a "critical stage" of a one-defendant trial before the absence crosses the line from trial error to structural error.  But that threshold is not zero.  Rather, for the reasons I have explained, harmless-error analysis can effectively and appropriately be performed when counsel's absence lasts only a few minutes.

---

[12] For this reason, the Majority opinion's invocation of *United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997), *see* Maj. Op. at 58-60, actually bolsters the point.  Even in seven months of trial, the opinion does not indicate that counsel was absent for a single second of the taking of directly inculpatory evidence.

So the probability line where an absence becomes long enough to create "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" must be drawn soon after counsel's absence spans more than a few minutes. And since this line must be ascertainable in any case without requiring any type of actual prejudice review of the record, I would draw the line when counsel is gone in a single-defendant trial at the lesser of either more than ten minutes or more than 1% of the combined critical-stage portions of trial. When ten minutes constitutes 1% or less of the combined critical stages of trial, the period is brief enough that the admitted evidence is relatively little, counsel can quickly and easily learn what he has missed and adjust his strategy accordingly, and the appearance of fairness and integrity in the trial is not undermined. A jury may reasonably infer, for example, that counsel has simply stepped out to use the restroom or check on a witness.

Though the period where an absence truly becomes structural error is surely greater than ten minutes or 1% of the taking of evidence, the probability of diminishing returns from attempting to conduct a prejudice analysis begins to increase significantly not long after counsel's absence lasts for ten minutes or 1% of the trial. And since we cannot identify a strict cutoff that necessarily includes only trial errors on one side and only structural errors on the other, we must err on the side of including some trial-error absences in the structural-error category,

rather than the other way around. After all, we are discussing a constitutional violation that is serious enough and the effects of which are difficult enough to assess that where it is found, prejudice is presumed. And, significantly, it is an error that is easily preventable, so the costs of setting a low threshold are negligible.

When we apply this line to Roy's case, we find that his case involves an absence that does not cause a breakdown of the adversarial process or any other damage to the fundamentally fair character of his trial. The counsel's absence in Roy's case did not create "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."

Roy's counsel was absent for a total of seven minutes, so he was missing for less than ten minutes of the total of all critical stages of trial. And as a percentage of the total critical stages of trial, those seven minutes amounted to less than 1%. Counsel's absence therefore falls on the trial-error side of the error line.[13] As a result, we conduct harmless-error review in Roy's case.

---

[13] Judge Wilson and Judge Martin take issue with drawing a precise, numerical line between trial error and structural error. That is a fair point. But *Cronic* expressly calls for a probability assessment. And the mere fact that the precise place to draw the line between the two types of error may not be immediately obvious does not mean that a category of absence that constitutes only trial error does not exist. We account for the lack of a readily discernible cutoff by drawing a line that necessarily includes all absences that could fairly be characterized as causing a breakdown of the adversarial process as doing so, even though it will also include some absences that do not so qualify on that side (*e.g.*, 11 minutes in an 8-month trial). The cost of overinclusion in the structural-error category is, as a practical matter, extremely low, given the

Nevertheless, the mere fact that a case may be susceptible of harmless-error review does not mean, of course, that any error is necessarily harmless.  To the contrary, where harmless-error review applies, the court must be convinced that "on the whole record . . . the error . . . [is] harmless beyond a reasonable doubt." *Rose*, 478 U.S. at 583 (citation and quotation marks omitted).  If the court cannot satisfy itself in this way—either because the record suggests that the error was not harmless beyond a reasonable doubt or because the record as a whole does not provide sufficient information to allow a determination to be made—even a trial-error absence will require reversal and remand for a new trial.

But that is not the case here.  As the Majority ably explains, the record here clearly demonstrates that Roy's counsel's trial-error absence was harmless beyond a reasonable doubt.

III.   **The fact that a brief absence of counsel during part of a "critical stage" of a single-defendant trial quickly rises to the level of *Cronic* error does not necessarily mean that the same thing is true in a multi-defendant trial.**

The Majority opinion worries that recognizing that the structural-error threshold is low for counsel's absence during trial in a single-defendant trial means that the threshold must be set equivalently low in multi-defendant trials.  This

---

fact that holding trial without defense counsel in a single-defendant case almost never happens. *See supra* at 204-07.

question is not before us, so I do not offer an opinion on it. Nevertheless, I express some thoughts as to why I do not share the Majority opinion's concerns, homing in on the factors that determine whether an absence of counsel during a critical stage of trial is structural error in the first place.

Beginning with the basic trial framework, when one or more defense lawyers are present during a multi-defendant trial, the overall trial structure itself at least arguably remains intact, even if other defense counsel are absent. That is, some licensed attorney serves in an adversarial role against the prosecution and might, as a practical matter, simultaneously assist in the defense of other defendants while acting on behalf of her own client.[14] But when a single defendant has no counsel whatsoever where directly inculpatory evidence is offered, courtroom proceedings do not even look like a "trial" as our Constitution envisions it, and counsel's absence very quickly rises to the level of *Cronic* error. No one is present to assist even theoretically in the accused's defense.

Second, while the absence of a particular defendant's attorney is still ascertainable when multiple defendants and defense counsel are present, one

---

[14] Of course, the Sixth Amendment entitles each defendant to his own counsel. And where counsel labors under an actual conflict of interest at trial, that circumstance constitutes structural error. *See Satterwhite*, 486 U.S. at 256-57 (citing *Holloway*, 435 U.S. at 490-91). But many times, multiple defendants' defenses are not inconsistent with one another. In addition, counsel sometimes agree to cover for each other with their clients' permission. When these conditions exist, the breakdown in the trial process that might occur otherwise in a single-defendant trial simply does not occur.

210

defendant's sole missing defense attorney at a table of, for example, five defendants and seven counsel,[15] is not as visually conspicuous as a sole defendant's appearance all alone at the defense table during trial. As a result, the point where the proceedings cease to appear like a constitutional trial to the jury and public is certainly higher and, depending on the circumstances, possibly non-existent.

Third, although the effect on the proceedings of a single defendant's counsel's longer absence in a multi-defendant trial may still be challenging and difficult to assess, at least we can review a record of how some defense counsel reacted to the questioning, the jury, and, where applicable, the client during the absence, so our speculation is not necessarily entirely imagined, and some form of a *Strickland*-type of analysis of the present attorney's actions may perhaps be possible. Similarly, at least the defendant's absent counsel can consult a professionally trained, defense-oriented person (a defense attorney who was present during the absence) about what transpired in his absence, so he can adjust his defense accordingly. These things are not even possibilities where counsel is absent for a non-*de minimis* portion of the taking of inculpatory evidence in a single-defendant trial.

---

[15] Sometimes a defendant chooses to be represented by more than one attorney.

211

Fourth, multi-defendant trials are often significantly longer than single-defendant trials. If counsel for more than one defendant in a multi-defendant trial is absent for more than a brief period of the taking of directly inculpatory evidence, the cost and effort of attempting to evaluate the record for harmless error may be justifiable in a way that it is not many single-defendant trials.

For these reasons, I respectfully disagree with the Majority opinion that recognizing *Cronic* error when counsel is briefly absent during part of a single-defendant trial dictates that counsel's brief—or even longer—absence in a multi-defendant trial would then also necessarily qualify as *Cronic* error or some other type of structural error.

## IV.    The Majority opinion's solution for determining when counsel's absence during part of a "critical stage" constitutes structural error is flawed because it is not categorical and because it sets too high a threshold for structural error when counsel is denied during a single-defendant trial.

The Majority opinion holds that counsel's absence during part of trial rises to the level of structural error when counsel misses a "substantial portion of the trial," determined "on a case-by-case basis considering, among other factors, the length of time counsel was out, the proportion of the trial missed, and the significance of what he missed." *See* Maj. Op. at 70-71. It further suggests through its analysis that a "substantial portion of the trial" is a relatively long period. In my view, both of these conclusions are inconsistent with the Supreme Court's jurisprudence on structural error involving the denial of counsel.

212

First, as I have mentioned, the Supreme Court has cautioned against "import[ing] into the initial structural-error determination (*i.e.*, whether an error is structural) a case-by-case approach that is more consistent with our traditional harmless-error inquiry (*i.e.*, whether an error is harmless). Under [the Supreme Court's] cases, a constitutional error is either structural or it is not." *Neder*, 527 U.S. at 14 (characterizing the Supreme Court's "traditional . . . approach to structural errors" as "categorical").

And this makes sense. If determining in the first place whether a type of error was structural or trial required an analysis of actual prejudice in a given case, it would not differ from harmless-error analysis: in any case where error was actually assessable but was, beyond a reasonable doubt, harmless to the defendant, the error would be harmless, and in any case where the prejudice inflicted by the error was either not assessable or demonstrably resulted in prejudice to the defendant, the error would be harmful.

But that's not how the dichotomy between structural error and trial error works. Rather, structural-error jurisprudence recognizes fundamental errors and requires us to make a probability determination that the existence of that type of error *in general* creates "'circumstances . . . that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Van Patten*, 552 U.S. at 124 (quoting *Cronic*, 466 U.S. at 658). Engaging in any

213

attempt to calculate the actual prejudicial effects of a type of error to determine whether, in a given case, it qualifies as structural in nature defeats the purpose of categorizing particular types of errors as structural.

The Majority opinion's solution to when structural error occurs, however, expressly calls for "*case-by-case* . . . consider[ation], [accounting for,] among other factors, the length of time counsel was out, the proportion of the trial missed, and the significance of what he missed." Maj. Op. at 71 (emphasis added). This approach necessarily requires the court to conduct some type of individualized assessment of prejudice in a given case to determine whether the error as presented in that case constitutes structural error, even though the Supreme Court has warned against delineating the parameters of a category of structural error by assessing the evidence adduced in a particular case.

Besides this problem, the Majority opinion's approach employs a balancing test, so it will necessarily yield conflicting results concerning whether an absence qualifies as structural error, depending on who applies the test, how the judge construes each factor, and how she or he weighs the test's factors. For example, what length of absence is too long and how do we decide? What proportion of trial is too great? How do we judge the "significance of what [counsel] missed"? Is determining the "significance of what [counsel] missed" some form of a mini-harmless-error inquiry?  How do we balance the four expressly named

214

considerations against each other?  What other factors should be considered, and how are they weighed in the balance?

And since knowing what counsel missed is "at least as important" a factor as the other three and "should bear heavily on whether to presume prejudice," *see id.* at 64, does it outweigh a longer absence that comprises a good percentage of the trial?  Different judges applying the substantial-portion-of-the-trial factors will, of course, arrive at different conclusions about whether structural error has occurred in any given case—a red flag that the line for structural error has not been categorically drawn.

Nor does the Majority opinion's application of the substantial-portion-of-the-trial test to Roy's facts provide much guidance.  Instead, it simply observes that we know what counsel missed and reduces counsel's absence to numbers:

> Roy's counsel missed only seven minutes of a trial that lasted 1,884 minutes or 31.4 hours (not counting recesses and jury deliberations), which is less than one-half of one percent of trial time.  He missed only 18 answers that were given by one of the government's 13 witnesses who collectively gave a total of approximately 2,745 answers, meaning he missed less than one percent of the total.  And we know exactly which questions and answers he missed.  His physical absence was far more momentary and far less substantial than any in the five cases that our sister circuits have decided under the substantial portion standard.  We have no trouble concluding that Roy's counsel did not miss a substantial portion of the trial.

*Id.* at 72-73.

Other than the fact that the Majority opinion adjudged Roy's counsel's absence "far more momentary and far less substantial than any in the five cases that our sister circuits have decided under the substantial portion standard," we don't know how the Majority weighed the factors against each other; how "miss[ing] only 18 answers that were given by one of the government's 13 witnesses who collectively gave a total of approximately 2,745 answers, meaning he missed less than one percent of the total," tells us the "significance of what [counsel] missed" any more than the number of minutes missed and the percentage of trial missed; what other factors we should consider when conducting this analysis; or when the fact that a record of what counsel missed exists ceases to support harmless-error review. And in the cavernous abyss between Roy's 7-minute absence and the other circuits' substantial-portion-of-the trial cases, where the attorney slept for either more than a day or slept repeatedly for several minutes at a time throughout the entire trial, we don't know where a trial-error absence becomes a structural-error absence.

The Majority opinion's substantial-portion-of-the-trial test also suffers from another problem: it significantly undervalues the right to counsel during trial, so it sets the bar too high for when counsel's absence crosses the threshold from trial error to structural error. As I have previously explained, the right to counsel during trial is essential under our system of justice, and it does not take long for

216

counsel's absence from part of trial to create serious, exponentially multiplying problems "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *See supra* at 194-205; *Cronic*, 466 U.S. at 658. For this reason, only a brief absence can be tolerated in a single-defendant trial before the likelihood of prejudice greatly outweighs the benefits of attempting to engage in a prejudice analysis.

The Majority opinion turns the significance of the right to counsel during a single-defendant trial upside down, essentially creating a rule under which counsel's absence—even for long periods—constitutes nothing more than trial error, except in the most extreme circumstances. But the right to counsel—particularly during trial—is absolutely fundamental to our system of justice. A single-defendant trial where counsel is absent for more than a very brief period inflicts great damage upon our system of justice; it is antithetical to it, to our sense of fairness, and to the reliability of any resulting verdict. Does the fact that we know what happened when counsel was gone somehow negate the deleterious effects on the trial framework of a long absence that comprises a good percentage of the trial? I think not.

And because of the ease with which defense-counsel absences in a single-defendant trial can and should be prevented, even less justification exists for tolerating anything more than counsel's very brief absence. Since the substantial-

217

portion-of-the-trial test that the Majority opinion adopts today to determine whether an attorney's absence qualifies as structural error does not sufficiently value the right to counsel during a single-defendant trial, I respectfully disagree with that standard.

## V.    Conclusion

So I end where I began.  I concur in the Majority's conclusion that the error in this case was harmless because it was not long enough to rise to the level of *Cronic* error, and the record shows it to have been harmless beyond a reasonable doubt.

But in a single-defendant trial, the non-*de minimis* absence of counsel creates "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  It collapses the constitutional framework of the trial; is easily identifiable and preventable by the court and the government; introduces an unknowable mix of error into the trial that is so likely to prejudice a defendant that assessing its effects in any given case is not worthwhile; and renders the trial process unreliable amounts to structural error under *Cronic*.  Based on these considerations, I would draw the line between trial-error absences and structural-error absences at the point where an absence lasts for more than ten minutes or 1% of the total "critical stages" of trial.  In my view, this approach comports with *Cronic*, the categorical nature of structural error as the

Supreme Court has explained it, and the importance of the right to counsel during

trial..

WILSON, Circuit Judge, dissenting:

The Constitution guarantees criminal defendants a fair trial. That guarantee does not require a perfect trial—it simply demands a trial that affords defendants a few basic protections. The most critical of those protections is the right to counsel. *See United States v. Cronic*, 466 U.S. 648, 654, 104 S. Ct. 2039, 2044 (1984) ("Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." (internal quotation marks omitted)). "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'" *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 2555 (1975).

Absent defense counsel, the trial process transforms from an adversarial search for truth to a one-sided prosecutorial campaign. Such a proceeding is incompatible with the Constitution's commitment to due process. "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *Cronic*, 466 U.S. at 657, 104 S. Ct. at 2046 (internal quotation marks omitted).

In stark contrast to the adversarial process and attendant protections demanded by the Constitution, the trial here proceeded while the defendant's sole

220

counsel was absent.  The defendant sat alone at counsel's table in the presence of the jury; defense counsel was nowhere to be seen.  There were no other defendants or defense counsel present.  Nonetheless, the trial judge reconvened the proceedings earlier than scheduled, and the skilled prosecutor introduced the testimony of the government's key witness—a law enforcement computer forensics expert—with the defendant still alone at counsel's table.  The testimony was directly inculpatory, used to convict the defendant of federal felony charges and to sentence him to life in prison.

This type of one-sided proceeding is an affront to the integrity of our system and a violation of the defendant's rights to a fair trial and to counsel.  Correlatively, such a serious constitutional error is unique in that it alters the structure of the trial itself, resulting in consequences that are both immeasurable and likely extremely prejudicial.  For that reason, I believe the error amounts to structural error, requiring automatic reversal and new, constitutionally-compliant proceedings.  The Constitution does not demand that the defendant go free—rather, it demands that, prior to being deprived of his liberty, the defendant receive a trial with the basic protections to which he is entitled.

The Majority, however, does not view the circumstances here as so serious a constitutional violation and so damaging a blow to the integrity of the trial process as I do.  The disagreement between the Majority and myself centers on the scope

221

of structural error and what constitutes *Cronic* error.  A constitutional violation is a structural error if the violation undermines the basic guarantee of fairness, resulting in a strong potential for prejudice and immeasurable effects.  *Cronic* error is a specific type of structural error—it arises when a defendant is denied counsel at a "critical stage" of the proceedings.

I believe that the denial of counsel during the introduction of inculpatory evidence by a key prosecution witness constitutes structural error.  The guiding structural-error criteria, as well as *Cronic*, lead me to this conclusion.  By calling such an error harmless trial error, the Majority affirmatively holds that the introduction of inculpatory evidence in counsel's absence is an "unimportant and insignificant" constitutional error.  *See Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 827 (1967).  The Majority reaches this conclusion by improperly performing the structural-error analysis required under Supreme Court precedents.  Because the Majority's analysis departs from those precedents and reaches a result at odds with the basic premises of the Constitution, I respectfully dissent.

## I.

The combined force of the Fifth and Sixth Amendments of the United States Constitution guarantees all federal criminal defendants the right to a fair trial.  Under the Fifth Amendment, a fair process is required before a defendant's liberty can be taken away.  When a trial court impedes a defendant's ability to obtain the

"guiding hand of counsel at every step in the proceedings against him," it violates the due process guarantee of the Fifth Amendment. *See Brooks v. Tennessee*, 406 U.S. 605, 612, 92 S. Ct. 1891, 1895 (1972) (quoting *Powell v. Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 64 (1932)). Furthermore, the Supreme Court has repeatedly emphasized the fundamental nature of the Sixth Amendment right to counsel—it is this right that preserves the defendant's other rights and the integrity of the judicial system itself. *See, e.g.*, *Cronic*, 466 U.S. at 656, 104 S. Ct. at 2045; *Kaley v. United States*, 571 U.S. __, __, 134 S. Ct. 1090, 1107 (2014) (Roberts, C.J., dissenting) ("In many ways, [the Sixth Amendment right to counsel] is the most precious right a defendant has, because it is his attorney who will fight for the other rights the defendant enjoys."); *see also Stano v. Dugger*, 921 F.2d 1125, 1170–71 (11th Cir. 1991) (en banc) (Tjoflat, J., dissenting) ("[T]he right to counsel is a fundamental component of the criminal justice system" because counseled representation protects "the very integrity of our system—its fairness, its accuracy as a truth-seeking process, and thus its ability to accord justice.").

A criminal defendant who has been denied counsel cannot—by that very measure—have received a fair trial because "lawyers in criminal courts are necessities, not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 796 (1963). The Constitution calls on the courts to vigilantly ensure that this right is upheld, and we, as judges, must "indulge every reasonable presumption against

223

waiver" of the right.  *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938).  Indeed, "the right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized."  *Herring*, 422 U.S. at 857, 95 S. Ct. at 2553.

The admission of inculpatory evidence against a defendant while his counsel is absent violates these fundamental rights.  The core issue presented here is whether that constitutional violation is structural or trial error.  The Supreme Court has held that all criminal defendants are entitled to a trial free from error that calls into question the fairness of the proceeding because such an error strikes a blow to the framework—the structure—of the proceeding itself.  *See Cronic*, 466 U.S. at 657–58, 104 S. Ct. at 2046.  This type of constitutional error, known as "structural error," occurs when there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *id.* at 658, 104 S. Ct. at 2046, or when the effects of the error defy assessment absent impermissible speculation, *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S. Ct. 2557, 2564 (2006); *Sullivan v. Louisiana*, 508 U.S. 275, 281–82, 113 S. Ct. 2078, 2083 (1993) (noting that structural errors are "necessarily unquantifiable and indeterminate").

When structural error occurs, the courts must presume prejudice and reverse for a new trial. *See Cronic*, 466 U.S. at 659 & n.25, 104 S. Ct. at 2047 & n.25 ("[Structural error is] constitutional error of the first magnitude and no amount of showing of want of prejudice w[ill] cure it." (internal quotation marks omitted)). Automatic reversal is required because "there are some constitutional rights so basic to a fair trial that their infraction" infects the entire trial process and "can never be treated as harmless error." *Chapman*, 386 U.S. at 23, 87 S. Ct. at 827–28; *accord Brecht v. Abrahamson*, 507 U.S. 619, 629–30, 113 S. Ct. 1710, 1717 (1993). This does not mean a trial on the whole must be unfair for an error to be structural; rather, structural error exists when the defendant has been denied "a particular guarantee of fairness." *See Gonzalez-Lopez*, 548 U.S. at 146, 126 S. Ct. at 2562.[1]

---

[1] *Gonzalez-Lopez* involved the absence of a particular guarantee of fairness—the right to have counsel of one's choosing at trial. The Court held that the denial of the defendant's choice of counsel resulted in a structural defect in the proceedings, requiring vacatur of the conviction. *Gonzalez-Lopez*, 548 U.S. at 152, 126 S. Ct. at 2566. In determining that the denial of counsel of one's choosing implicates the constitutional guarantee of fairness, the Supreme Court indicated that counsel need not be entirely deprived in order to trigger the Sixth Amendment's protection.

Consequently, *Gonzalez-Lopez* provides important foundation for this case: if the guarantee-of-fairness consideration was relevant where *some* counsel was present, just not the one chosen by the defendant, then surely here, where the defendant had no counsel present to protect his constitutional rights, the same guarantee-of-fairness consideration applies. Further, the defendant in this case selected a particular counsel to represent him, and then the court proceeded without that counsel. Thus, the denial of the defendant's counsel at trial *ipso facto* denied the defendant the right to have present the counsel that he chose. For these reasons, the circumstances constituting structural error and requiring reversal in *Gonzalez-Lopez* are sufficiently analogous to the circumstances presented in this case. *Cf. Wright v. Van Patten*, 552

225

The Supreme Court has identified several sets of circumstances that constitute structural error, including the provision of an erroneous reasonable-doubt instruction, the denial of the right of self-representation, and the denial of the right to a public trial. *See, e.g.*, *Sullivan*, 508 U.S. at 280–81, 113 S. Ct. at 2082; *McKaskle v. Wiggins*, 465 U.S. 168, 177–78 & n.8, 104 S. Ct. 944, 950–51 & n.8 (1984); *Waller v. Georgia*, 467 U.S. 39, 49 & n.9, 104 S. Ct. 2210, 2217 & n.9 (1984). In addition, in *Cronic*, the Court held that the denial of counsel at a "critical stage" of trial amounts to structural error. *See* 466 U.S. at 659, 104 S. Ct. at 2047. The potential for prejudice when counsel is denied during a critical stage is so great that fairness demands automatic reversal.

This case involves an important type of structural error—the denial of counsel.[2] *See Gonzalez-Lopez*, 548 U.S. at 149, 126 S. Ct. at 2564. As noted above, structural-error analysis turns on the potential for prejudice and whether the

U.S. 120, 125, 128 S. Ct. 743, 746 (2008) (per curiam) (citing *Gonzalez-Lopez* in describing *Cronic* structural error).

[2] From the outset, the Majority mischaracterizes the error here as the erroneous admission of particular evidence at trial, which is an error amenable to harmless-error review. *See, e.g.*, *Satterwhite v. Texas*, 486 U.S. 249, 257, 108 S. Ct. 1792, 1798 (1988). But the general admissibility of evidence introduced during defense counsel's absence is not the issue. Instead, the issue is that a criminal defendant's sole defense counsel was absent while inculpatory evidence was admitted to the jury. Those are the circumstances that violated the defendant's constitutional rights here; those are the circumstances that create "a serious risk of injustice." *See Cronic*, 466 U.S. at 656, 659 n.25, 104 S. Ct. at 2045, 2047 n.25. Thus, *Satterwhite*'s rule does not apply because the nature of the harm is not limited to the specific evidence that was erroneously introduced. *See* Rosenbaum, J., concurring, at 196–97.

effect of an error is readily assessable. Considering these factors, the absence of the defendant's sole counsel during the introduction of inculpatory evidence undoubtedly constitutes structural error. But, perhaps even more telling, *Cronic* also specifically requires a finding that the denial of counsel in these circumstances amounts to structural error.

## A.

The defendant in this case was denied his right to counsel while the jury heard directly inculpatory evidence, depriving him of a core constitutional guarantee. As the jury watched, the court departed from the traditional trial framework of a defendant having counsel by his side while the prosecution offers evidence against him. Under these circumstances, the denial of counsel yields strong potential prejudice and the effects of the error are "necessarily unquantifiable and indeterminate"—gauging the effect requires speculation. Thus, the circumstances in this case "unquestionably qualif[y] as structural error." *Cf. Gonzalez-Lopez*, 548 U.S. at 149, 126 S. Ct. at 2564 (internal quotation marks omitted). I broadly address the potential for prejudice and speculative nature of the effects of this error before turning to the facts of the proceedings below.

A number of Supreme Court cases addressing structural error caused by the absence of counsel demonstrate that the potential for or likelihood of prejudice is key to determining which errors are structural. For example, in *Hamilton v.*

*Alabama*, the Court held that counsel's absence during the defendant's arraignment was structural error.  368 U.S. 52, 54–55, 82 S. Ct. 157, 158–59 (1961).  In reaching this determination, the Court did not require that the defendant provide any evidence that his plea would have been different had counsel been present; that is, the Court did not consider whether the defendant was *actually prejudiced* by counsel's absence.  Reversal was automatic.  *Id.* at 55, 82 S. Ct. at 159.  Likewise, in *White v. Maryland*, the Supreme Court automatically reversed the lower court because the prosecution introduced evidence at trial of a guilty plea that the defendant entered before he was appointed counsel.  373 U.S. 59, 59–60, 83 S. Ct. 1050, 1051 (1963) (per curiam).

These cases make clear that the *potential* for prejudice is what results in structural error.[3]  Actual prejudice is not required.  In *Hamilton*, the defendant never indicated that the presence of counsel at the arraignment actually would have changed the outcome, and the Court did not analyze this possibility.  In *White*, the potential for prejudice was sufficient to vacate the conviction, even though the potential prejudice—admission into evidence of the guilty plea—could have been

_____

[3] The importance of the potential for prejudice inquiry also manifests in structural error cases outside of the denial-of-counsel context.  Most recently, in a recusal case, the Supreme Court indicated that even a "potential for" or "risk of" bias was enough to constitute structural error.  *See Williams v. Pennsylvania*, 579 U.S. ___, ___, 136 S. Ct. 1899, 1905–07 (2016) (noting that "the decision [of a prosecutor] to pursue the death penalty is a critical choice in the adversary process" and reversing based on the risk of bias when a non-recused judge who served as the supervising prosecutor participates in the subsequent judicial proceedings).

228

mitigated by counsel's presence and the opportunity to cross-examine. *White* is especially informative for what it ultimately found violative of the right to counsel. There, the potential prejudice arose from the creation of inculpatory evidence in counsel's absence.

If the absence of counsel during the creation of inculpatory evidence was considered structural error in *White*, it is also structural error for a court to allow the admission of inculpatory evidence in counsel's absence. In both circumstances, the potential for prejudice arises from the potential for the jury to hear inculpatory evidence in violation of the defendant's right to counsel. There is extreme potential for prejudice against a defendant who is left without counsel as the prosecution presents the jury with incriminating evidence for its consideration. If allowing a criminal defendant to "stand alone"—in this defendant's case, truly, entirely alone—against the government while the prosecution elicits incriminating testimony does not constitute a structural defect in the proceedings, it is difficult to envision what would. *See United States v. Wade*, 388 U.S. 218, 226–27, 87 S. Ct. 1926, 1932 (1967) ("[I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." (footnote omitted)). These "circumstances . . . are so likely to prejudice the accused that the cost of litigating

229

their effect in a particular case is unjustified." *See Cronic*, 466 U.S. at 658, 104 S. Ct. at 2046.

The Supreme Court has also indicated that where the impact of a serious constitutional defect is subject to pure speculation, the defect constitutes structural error. *See Gonzalez-Lopez*, 548 U.S. at 149 n.4, 126 S. Ct. at 2564 n.4 (rejecting the use of a "single, inflexible criterion" for determining structural error and instead finding that structural error occurred in light of the pure speculation involved in determining what would have happened but for the error); *see also Satterwhite*, 486 U.S. at 256, 108 S. Ct. at 1797 (stating that when "the scope of a violation . . . cannot be discerned from the record, any inquiry into its effect on the outcome of the case would be purely speculative"); *Holloway v. Arkansas*, 435 U.S. 475, 490–91, 98 S. Ct. 1173, 1181–82 (1978).

Thus, a key distinction between trial error and structural error is that the latter occurs where the effect of the error is "necessarily unquantifiable and indeterminate." *See Sullivan*, 508 U.S. at 281–82, 113 S. Ct. at 2083. This is why structural errors are markedly different from trial errors, which can be "quantitatively assessed." *Id.*; *see also Arizona v. Fulminante*, 499 U.S. 279, 308, 111 S. Ct. 1246, 1264 (1991). Given the "myriad aspects of representation," there are numerous unknowable possibilities that may have been permitted or prevented

230

by the participation of an attorney during the prosecution's introduction of inculpatory evidence. *Cf. Gonzalez-Lopez*, 548 U.S. at 150, 126 S. Ct. at 2564.

The admission of inculpatory evidence against the defendant in a criminal trial while counsel is absent from the courtroom is not a trivial error; we cannot simply review the remainder of the evidence against the defendant to determine whether the outcome of the trial would have been different. The absence of counsel under such circumstances has unquantifiable effects on the jury's perceptions of the defendant and counsel's ability to marshal an adequate defense. "Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *See id.*, 126 S. Ct. at 2565. We cannot know what defense counsel would have said or done had he been present the first time around; nor can we ascertain with any degree of certainty how the prosecution's approach or the witness's answers might have changed if defense counsel had been present and able to participate in the process. We are therefore not able to accurately assess the impact counsel's absence had on the proceedings. As the Majority points out, maybe it had no impact; but it is just as likely that it had a significant negative impact. Either way, we are forced to speculate. This problem is sufficient on its own to find structural error. *See id.* at 149 n.4, 126 S. Ct. at 2564 n.4 ("[H]ere, as we have done in the past, we rest our

231

conclusion of structural error upon the difficulty of assessing the effect of the error.").

Turning to the facts of this case, there is no question that defense counsel's absence during the introduction of directly inculpatory evidence raised substantial potential for prejudice, the full extent of which is immeasurable. A law enforcement expert testified for the prosecution during defense counsel's absence, answering inculpatory questions about where the photographs of the underage victim were found and providing graphic descriptions of the images. Specifically, the expert testified that the photos of the minor were taken on "March the 10th, 2005, at 6:49 p.m." He repeated that assertion again during counsel's absence, reiterating that the photos were "created initially by the camera" on "March the 10th of 2005 at 6:49 p.m." The expert also detailed the location of the files on the defendant's computer, including descriptions of directories, subdirectories, and sub-subdirectories, as well as the categorization of those files. In asking the expert about the files, the prosecutor called them "notable images," and the expert substantiated that characterization by mirroring the characterization in his answer and providing a detailed description of the content of the photos. Finally, the expert opined on the date of the images' creation and the date they were uploaded to the computer.

232

This testimony went straight to the heart of one crime for which the defendant was tried (possession of child pornography) and supported an inference that the defendant would have been predisposed to commit the other crime (enticement of a minor). Critically, after defense counsel returned, the expert testified that the photos had been created on "March 11, 2006," contrary to the testimony he gave while counsel was absent. These circumstances are instructive as to both the potential for prejudice at an "inculpatory evidence" stage and the speculation required to assess the effect of this error.

The fact that the trial proceeded without the defendant's sole counsel present raises a slew of highly prejudicial circumstances. Most immediately, and as a practical matter, defense counsel lost the opportunity to observe the witness's testimony firsthand, which limited his ability to assess (1) the witness's demeanor when giving the testimony, (2) the jurors' demeanors when hearing the witness's testimony, and (3) the jurors' reactions to the evidence admitted. *Cf. Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985) (noting that only those who have the opportunity to observe witness testimony firsthand "can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"). The jurors' reaction to testimony is incredibly important to inform defense counsel's strategy decisions moving forward. Here, defense counsel missed the jurors' initial reactions to the

233

introduction of inculpatory evidence and thus lost a key opportunity to assess his client's case in response. That the evidence was resubmitted to the jury immediately after defense counsel arrived does not assuage the error; the element of surprise was gone and any initial reactions to the evidence went with it. Moreover, this lost opportunity impacted not only the immediate steps counsel took following the reintroduction of this evidence in his presence but also the approach he took thereafter. *See Gonzalez-Lopez*, 548 U.S. at 150, 126 S. Ct. at 2564 (describing the "myriad aspects of representation" the participation of an attorney entails). And the re-introduction of the same evidence gave the prosecution the advantage of repetition, thereby emphasizing that inculpatory evidence.

Furthermore, witness demeanor may be dispositive for a jury. In the words of Judge Learned Hand, "[t]he carriage, behavior, bearing, manner, and appearance of a witness—in short, his 'demeanor'—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question . . . ." *Dyer v. MacDougall*, 201 F.2d 265, 268–69 (2d Cir. 1952). Indeed, we regularly recognize and defer to "the whole nexus of sense impressions which [the jury] get[s] from a witness," and thus generally affirm findings of fact by a jury "on the hypothesis that this part of the evidence may have turned the scale." *Id.* at 269. These are "matters that cannot be gleaned from a written

234

transcript." *See United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) (noting that some of the benefits of live testimony include the ability "to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice").

Even more troubling, in this particular case, the introduction of testimony in counsel's absence prevented defense counsel from impeaching a key government witness's credibility. During defense counsel's absence, the law enforcement expert stated that the date on the camera was 2005. Later, he said it was 2006. Regardless of whether the expert misrepresented or misspoke, if counsel had been there in the first instance, he could have attacked the witness's credibility on cross-examination. However, during cross-examination, defense counsel did not mention the discrepancy between the expert's first statement and his second. It is, at the very least, reasonable to conclude that counsel's failure to cross-examine the expert about this mistake occurred because counsel was unaware of the discrepancy. Counsel was not present when the expert first said 2005 and the expert never repeated that inconsistent statement.[4]

---

[4] That defense counsel received a report including the apparently erroneous date prior to trial does not mitigate the problem of defense counsel's absence when this evidence was introduced live. Defense counsel could not know what the expert witness was going to say until he said it; thus, the inconsistencies in the live testimony remain problematic. Moreover, impeachment of live testimony has an unparalleled effect on trial proceedings.

Contrary to the Majority's view, the effects of a lost opportunity to impeach are not perfectly quantifiable.  Lost opportunities matter.[5]  *See Geders v. United States*, 425 U.S. 80, 91, 96 S. Ct. 1330, 1336–37 (1976) (reversing without inquiry into prejudice because counsel was denied the opportunity to confer with his client during a recess); *Herring*, 422 U.S. at 865, 95 S. Ct. at 2556–57 (reversing without inquiry into prejudice because trial judge's order denying counsel the opportunity to make a summation at close of bench trial denied defendant assistance of counsel).  We are left to wonder whether the credibility of the witness may have been impeached with regard to the photo dates, and what would have happened had the jury had the benefit of this impeachment.

The significance of such an error is particularly obvious in this case: the defendant did not have contact with the victim until at least August of 2005, *months after* the date the expert initially claimed the photo was taken.  Attacking credibility is one of the best tactics a defense attorney may have to undermine a witness's testimony.  When an attorney demonstrates that a witness has made an

---

[5] The Majority claims that "there is nothing unusual—or unusually difficult—about determining whether a failure to object, or a lost opportunity to object, to testimony was prejudicial or harmless."  *See* Maj. Op. at 81.  I am not so sure that a lost opportunity to object is the same thing as the failure to object—or so easily quantifiable.  It seems to me that a lost opportunity to object is an altogether different problem, one that requires speculation to resolve.  I also note that the Majority cites no case law supporting that a lost *opportunity* to object is in fact readily calculable.  The cases cited instead deal with the more readily assessable *failure* to object, which, of course, lends itself to the deficient-performance analysis not at issue here.  And further, here, it was a lost opportunity to impeach—the effects of which could have pervaded the witness's entire testimony.

inconsistent statement, it allows the attorney to argue to the jury that other things the witness said might not have been trustworthy or reliable either. Accordingly, the admission of inculpatory evidence in the absence of defense counsel in this case critically impaired the defendant's right to present a defense, particularly the right to challenge the credibility of an important government witness. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967).

Moreover, defense counsel's absence during the introduction of inculpatory evidence not only affected counsel's ability to advocate for his client but also potentially prejudiced the defendant's case by the appearance that the absence presented to the jury. I question what the jurors must have thought when they saw the district court commence proceedings without defense counsel present. The spectacle of the defendant seated alone at counsel table while, on the other side, the attorney for the government elicits inculpatory evidence from a witness must have been a lopsided sight indeed. It may have led the jurors to conclude that the defendant's own advocate did not believe that the defendant's case was worthwhile. And it may have made the jurors see the trial judge as presuming the defendant was guilty. After all, if the judge does not care whether defense counsel is there, why should the jury?

Reinitiating the trial without defense counsel present also may have done irreparable damage to the jury's perspective of defense counsel. It is well-

237

documented that jurors' perceptions of attorneys influence verdicts. In this case, there is no positive association that could come from defense counsel not being present when the government elicited incriminating testimony from a key witness.

Faced with these considerations, how can we quantify and dismiss as harmless beyond reasonable doubt the impact that defense counsel's absence had on the jury when it saw the district court resume the trial without defense counsel present, leaving the defendant to fend for himself? There is no way to quantify the extent of this error's effects on the jury without speculating. We cannot assess it from a transcript. "The idea that a reviewing court can assess from a cold transcript the prejudice caused by counsel's absence completely ignores the role that counsel's physical presence in the courtroom actually plays." David A. Moran, *Don't Worry, I'll Be Right Back: Temporary Absences of Counsel During Criminal Trials and the Rule of Automatic Reversal*, 85 Neb. L. Rev. 186, 207 (2011). This is because "the reviewing court cannot possibly discern from the transcript how the jury . . . reacted non-verbally to the proceedings that occurred in counsel's absence. During an ongoing trial, real-world trial counsel make crucial decisions based on the reaction of the jury to testimony, evidence, argument, and other courtroom proceedings." *Id.*; *see also United States v. Zeigler*, 994 F.2d 845, 849 (D.C. Cir. 1993).

238

Of course, the Majority states, "[w]e know what counsel did, and did not do, after he heard those questions asked and answered." Maj. Op. at 49. Similarly, one of my colleagues concurs in the affirmance because he believes the defendant received a "do-over." Jordan, J., concurring, at 172–74. But we do not know what counsel would have done if he had been there the *first* time the evidence was introduced; we only know what he did the *second* time. It matters neither whether the substance of the evidence was repeated and subjected to cross-examination when counsel returned nor that counsel failed to object when he ultimately heard the evidence introduced.[6] What matters is that counsel did not have the opportunity in the first instance to, *inter alia*, observe the witness as he testified, note the impact of the inculpatory evidence on the jury, or attack the credibility of the witness with a prior inconsistent statement. Plus, hearing the same inculpatory evidence *twice* is hardly curative—it might even make matters worse.

Additionally, the suggestion that we know what counsel did and the theory that counsel got a "do-over" both fail to account for the harm inflicted by

---

[6] The Supreme Court has made clear that counsel's failure to object to the taking of evidence during his absence is irrelevant for purposes of determining whether structural error has occurred. *See White*, 373 U.S. at 60 n.*, 83 S. Ct. at 1051 n.* (failure of counsel to object to evidence obtained in violation of the right to counsel does not negate need for automatic reversal because "the rationale of [structural error precedent] does not rest . . . on a showing of prejudice"). If the Supreme Court has held that an objection is unnecessary to warrant automatic reversal where counsel is present during the admission of the offending evidence, an objection is certainly unnecessary where counsel is not even present for the admission of the offending evidence.

proceeding without counsel in front of the jury. Any "do-over" could not fix the fact that the jury had just witnessed the trial judge start up proceedings again without defense counsel present. We do not know the effect that seeing the criminal defendant sitting at counsel's table alone had on the jury; we do not know what the jurors must have thought when they watched the judge reconvene trial without waiting for defense counsel to arrive, or what impression of guilt may have attached when the judge appeared not to care whether defense counsel was there. Thus, not only do we not know what counsel would or would not have done but also it is inaccurate to claim that the defendant got a "do-over"—in either practical or legal terms—simply because evidence was repeated for a second time when his counsel came back into the courtroom.[7]

This problem is precisely why errors such as this are structural in nature. As the Supreme Court has explained, when "the scope of a violation . . . cannot be discerned from the record, any inquiry into its effect on the outcome of the case would be purely speculative." *Satterwhite*, 486 U.S. at 256, 108 S. Ct. at 1797; *see also Holloway*, 435 U.S. at 490–91. Since we cannot accurately assess the effect

---

[7] I emphasize that the "do-over" notion simply does not cure a structural defect. The problem with structural error is that it strikes a blow to the integrity of the process itself, calling into question the system put into place to guarantee fairness. The system does not get a "do-over," even if one can accept that the defendant here did.

of the absence of defendant's counsel during the admission of inculpatory evidence, fundamental fairness requires a new trial.

## B.

The Supreme Court's decision in *Cronic* also compels a finding that the violation here is structural error. In *Cronic*, the Court announced that structural error occurs if counsel is denied at a "critical stage" in the proceedings. This is because "a trial is unfair if the accused is denied counsel at a critical stage of his trial"; in the absence of counsel, "a serious risk of injustice infects the trial itself." *Cronic*, 466 U.S. at 656, 659 & n.25, 104 S. Ct. at 2045, 2047 & n.25 (internal quotation marks omitted). The error at bar is a *Cronic* error because the stage of trial in which the prosecution offers inculpatory evidence is a critical stage in the proceedings against the defendant.[8]

A critical stage is one that holds "significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 696, 122 S. Ct. 1843, 1851 (2002). To determine whether a stage in the proceedings meets this definition, we again look to the

---

[8] As a threshold point, it is worth noting that defense counsel was actually absent from the proceedings. *Cronic* applies to even constructive denials of counsel, and much of the Supreme Court case law has focused on whether a defendant was constructively denied counsel due to defense counsel failures and, thus, whether the standard *Strickland* deficient performance inquiry is appropriate. *See generally Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). In contrast, this case is squarely removed from the *Strickland* deficient-performance line of inquiry because, here, defense counsel was denied by virtue of being physically absent. *See Vines v. United States*, 28 F.3d 1123, 1127 (11th Cir. 1994) ("*Strickland* assumes the presence of counsel and is therefore inapplicable in the absence of counsel context."). *Contra* Tjoflat, J., concurring, at 128 & n.3.

structural-error factors: potential for prejudice and the necessity of speculation. We must "analyze whether potential substantial prejudice to [a] defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *See Wade*, 388 U.S. at 227, 87 S. Ct. at 1932; *see also Cronic*, 466 U.S. at 656, 104 S. Ct. at 2045.

The question governing every criminal trial is whether enough inculpatory evidence exists to find a defendant guilty beyond a reasonable doubt. Considering this basic premise, the prosecution's submission of inculpatory evidence is essential to the trial process. Adding to its description of a "critical stage" as one that holds "significant consequences for the accused," *Bell*, 535 U.S. at 696, 122 S. Ct. at 1851, the Supreme Court has clarified that "critical stages" include "proceedings between an individual and agents of the State (whether 'formal or informal, in court or out') that amount to 'trial-like confrontations,' at which counsel would help the accused in 'coping with legal problems or . . . meeting his adversary,'" *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 212 n.16, 128 S. Ct. 2578, 2591 n.16 (2008) (alteration in original) (citations omitted).

There is no stage during criminal proceedings more "trial-like" than when the prosecution offers evidence that helps convince the jury the defendant is guilty. The submission of inculpatory evidence is the stage of trial that matters. It is when "the core purpose of the counsel guarantee" is necessary, "to assure '[a]ssistance'

at trial, when the accused [i]s confronted with both the intricacies of the law and the advocacy of the public prosecutor." *See United States v. Ash*, 413 U.S. 300, 309, 93 S. Ct. 2568, 2573 (1973). At this stage, the potential for prejudice is at its highest point, and the effects of counsel's absence are unquantifiable.

I can think of no more critical a stage in criminal proceedings than the admission of inculpatory evidence against a defendant. Several of our sister circuits agree. *See, e.g.*, *United States v. Hamilton*, 391 F.3d 1066, 1070–71 (9th Cir. 2004) (finding that "the portions of the consolidated proceedings in which evidence relating to [the defendant's] case" was presented constituted a critical stage, and the absence of defense counsel at such a stage resulted in structural error); *Olden v. United States*, 224 F.3d 561, 568 (6th Cir. 2000) ("When the government presents evidence probative of a defendant's culpability in criminal activity, or evidence that further implicates a defendant in criminal conduct, that portion of a criminal trial is sufficiently critical to the ultimate question of guilt to trigger the protections of *Cronic.*"); *Burdine v. Johnson*, 262 F.3d 336, 347 (5th Cir. 2001) (en banc) ("[T]he presentation of evidence against a defendant is a critical stage of a criminal proceeding."); *see also Green v. Arn*, 809 F.2d 1257, 1263 (6th Cir.) ("It is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt."), *vacated on other grounds*, 484 U.S. 806, 108 S. Ct. 52 (1987) (mem.), *reinstated*, 839 F.2d 300 (6th Cir. 1988); *United*

243

*States v. Russell*, 205 F.3d 768, 771–72 (5th Cir. 2000).  Nevertheless, in the Majority's holding today, we become the first circuit to find that, in a single-defendant trial, the complete absence of the defendant's sole counsel during the introduction of inculpatory evidence does not constitute structural error.

Although several of our sister circuits agree that the introduction of inculpatory evidence against a defendant is a critical stage, none of them have encountered circumstances as egregious as those presented here.  For example, *Olden*, *Green*, and *Russell* addressed instances where the attorney for one defendant in a multi-defendant trial was absent and the court, counsel, and parties operated under the erroneous assumption that the continued presence of a co-defendant's attorney was adequate to protect the defendant's right to counsel.  In each case, a co-defendant's counsel was available to assist the defendant with cross-examination or to represent the defendant's interests otherwise, but the appellate court nonetheless found that reversal was required under the Sixth Amendment.[9]

In *Olden*, the Sixth Circuit concluded that remand was warranted in a multi-defendant, multi-attorney trial even when a co-defendant's counsel agreed to—and

---

[9] In *Olden*, the Sixth Circuit  remanded for an evidentiary hearing in order to determine whether the defendant "voluntarily, knowingly, and intelligently waived" his Sixth Amendment rights, and held that if the defendant could establish that his rights were not properly waived, then a new trial was warranted per *Cronic*.  *See* 224 F.3d at 569.

did—stand in for the defendant's counsel during an absence. *See Olden*, 224 F.3d at 568–69. Earlier, in *Green*, the Sixth Circuit reversed when confronted with defense counsel's temporary absence in a multi-defendant trial, *see* 809 F.2d at 1263–64, and even the sole dissenting judge (who would not have reversed based on structural error) noted that his view would be different if he had been presented with the "extreme" facts in the case before us now, *see id.* at 1265 (Boggs, J., dissenting). Judge Boggs wrote: "The facts of [*Green*] are a long way from, for an extreme example, taking of direct testimony against a single defendant whose counsel is absent." *Id.* And, in *Russell*, counsel for one of the defendant's sixteen co-defendants volunteered to sit in on behalf of the defendant's absent counsel and the court instructed the government not to call any witness relevant to the defendant during his counsel's absence. *See* 205 F.3d at 769–70. Yet the Fifth Circuit still found structural error since potentially inculpatory evidence was offered while the defendant's counsel was absent. *See id.* at 772–73.

Although the cases on which the Majority relies reached the opposite result, those cases are distinguishable from the present case because none involved a single defendant deprived of his sole counsel. *See Sweeney v. United States*, 766 F.3d 857, 858–59 & n.2 (8th Cir. 2014), *cert. denied*, 135 S. Ct. 1841 (2015) (mem.); *United States v. Kaid*, 502 F.3d 43, 44–45 (2d Cir. 2007) (per curiam). In fact, in *Kaid*, there were so many defense attorneys and co-defendants that

245

counsel's "alleged trial absence" was not "noted anywhere in the trial record—not by the able district judge, not by the attorney involved, not by fellow defense attorneys, not by the prosecutor, and not by [the defendant] himself." *See* 502 F.3d at 44–45.[10] This is clearly different from the circumstances here; it strains credulity to claim that no one noticed the sole defendant sitting entirely alone at counsel's table.

In sum, several of our sister circuits have held that even *potentially* inculpatory evidence introduced against a defendant during a multi-defendant, multi-counsel case, while that defendant's counsel was absent, constitutes structural error. And those circuits that disagree have not faced the circumstances we encounter here. Here, the trial judge, defense attorney, and defendant received no assurances that another attorney was looking out for the defendant's interests. No co-defendant's attorney sat at the table with the defendant, the presence of whom could mitigate the potential for prejudicial effect in the eyes of the jury— instead, he sat alone. Nonetheless, the Majority concludes that *directly* inculpatory evidence introduced against a defendant in a single-defendant, single-counsel case while defense counsel is absent constitutes harmless trial error.

---

[10] The Majority's reliance on *Kaid* is also problematic because the Second Circuit in that case assessed the defendant's absence-of-counsel claim under *Strickland*—an analysis that even the Majority concedes is erroneous, *see* Maj. Op. at 19 n.7 (citing *Vines*, 28 F.3d at 1127 ("*Strickland* assumes the presence of counsel and is therefore inapplicable in the absence of counsel context.")).

246

Regardless of what other circuits have done, the Supreme Court has indicated that it matters whether the evidence presented during counsel's absence directly inculpated a sole defendant. In *Woods v. Donald*, the Sixth Circuit granted a petitioner habeas relief after potentially "indirectly inculp[atory]" evidence was introduced against him in the absence of defense counsel. *See* 575 U.S. ___, ___, 135 S. Ct. 1372, 1377 (2015) (per curiam). The Supreme Court reversed, explaining that, because the Court had never decided the specific question in that case—whether testimony about co-defendants is a critical stage requiring the presence of counsel under *Cronic*—the Sixth Circuit erred in ruling that the state court of appeals' decision was contrary to a Supreme Court holding. *See id.* at 1377. Under the deferential standard for federal habeas review, "[w]ithin the contours of *Cronic*, a fairminded jurist could conclude that a presumption of prejudice is not warranted by counsel's short absence during testimony about other defendants where that testimony was irrelevant to the defendant's theory of the case." *Id.* at 1377–78. However, in so holding, the Court emphasized the distinction relevant here: "The relevant testimony was not merely 'testimony of a government witness'; it was prosecution testimony *about other defendants*." *See id.* at 1377 (noting that "the Sixth Circuit framed the issue at too high a level of generality"). Clearly, this is an important distinction.[11]

---

[11] *Woods* informs my view, but it is not dispositive. The Supreme Court stated that it was

247

\*        \*        \*

Supreme Court instruction as to what constitutes a critical stage, guidance

from other circuits, and a basic understanding of how criminal trials work—the

heart of which is when the prosecution introduces evidence against the defendant

to prove his guilt—all dictate the conclusion that the admission of directly

inculpatory evidence against a defendant is a critical stage of the trial.  The

deprivation of counsel during this critical stage is a constitutional error, "and no

amount of showing of want of prejudice w[ill] cure it."  *See Cronic*, 466 U.S. at

659, 104 S. Ct. at 2047.

## II.

The Majority fails to adequately account for the key features of the error at

issue.  In an effort to quantify the unquantifiable, the Majority disregards the

potential for prejudice, focuses on the amount of time defense counsel was absent,

---

only addressing "the narrow context of federal habeas review," not "the merits of the underlying Sixth Amendment principle."  *Woods*, 135 S. Ct. at 1378 (internal quotation marks omitted). But, in the absence of binding precedent on this point, *Woods* offers valuable insight into the type of distinctions the Court may make if and when it takes such a case on direct review.  One need only look to the relationship between, for example, *Lawrence v. Texas* and *United States v. Windsor* to understand how the Court's disavowal of a rule in an earlier case may nonetheless inform a future holding.  *See United States v. Windsor*, 570 U.S. __, __, 133 S. Ct. 2675, 2696 (2013); *id.* at 2709 (Scalia, J., dissenting) (discussing the Court's earlier limitation of its holding in *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 2484 (2003)).

and adopts a novel, hypertechnical approach to "stages" that inverts and undermines the constitutional inquiry we are obligated to perform.

### A.

In disregarding the potential for prejudice here, the Majority conflates the constitutional analysis. To determine whether an error is structural or subject to harmless-error analysis, we must first examine the potential for prejudice. If the potential for prejudice does not warrant a structural error finding, we then conduct an actual-prejudice/harmlessness inquiry. The Majority forgoes the threshold step in this process, first finding that the defendant's criminal proceeding as a whole was not affected by counsel's absence, and then concluding that structural error has not occurred. This semantic inversion evades the point. If a structural error occurs, it inherently undermines the fairness of a criminal proceeding as a whole by virtue of its occurrence. *See Brecht*, 507 U.S. at 629–30, 113 S. Ct. at 1717 ("The existence of [structural] defects—deprivation of the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process." (footnote omitted)); *United States v. Davila*, 569 U.S. ___, ___, 133 S. Ct. 2139, 2149 (2013). That is the difference between a prejudice inquiry and a prejudice presumption. Structural errors, by definition, "pervade the entire proceeding." *See Satterwhite*, 486 U.S. at 256, 108 S. Ct. at 1797; *Cronic*, 466 U.S. at 659 n.25, 104 S. Ct. at 2047 n.25 ("The Court has "uniformly found

249

constitutional error *without any showing of prejudice* when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (emphasis added)).

But the Majority from the outset performs a harmless-error analysis. The Majority's reasoning parallels the government's reasoning in *Gonzalez-Lopez*, which the Supreme Court rejected. The government in *Gonzalez-Lopez* argued, "[a] trial is not unfair and thus the Sixth Amendment is not violated . . . unless a defendant has been prejudiced." *See* 548 U.S. at 145, 126 S. Ct. at 2562. The Court squarely rejected this construction, finding: "It is true enough that the purpose of the rights set forth in th[e Sixth] Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair." *Id.* Instead, the Sixth Amendment right to counsel during trial "commands, not that a trial be fair, but that a particular guarantee of fairness be provided" throughout the trial. *Id.* at 146, 126 S. Ct. at 2562.

Thus, the right at stake in this case is the right to defense counsel during the introduction of directly inculpatory evidence, "not the right to a fair trial" as a whole. *See id.* "[A]nd that right was violated because the deprivation of counsel was erroneous." *See id.* In these circumstances, "[n]o additional showing of prejudice is required to make the violation 'complete.'" *See id.*

**B.**

250

The Majority attempts to distinguish this case from others based on the amount of time counsel was absent, hanging its hat on a rigid comparison of the minutes that counsel was absent in relation to the length of time counsel was present. *See, e.g.*, Maj. Op. at 50–51 ("[T]he absence in *Kaid* was nearly three times as long as the absence in Roy's case . . . ."); *id.* at 51 (noting that, in *Sweeney*, there were "twice as many transcript pages of testimony and more than twice as many questions and answers as counsel missed in Roy's case"). This mechanical focus on minutes and seconds drives the Majority's "critical stage" inquiry. And in considering the contours of structural error outside of the "critical stage" framework, the Majority sets forth a new test that turns on the length of a counsel's absence: the "absence for a substantial portion of trial" test. *See id.* at 61–73. The Majority's mechanical, minutes-and-seconds approach is misplaced.

First, the Majority's mechanical calculation is simply the wrong inquiry for the "critical stage" analysis. The connotation of "critical" is that it denotes a substantive inquiry—we must look to what was happening to see whether what occurred was important. The importance of the proceedings that counsel missed outweighs the amount of time that counsel was away. To simply look at the length of time and the number of transcript pages disregards what was critical about the stage of the proceedings relevant here—the introduction of directly inculpatory evidence. The rule from *Cronic* is not that reversal is required when counsel is

251

absent from a "some-time-longer-than-seven-minute stage in the proceedings." The rule is that reversal is required when counsel is absent at a critical stage in the proceedings. The Supreme Court certainly could have said that reversal is required when counsel is absent for a "lengthy period of time," or for "prolonged periods," if length of time was the key factor in the inquiry into whether a stage is a critical stage. But there is no support for the Majority's treatment of length of time as all but dispositive.

Second, the Majority's "length of time" distinction is not enough to remove the circumstances here from structural error. The Majority focuses on the length of time to try to distinguish relevant cases from our sister circuits, engaging in a tedious line-drawing exercise while emphasizing that seven minutes in a lengthy trial is not a substantially long period. I agree that seven minutes is not all that long. But it is long enough to permit incriminating evidence to be admitted, and it is long enough to create an attendant risk of substantial prejudice. *See Olden*, 224 F.3d at 568 ("[W]hen the government presents evidence probative of a defendant's culpability in a criminal activity, or evidence that further implicates a defendant in criminal conduct, that portion of a criminal trial is sufficiently critical to the ultimate question of guilt to trigger the protections of *Cronic*."); *Russell*, 205 F.3d at 772 ("[F]or [the defendant] to be without counsel as the probability of his guilt

increased during the government's presentation of evidence against his co-conspirators is unacceptable.").

In fact, illustrating the shortcomings in the Majority's "length of time" distinction—as well as the shortcomings in the Majority's "absence for a substantial portion of trial" test—a one-minute absence of counsel could be enough to constitute structural error. Consider an expert witness in a homicide trial who takes the stand and opines that the fingerprints on the murder weapon belong to the defendant, while counsel for the defendant has not yet returned from lunch. The government introduces the expert testimony in less than one minute during defense counsel's absence. That, in my estimation, is long enough to warrant application of the *Cronic* reversal rule because the expert opinion evidence is directly inculpatory, and the probability of the defendant's guilt dramatically increases during that one-minute span. *See Russell*, 205 F.3d at 772. Furthermore, even if the testimony is repeated and subjected to cross-examination when defense counsel returns, there is no way to measure how much the initial opinion influenced the jury's consideration of the defendant's guilt.

Under the Majority's inverted analysis, we might conclude that the one-minute absence was an insufficient "stage" or was not for a "substantial portion of trial" because it was so short and the other evidence so damning that the defendant surely would have been found guilty anyway. That conclusion, however, would be

253

premised on pure speculation as to the effects of the admitted testimony—speculation that indicates structural error.  Therein lies the problem with applying a harmless-error analysis to an absence of counsel during the admission of inculpatory evidence.[12]

Again, structural error results in a presumptive-prejudice rule—we presume prejudice when structural error occurs and thus do not perform the prejudice inquiry required for harmless-error review.  The Majority rewrites *Cronic* (and structural error, writ large) to make exceptions—when the absence is not too lengthy, when the evidence is so great—and instead applies the prejudice test that the Supreme Court rejected in *Cronic*.  To suggest that the specific length of time that counsel is absent perfectly correlates with the impact of potential lost

---

[12] Similarly, I am not persuaded by Judge Rosenbaum's conclusion that defense counsel's absence in this case was "de minimis."  As a practical matter, this approach falls into the same trap as does the Majority's, by measuring "de minimis" in light of how long counsel was absent relative to time present instead of considering the substance of the evidence introduced.  *See* Rosenbaum, J., concurring, at 217 ("I would draw the line between trial-error absences and structural-error absences at the point where an absence lasts for more than ten minutes or 1% of the total 'critical stages' of trial.").  I believe we should determine whether structural error occurred by focusing on the potential for prejudice given the substance of what was introduced in counsel's absence and whether we can assess the effects that flow from that absence, not a rigid measure of the minutes counsel missed.

In addition, as a legal matter, the de minimis approach functions as an exception to the exception, which is an approach that has not been endorsed by the Supreme Court.  In the absence of any statement that such an exception applies, I would decline to create it.  Under Supreme Court precedent, "a constitutional error is either structural or it is not."  *Neder v. United States*, 527 U.S. 1, 14, 119 S. Ct. 1827, 1836 (1999).  If the error can be readily quantified and deemed de minimis, then it is trial error, not structural error.  *Sullivan*, 508 U.S. at 281–82, 113 S. Ct. at 2083 (noting that structural errors are "necessarily unquantifiable and indeterminate"); *Fulminante*, 499 U.S. at 309, 111 S. Ct. at 1265 (noting that structural errors "defy analysis by harmless-error standards").

opportunities to advocate for his client is deceptively simplistic.  It disregards what the Court has recognized as the "myriad aspects of representation," resulting in countless unknowable possibilities that may have been permitted or prevented by the participation of an attorney.  *Gonzalez-Lopez*, 548 U.S. at 150, 126 S. Ct. at 2564.  Even more importantly, to say that the length of counsel's absence is short and, consequently, not prejudicial bypasses the threshold inquiry—whether the error is trial error, permitting such an analysis in the first place, or structural error, prompting a presumption of prejudice.[13]

## C.

Consistent with its mechanical approach to structural-error analysis, the Majority creates a hypertechnical "critical stage" standard that elevates form over substance.  The Majority makes an extended argument that a "critical stage" is "a qualitatively distinct, discrete, and separate phase or step of a criminal proceeding" or "a self-contained proceeding or a discrete and separately identifiable portion of a larger proceeding."  Maj. Op. at 28–32.  However, my understanding of the critical-stage concept set forth by the Supreme Court recognizes that there are

---

[13] Several of the highest state courts to consider this question have similarly declined to focus on the overall length of time that counsel was absent, instead looking to the substance of what occurred during the absence.  The Pennsylvania Supreme Court found automatic reversal under *Cronic* was warranted when defense counsel was absent for a brief conversation between the court and a juror.  *See Commonwealth v. Johnson*, 828 A.2d 1009, 1015 (Pa. 2003).  Similarly, the South Carolina Supreme Court presumed prejudice and reversed under *Cronic* where defense counsel was temporarily absent during the testimony of one of the prosecution witnesses.  *See McKnight v. State*, 465 S.E.2d 352, 359–60 (S.C. 1995).

defining moments in any trial that pervade the remainder of the proceedings, not just isolated, discrete phases or steps.  In *Cronic*, the Court cited several cases of Sixth Amendment structural error that involved defining moments, such as counsel's lost opportunity to make a statement, *see Herring*, 422 U.S. at 865, 95 S. Ct. at 2556–57; the defendant's inability to converse with counsel during a recess, *see Geders*, 425 U.S. at 91, 96 S. Ct. at 1336–37; and deprivation of the defendant's right to consult with counsel to determine when to testify at trial, *see Brooks*, 406 U.S. at 612–13, 92 S. Ct. at 1895.[14]  Those cases did not involve the denial of counsel during a "discrete and separately identifiable" phase of criminal proceedings; they involved the denial of counsel "*at* a critical stage of . . . trial." *See Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047 (emphasis added).  *Accord Gregg v. United States*, 754 A.2d 265, 268–71 (D.C. Ct. App. 2000) (holding that, where

---

[14] The *Cronic* Court stated:

> The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.  *See, e.g.*, *Geders v. United States*, 425 U.S. 80, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976); *Herring v. New York*, 422 U.S. 853, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975); *Brooks v. Tennessee*, 406 U.S. 605, 612–613, 92 S. Ct. 1891, 1895, 32 L. Ed. 2d 358 (1972); *Hamilton v. Alabama*, 368 U.S. 52, 55, 82 S. Ct. 157, 159, 7 L. Ed. 2d 114 (1961); *White v. Maryland*, 373 U.S. 59, 60, 83 S. Ct. 1050, 1051, 10 L. Ed. 2d 193 (1963) (per curiam); *Ferguson v. Georgia*, 365 U.S. 570, 81 S. Ct. 756, 5 L. Ed. 2d 783 (1961); *Williams v. Kaiser*, 323 U.S. 471, 475–476, 65 S. Ct. 363, 366, 89 L. Ed. 398 (1945).

*Cronic*, 466 U.S. at 659 n.25, 104 S. Ct. at 2047 n.25.

defense counsel is absent for even a portion of voir dire, reversal under *Cronic* is required in the absence of a waiver).

### III.

Certainly, the Majority and I have strikingly different approaches to understanding the issue before us. While the Majority obliquely takes into account the facts of the crime, the potential outcome of treating this as structural error, et cetera, I see this as a strictly constitutional question about process, fairness, and the integrity of the trial. We are not instructed to consider what could happen with a different criminal defendant in a different criminal trial. And we are not instructed to consider the outcomes that might result from our proper application of the law. When I remove the impermissible factors that are skewing the Majority's analysis, I reach a very different result.

A conspicuous example of the divergence between our approaches to this case can be seen in the Majority's hypothetical regarding Manuel Noriega. The Majority's response to the incalculable negative impact of having the trial proceed without the defendant's sole counsel there is to fearfully query, "but what about (former military dictator) Manuel Noriega?" *See* Maj. Op. at 59–60. Well, what about him? Presumably, if irreparable constitutional error occurred in a trial—whether it be in the trial of Manuel Noriega or anyone else—we would reverse and remand for proceedings consistent with what the Constitution requires. It is simply

what we, as judges and guardians of the Constitution, are required to do.  No matter how bad the defendant; no matter how egregious the crime; no matter how long the defendant's trial lasted.  Neither our views of the defendant nor our policy concerns about the costs of a second trial are relevant.

It is easy to focus on the disturbing nature of this particular defendant's offense to avoid reaching the constitutionally required result.  But it is in precisely cases such as these that we must vigilantly ensure we are adhering to our obligation to uphold the same protections for all criminal defendants, rather than being swayed by emotions or public influence.  The extent of our commitment to the Constitution and the protections it guarantees can be measured by our treatment of the most despised defendants.  To be sure, these individuals may not elicit our pity and may ultimately deserve harsh punishment, but the constitutional processes that the Framers put in place are there to protect everyone, including people accused of the gravest and most serious crimes.  It is in those instances that we are most likely to react inflammatorily by disregarding due process.  That is precisely why it is in those instances that our adherence to constitutional protections must be resolute.[15]

---

[15] Lest there be any confusion, I am not saying that people accused of terrible crimes are entitled to *more* constitutional protections.  Rather, I am noting that the terrible crimes of which someone is accused should not be used to detract from the legal merits of his case or to avoid

The Sixth Amendment guarantee of the right to counsel does not apply on a sliding scale based on the gravity of the defendant's offense. We are not called upon to judge the character of the individual but rather the fairness of the process. Thus, the lurid details of this defendant's offense serve only to distract from the constitutional question this appeal raises: whether, in the trial of a single defendant represented by a single lawyer, it constitutes structural error for the trial judge to resume proceedings without defense counsel present, leaving the defendant unaided in the presence of the jury while the prosecution presents directly inculpatory evidence. I conclude that it does.

## IV.

The Supreme Court has given explicit instructions for remedying structural error: remand for new, constitutionally-compliant proceedings. *See, e.g.*, *Cronic*, 466 U.S. at 659 & n.25, 104 S. Ct. at 2047 & n.25. The nature of the right at issue—one that is "so basic to a fair trial" that it cannot be treated as harmless error—and the characteristics of structural error itself—the effects of which cannot be readily measured and are likely to be substantially prejudicial—mandate this result. *See Chapman*, 386 U.S. at 23, 87 S. Ct. at 827–28; *Brecht*, 507 U.S. at 629–

---

applying basic constitutional requirements. Such a defendant deserves no more—and no less—constitutional protections than any other defendant.

30, 113 S. Ct. at 1717. Immediate reversal and remand for a new trial is still a "far more desirable" result than for the error to come up in a "spin-off of collateral proceedings that seek to probe murky memories." *Stano*, 921 F.2d at 1172 (Tjoflat, J., dissenting) (quoting *Boykin*, 395 U.S. at 244, 89 S. Ct. at 1713). There is no need for us to invite additional litigation when we may resolve the issue now.[16]

The Supreme Court recently reaffirmed that reversal is the only constitutionally viable remedy upon a finding of structural error. In *Williams*, the Court ruled it was structural error for the Supreme Court of Pennsylvania to consider a case with a judge on the panel who should have recused, and thus, the Court reversed and remanded the case to "[a]llo[w] an appellate panel to reconsider [the] case without the participation of the interested member." *See* 136 S. Ct. at 1909–10. Although the Supreme Court of Pennsylvania already "entertained [the defendant's] motion for reargument without [the biased judge], who had retired months before the court denied the motion," *id.* at 1922 (Thomas, J., dissenting), the Court was not persuaded that such a pre-existing "do-over" mattered—a new appellate panel had to reconsider the issue. The rule is therefore

---

[16] This case is before us on direct appeal—the best time to correct the error. *Cf. Davis v. Ayala*, 576 U.S. ___, ___, 135 S. Ct. 2187, 2213 n.1 (2015) (Sotomayor, J., dissenting), *reh'g denied*, 136 S. Ct. 14 (2015) (mem.).

260

clear: new proceedings are in order.  In *Williams*, the defendant was entitled to a new hearing.  The defendant here is entitled to a new trial.[17]

Finally, even were harmless-error review to apply, I would find that reversal is required because the error in this case was not "harmless beyond a reasonable doubt."  *See Chapman*, 386 U.S. at 24, 87 S. Ct. at 828.  The admission of inculpatory evidence against a criminal defendant while his counsel is absent from the courtroom is a serious constitutional error.  The prejudicial effects of subjecting a defendant to such a one-sided prosecutorial campaign are immeasurable.  Here, that error eviscerated the guarantee of fairness and reliability that the adversarial process provides, and it undoubtedly had a serious impact on the jury's views of the court, the defendant, and defense counsel.

## V.

There has also been extensive discussion amongst my colleagues about who was at fault in permitting this error to occur.  For instance, Judge Tjoflat in his concurrence suggests that, if there was no one at fault, it is unclear how the Majority can assess the error under our current harmless-error precedents.  If Judge

---

[17] My concurring colleagues hope that "de minimis" errors or "do-overs" do away with or transform structural error into trial error.  By couching their analyses in these terms, they conveniently avoid the result that the Supreme Court has told us structural error requires.  The *Williams* Court could have articulated an exception to structural error's automatic reversal rule under any of these theories, as highlighted by Justice Thomas in his dissent, but it instead reinforced the automatic reversal rule.  Given the Supreme Court's clear instructions on the result required, I am not persuaded that we can sidestep the trial error/structural error dichotomy and the result mandated upon a finding of structural error.

Tjoflat is correct, then this ambiguity additionally signals that the defect at issue constitutes structural error.

But if this discussion is really a question about on whom we should place the burden that constitutional rights remain inviolate, then amongst the defendant, defense attorney, and the trial judge, it is the judge who properly shoulders that burden. The Supreme Court has "consistently recognized the important role the trial judge plays in the federal system of criminal justice." *Geders*, 425 U.S. at 86, 96 S. Ct. at 1334. That is because "the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States*, 289 U.S. 466, 469, 53 S. Ct. 698, 698–99 (1933); *see* Rosenbaum, J., concurring, at 190 ("[T]he court alone enjoys control over the trial proceedings, including when to start, stop, and resume trial. And trial simply cannot proceed without the court's actions in allowing it to do so."). The trial judge must therefore see to it that defense counsel is present before permitting the introduction of inculpatory evidence in a one-defendant, one-defense-counsel case, and, if the judge fails to do so, reversal is warranted.[18] The defendant would not simply go free; remand would occur for a fair trial to take place.

_____

[18] As I previously wrote, I am "unpersuaded that United States District Judges should be excused from the less than onerous burden of ensuring that the defendant's lawyer is seated at

Such "a per se rule of prejudice in these kinds of cases may be the most efficient mechanism for preventing miscarriages of justice." *See Stano*, 921 F.2d at 1172 (Tjoflat, J., dissenting). It "creates a strong incentive for the courts at the . . . trial level to ensure that a defendant is accorded meaningful representation. A per se rule of prejudice will thus sharpen the trial court's sense of responsibility in discharging its duties at the first stage." *Id.*

That sense of responsibility needs sharpening. By reconvening the trial early and permitting the introduction of incriminating evidence without confirming that defense counsel was present, the district court in this case failed to "ensure[] to the defense in a criminal trial the opportunity to participate fully and fairly in the adversary factfinding process." *See Herring*, 422 U.S. at 858, 95 S. Ct. at 2553. Moreover, the deprivation of defense counsel during the introduction of inculpatory evidence is not an isolated incident in the district court judge's courtroom. In a different criminal jury trial, the same judge resumed proceedings

---

counsel table, next to his client, or is somewhere in the courtroom when the government seeks the admission of incriminating evidence." *United States v. Roy*, 761 F.3d 1285, 1298 (11th Cir.), *reh'g en banc granted*, *opinion vacated*, 580 F. App'x 715 (11th Cir. 2014) (mem.).

in the absence of defense counsel and the defendant, and the judge then allowed the government to elicit incriminatory evidence from one of its witnesses.[19]

Here, regardless of the judge's intentions, the defendant's constitutional rights were violated when the judge began proceedings without counsel present. When, in a single-defendant, single-defense-counsel trial, a judge absentmindedly allows the government to offer inculpatory evidence while defense counsel is out of the courtroom, the mistake results in a violation of the defendant's Sixth Amendment right to counsel. And, alternatively, when a judge is aware of defense counsel's absence in such a case and intentionally begins trial without counsel in order to cure attorneys of tardiness, the defendant is deliberately deprived of counsel in violation of the Sixth Amendment. I am not willing to suggest that trial judges can send such a message to attorneys at the expense of a defendant's constitutional rights. An attorney's failure to be present should result in sanctions against the attorney, not constitutional violations against the defendant that strike a blow to the integrity of the trial process.

## VI.

---

[19] *See* Transcript of Jury Trial, App. at 125:3–5, *United States v. Garcia*, No. 14-11845 (11th Cir. Dec. 11, 2014) (trial judge refusing to permit reading of transcript of missed testimony to defense counsel even after prosecution's request). I would take judicial notice of this fact. *See* Fed. R. Evid. 201(b); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

We have a duty not only to ensure that our legal proceedings are fair and impartial but also to make certain that they "appear fair to all who observe them." *Indian v. Edwards*, 554 U.S. 164, 177, 128 S. Ct. 2379, 2387 (2008) (internal quotation marks omitted). As the Supreme Court emphasized in *Cronic*, "'[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'" 466 U.S. at 655, 104 S. Ct. at 2045 (quoting *Herring*, 422 U.S. at 862, 95 S. Ct. at 2555). Indeed, the right to counsel is the most important right a criminal defendant has and the best means of ensuring a fair trial; "[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *Id.* at 654, 104 S. Ct. at 2044 (internal quotation marks omitted).

To put it plainly, defense counsel is a key participant in a criminal trial. He is both his client's mouthpiece and his client's confidant. Counsel's role includes viewing, interpreting, and responding to the demeanor of the other trial participants, including the jurors, witnesses, opposing party, and presiding judge. His ability to confer with his client about and develop an ongoing strategy for the case depends on these observations. Moreover, defense counsel influences the conduct and perceptions of other key participants by his presence and actions. By

265

finding that defense counsel's absence during the introduction of inculpatory evidence against his client is harmless error, the Majority devalues defense counsel and the important role defense counsel plays in ensuring the integrity of the judicial process.

We all agree that the defendant's trial in this case was imperfect—his Sixth Amendment right to counsel was violated when the trial proceeded without his only counsel present. But, most importantly, the trial was also fundamentally unfair. The defendant was denied counsel while the prosecution admitted inculpatory evidence against him—evidence that was used to convict and sentence him to life in prison. When a district court allows substantive, inculpatory evidence against a criminal defendant in the absence of any counsel and in the presence of the jury, I can neither quantify the effects of the error nor declare that the error was harmless beyond a reasonable doubt.

The absence of defense counsel in these circumstances constitutes "constitutional error of the first magnitude, and no amount of showing of want of prejudice w[ill] cure it." *Id.* at 659, 104 S. Ct. at 2047 (internal quotation marks omitted). Such a violation undermines not only the defendant's individual constitutional rights but "also the accuracy of the truth-seeking process and thus the integrity of the criminal justice system itself." *See Stano*, 921 F.2d at 1170–71 (Tjoflat, J., dissenting). Affirming this conviction would abdicate my duty both to

266

protect the adversarial process and to preserve the appearance of fairness. *See*

*Gonzalez-Lopez*, 548 U.S. at 146, 126 S. Ct. at 2562 (stating that the right to

counsel serves to provide not simply a fair trial but rather "a particular guarantee of

fairness"). Because the defendant received a trial that was neither perfect nor fair,

I respectfully dissent.

MARTIN, Circuit Judge, dissenting:

Today's majority fashions a new requirement that trial counsel must be missing for a "substantial portion" of the trial before our court can presume a defendant was prejudiced by his lawyer's absence. Maj. Op. at 60–73. This requirement is not in keeping with the Supreme Court's recognition in United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039 (1984), that "[w]ithout counsel, the right to a trial itself would be of little avail." Id. at 653, 104 S. Ct. at 2043 (quotation omitted). More specifically, this "substantial portion of the trial" requirement is nowhere to be found in Cronic, which speaks of the denial of counsel "at a critical stage of [] trial," with nothing indicating that counsel must go missing for a certain length of time during his client's trial before we presume prejudice. Id. at 659, 104 S. Ct. at 2047 (emphasis added). The majority's new test assumes that courts can somehow separate out critical from uncritical portions of trial based on the amount of time the defendant's counsel was absent. Judge Wilson's dissent ably explains why this arithmetic-based approach won't work. See Wilson Op. at 250–54.

The majority's approach fails to honor the Supreme Court's reason for creating the "critical stage" doctrine in the first place. The Supreme Court created the "critical stage" analysis not for the purpose of slicing and dicing parts of a trial into what looks (after the fact) to be important and what does not. Rather the

268

Supreme Court relied on its "critical stage" analysis to expand the right to counsel beyond trial. I can't fathom that in doing so the Court meant to imply that a defendant forfeits his Sixth Amendment right to counsel when he needs it most: during the trial itself. And the Court has certainly never suggested that the defendant can go without counsel while the government is introducing evidence of his guilt.

The Supreme Court's development of the "critical stage" doctrine started with Hamilton v. Alabama, 368 U.S. 52, 82 S. Ct. 157 (1961). Charles Hamilton had no lawyer during his arraignment and was later sentenced to death. Id. at 52, 82 S. Ct. at 158. The Court explained that "arraignment . . . is a critical stage in a criminal proceeding [because] [w]hat happens there may affect the whole trial." Id. at 54, 82 S. Ct. at 158–59. For example, the Court continued, arraignment was a stage at which "[a]vailable defenses may be [] irretrievably lost" (just as at trial). Id. It is because the harm done to a defendant by standing alone at arraignment is so similar to the harm of standing alone at trial that the Supreme Court expanded the right to counsel to arraignments too. Id.

From there, the Supreme Court identified other "critical stages," always based on the similarity of the non-trial proceeding to the trial itself. See United States v. Gouveia, 467 U.S. 180, 189, 104 S. Ct. 2292, 2298 (1984) ("Although we have extended an accused's right to counsel to certain 'critical' pretrial

269

proceedings, we have done so recognizing that at those proceedings, the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." (emphasis added) (citation and quotation omitted) (alteration adopted)); see also, e.g., Mempa v. Rhay, 389 U.S. 128, 135–37, 88 S. Ct. 254, 257–58 (1967) (deferred sentence hearing); United States v. Wade, 388 U.S. 218, 236–37, 87 S. Ct. 1926, 1937 (1967) (pretrial, postindictment lineup); White v. Maryland, 373 U.S. 59, 60, 83 S. Ct. 1050, 1051 (1963) (per curiam) (preliminary hearing). None of these cases show that the Supreme Court has ever "question[ed] the fact that the trial itself remains a critical stage of any criminal proceeding." Burdine v. Johnson, 262 F.3d 336, 347 (5th Cir. 2001). After all, the "[t]rial is the central and focal point of the prosecutorial continuum, the forum in which the defendant's guilt or innocence is determined." Vines v. United States, 28 F.3d 1123, 1140–41 (11th Cir. 1994) (Birch, J., dissenting).

The majority ruling turns the idea of a "critical stage" on its head. It wields the "critical stage" inquiry as a sword against defendants, slicing away at the right to counsel during the trial itself.[1] In addition to being contrary to Supreme Court

---

[1] Professor Pamela S. Karlan describes a similar process of "surreptitious[] redefin[ition]" with respect to the prohibition on racial discrimination in jury selection articulated in Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). See Pamela S. Karlan, Race, Rights, and Remedies in Criminal Adjudication, 96 Mich. L. Rev. 2001, 2021 (1998). Professor Karlan explains that courts "have responded to the fact that many Batson violations might be found harmless if harmless error analysis were performed by declining to find a violation in the first place." Id. In similar fashion, the majority here finds no violation of Cronic by redefining the

doctrine, this inquiry is not practical.  Despite its hundred-plus pages of exhaustive treatment of cases from across the courts of appeals, the majority opinion leaves more questions than answers about when Cronic applies.  Would a twenty-minute disappearance of counsel be enough?  A half hour?  Ninety percent of the government's case-in-chief?  How about an absence for all of one government witness's testimony?  The Supreme Court's treatment of the "critical stage" makes clear that we shouldn't be asking those questions.[2]  The question I read Cronic to require us to ask is much more straightforward.  It asks whether the trial ever proceeded with no lawyer standing between the accused and the government.  The Supreme Court has told us what to do when the answer to that question is yes: reverse the conviction.  See Cronic, 466 U.S. at 659 & n.25, 104 S. Ct. at 2047 & n.25.

---

parameters of the right to counsel at a critical stage of trial.  By doing so, it avoids automatic reversal.  As Professor Karlan explains, "when courts cannot calibrate the remedy, they fudge on the right instead."  Id. at 2015.

[2] Though I agree with Judge Rosenbaum's explanation of Cronic and structural error in Parts I and II of her well-reasoned concurrence, I, like Judge Wilson, cannot agree with the proposal for a de minimis carve-out.  Applying a de minimis exception dulls the precision of a presumed-prejudice rule and creates line-drawing issues in the same way as does the majority's approach.  After all, if a seven-minute absence is so de minimis that we can examine actual prejudice, what absence would warrant the Cronic presumption?  Again, twenty minutes?  A half hour?  It's not clear how a court would decide.  More importantly, I do not think we should sort large from small structural errors based on proportions and percentages.

271

I certainly understand that reversing a conviction because counsel was gone for less than 1% of the entire trial may seem like an overcorrection.  But the Supreme Court's insistence that the total absence of counsel falls within the "very limited class" of structural errors reflects the Court's belief that the damage from such an absence is impossible to measure.  See Johnson v. United States, 520 U.S. 461, 468, 117 S. Ct. 1544, 1549 (1997).  It's true, as the majority points out, that the Supreme Court "has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless."  Arizona v. Fulminante, 499 U.S. 279, 306, 111 S. Ct. 1246, 1263 (1991).  See Maj. Op. at 76–77.  But the Supreme Court has also repeatedly recognized that it is structural error "when counsel [i]s either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."  Cronic, 466 U.S. at 659 n.25, 104 S. Ct. at 2047 n.25; see, e.g., Woods v. Donald, 575 U.S. __, 135 S. Ct. 1372, 1375 (2015); Bell v. Cone, 535 U.S. 685, 695–96, 122 S. Ct. 1843, 1850–51 (2002); Geders v. United States, 425 U.S. 80, 91, 96 S. Ct. 1330, 1337 (1976); Herring v. New York, 422 U.S. 853, 864–65, 95 S. Ct. 2550, 2556 (1975); Brooks v. Tennessee, 406 U.S. 605, 612–613, 92 S. Ct. 1891, 1895 (1972); Hamilton, 368 U.S. at 55, 82 S. Ct. at 159.

The majority reads this history to say there's no reason to distinguish the right at issue here from those rights the Supreme Court has subjected to harmless-

272

error review.  Indeed, the majority says it would be "special treatment" to exempt the right to have your lawyer with you at trial from harmless-error review.  Maj. Op. at 126.  This has it the wrong way around.  The right to the presence of counsel is one of the rare rights for which the Supreme Court has presumed prejudice.  It did so for a simple reason: "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have."  Cronic, 466 U.S. at 654, 104 S. Ct. at 2044 (quotation omitted); see also Kaley v. United States, 571 U.S. __, 134 S. Ct. 1090, 1107 (2014) (Roberts, C.J., dissenting) ("In many ways, this is the most precious right a defendant has, because it is his attorney who will fight for the other rights the defendant enjoys.").  The Supreme Court singled this right out for "special treatment," and it is not for us to withdraw that protection.

I realize that debates like the one we have here could lead the Supreme Court to decide, in the future, that the right to counsel at a "critical stage" of trial is subject to harmless-error review.  But it has not done so yet.  And in the absence of such a directive, we should not be cutting away at the precious right to counsel simply because we don't like the prescribed remedy.  The majority does that here. Indeed the majority distorts the right to counsel at a "critical stage" to such an extent that now the absence of defense counsel when the government is

273

introducing inculpatory evidence—the time when a defendant needs his counsel

the most—is harmless.  I respectfully dissent.

JILL PRYOR, Circuit Judge, dissenting:

Despite our Court's unanimous agreement that Alexander Roy's Sixth Amendment right to counsel was violated when his lawyer was absent briefly during his criminal trial, collectively we have spilled a great deal of ink sorting out whether and why this violation does or does not give Mr. Roy the right to a new trial. A majority of this Court has decided that even though Mr. Roy's lawyer's absence during the taking of evidence directly probative of guilt violated the Sixth Amendment, this constitutional violation does not warrant a new trial because the error was harmless. I understand the appeal of the majority's approach. On this record, I would not find it difficult to conclude that Mr. Roy suffered no prejudice from his lawyer's brief absence from the courtroom. But the Supreme Court has told us not to look to the effect of the error *in this case* to determine whether a new trial is required. So I write to explain why I dissent from the majority's decision.

In my view, because Mr. Roy had no counsel beside him at trial while a witness gave incriminating testimony against him, we must reverse his conviction and remand for a new trial.[1] The Supreme Court explained in *United States v. Cronic* that "if the accused is denied counsel at a critical stage of his trial," such

---

[1] I follow the lead of my colleagues in limiting my analysis to circumstances in which the government offers incriminating evidence while a defendant's lawyer is absent, as was the case here. I do not mean to suggest, however, that counsel's absence during the taking of directly inculpatory evidence is the only circumstance in which the absence of counsel could amount to a constitutional violation. *See infra* note 2.

error is structural, meaning it is not subject to a harmless error analysis. 466 U.S. 648, 659 (1984). Rather, prejudice is presumed. *Id.* Contrary to the position of a majority of the Court, nothing in *Cronic* suggests that counsel must be absent for a substantial part of a critical stage for the error to be structural or that structural error may be judged with reference to minutes, percentages, or proportions of a trial.[2] By my reading of *Cronic* (a reading I share with Judges Wilson and Martin), Mr. Roy's lawyer's absence, brief though it was, while the government was introducing evidence of his guilt meant that Mr. Roy was "denied counsel at a critical stage of his trial," a structural error requiring reversal. *Id.*

I maintain this view even though were we to apply a harmless error analysis to the facts of this case, I would be inclined to agree with a majority of my colleagues that the absence of Mr. Roy's counsel from the courtroom caused him no prejudice:  counsel's absence was very brief, particularly with reference to the trial as a whole; we know from the transcript what transpired in counsel's absence and when he returned; and the testimony counsel missed largely was repeated upon his return. I believe that a new trial is required, however, because the Supreme Court has directed in no uncertain terms that when an error is structural, it is

---

[2] I note Judge Martin's observation that the Supreme Court's inclusion of proceedings beyond the trial itself in what constitutes a "critical stage" reflects an expansive view of the denial of the right to counsel for which prejudice is presumed, not a narrower one. *See* Martin Op. at 267-68.

categorically so.  A "case-by-case inquiry into prejudice" simply is inappropriate where structural error exists.  *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *see Neder v. United States*, 527 U.S. 1, 14 (1999) (describing structural error as "categorical").[3]  Regardless of how we couch it, any evaluation of facts specific to Mr. Roy's lawyer's absence necessarily is not categorical.[4]  So, even though it's tempting, we may not peek at those facts in determining whether the error is structural.  *See Cronic*, 466 U.S. at 658 (noting that structural errors are those errors that, as a category rather than individually, involve "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified").

The result *Cronic* dictates (and my dissenting colleagues and I would reach) reflects that "[t]he assistance of counsel is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and

---

[3] I find helpful Judge Wilson's discussion of the Supreme Court's recent decision in *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016).  *Williams* concerned the failure of a judge to recuse on account of a conflict rather than the absence of counsel, but both can be structural errors, so in that sense the case is instructive.  In *Williams*, as Judge Wilson explains, the Supreme Court held that the judge's failure to recuse was structural error, requiring reversal and a new appeal, even though the Court had ample reason to conclude that the result of the appeal would have been the same without the error.  *See* Wilson Op. at 259-60.  If in deciding whether the error was structural the Supreme Court had engaged in a case-by-case (rather than categorical) inquiry into whether the effect of the judge's failure to recuse was known or could be determined, the Court most likely would have found no structural error.

[4] Of course, in an absence of counsel case, to determine that structural error has occurred it may be necessary for a court to find facts related to whether counsel was absent and whether inculpatory evidence was presented during the absence.  But once a court answers "yes" to these preliminary questions, no case-by-case determination is permitted.

liberty.  The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done." *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963) (alterations and internal quotation marks omitted).

Considering that Mr. Roy's case is the first this Circuit has seen where a sole defendant is left without counsel during the presentation of incriminating evidence, I think it's fair to say such circumstances are rare.  The majority worries, however, that "[b]ecause there is no principled way to limit an application of *Cronic* to single-defendant trials, a holding in favor of Roy would have far-reaching effects":

> Whatever measures a judge takes . . . , it will be practically impossible to prevent presumptive prejudice error in a large, multidefendant, long-running trial.  *See Green v. Arn*, 809 F.2d 1257, 1265 (6th Cir. 1987) (Boggs, J., dissenting) ("If a reversal is mandated whenever counsel (even retained) is absent from the courtroom for any significant period, we make such an escape a sure ticket to a new trial. In multi-defendant cases, judges will be required to keep a continual head count . . . lest cagey counsel be able to invoke this new rule.").

Maj. Op. at 57-58 (quoting *United States v. Roy*, 761 F.3d 1285, 1323 (11th Cir.) (Carnes, C.J., dissenting) (some internal citations omitted), *reh'g en banc granted*, *opinion vacated*, 580 F. App'x 715 (11th Cir. 2014)).  I am not as troubled by the burden on trial judges—nor do I believe it would be practically impossible—to ensure, even in lengthy multi-defendant trials, that each defendant is never left without a lawyer present.

278

Judge Rosenbaum points out that, as guardians sworn to protect the constitutional right of defendants to counsel in criminal trials, trial judges necessarily are charged with vigilantly policing that right.  *See* Rosenbaum Op. at 189-90, 204.  In most every case, fulfilling this duty will not be onerous.  That is because accompanying the duty to protect defendants' right to counsel is the trial judge's singular authority to control the courtroom, including the timing and circumstances under which the trial can proceed.

As Judge Rosenbaum observes, trial judges can and regularly do ask the lawyers for all parties whether they are ready before proceeding.  *See id.* at 204.  In the case of a multi-defendant trial, perhaps the trial judge will have to read a dozen or so co-defendants' names and confirm the presence of counsel for each one. Maybe this will take an extra minute or two at the beginning of the trial day and after each recess.  I am not bothered by adding a few minutes to the trial day to ensure that each defendant in the courtroom has a lawyer present.

I am confident that trial judges can keep a lawyer for each co-defendant present throughout the taking of evidence.  At the beginning of a multi-defendant trial, and during the course of its other instructions to counsel and the parties, the judge can easily pause to instruct the lawyers for the defendants that if any lawyer needs to leave the courtroom during the taking of evidence, with the result that her client would be left without a lawyer representing him during her absence, the

279

lawyer attempting to depart must inform the court before leaving.[5]  The trial judge

can certainly warn that if a lawyer violates this instruction she will face sanctions,

or worse.[6]  *See* 18 U.S.C. § 401 (permitting a district court to punish by fine or

imprisonment, or both, if an attorney disobeys the court's "lawful writ, process,

order, rule, decree, or command").

If a lawyer speaks up and says he needs to be excused from the courtroom

temporarily, the trial judge has choices available, none of which is likely to take a

substantial amount of time or vary much from how courts ordinarily handle such

situations.  The judge could ask the lawyer to wait until a recess, briefly pause the

taking of any evidence and await the lawyer's return, or conduct a colloquy with

---

[5] I agree with the majority that the presence of lawyers for co-defendants—even when a co-defendant's lawyer agrees to cover for an absent defense lawyer—is irrelevant to the structural error inquiry unless the defendant knowingly and voluntarily waives the right to the presence of his own lawyer.  *See* Maj. Op. at 56-57; *Olden v. United States*, 224 F.3d 561, 568-69 (6th Cir. 2000) (holding that defendant was denied counsel even though his lawyer asked another defendant's lawyer to "take notes or whatever" in the defendant's lawyer's temporary absence); *United States v. Russell*, 205 F.3d 768, 769-72 (5th Cir. 2000) (reversing conspiracy conviction under *Cronic* when a lawyer representing a co-defendant agreed to "sit in" for the defendant's absent counsel); *Green*, 809 F.2d at 1259-63 (upholding reversal of conviction of Green, one of three defendants at trial, due to her lawyer's temporary absence during the cross-examination of a witness even though Green's lawyer and Green's co-defendants' lawyer had agreed that the co-defendants' lawyer would do the cross-examination on behalf of all defendants).

[6] And given that many defense lawyers are repeat players in the courts in which they practice, the threat of sanctions (and any accompanying reputational harm) likely would suffice to prevent attorney misconduct.  I acknowledge the possibility of intentional attorney misconduct in an attempt to create error, but I have enough faith in our colleagues at the Bar to believe that if it occurred at all, it would be exceedingly rare and could be dealt with using all the means at the courts' disposal.  The remote possibility that the rare lawyer might abuse the system in this way does not demonstrate that my interpretation of *Cronic* would lead to absurd results.  Neither should it otherwise guide or influence our jurisprudence.

the departing lawyer's client to ensure that any waiver of the defendant's right to the presence of counsel is made voluntarily and with full knowledge of his rights.

As I see it, any additional work on the part of the trial judge to ensure that each defendant always has one lawyer present in the courtroom to represent him during the taking of evidence almost never will be onerous.  And if the burden is, on the rare occasion, onerous, let it be so:  trial judges are sworn to protect the constitutional rights of the criminal defendants who stand trial before them.  I can scarcely think of a more important duty than the protection of the right to counsel. If ensuring that right is protected takes an hour, three hours, or even a full day of a lengthy trial, I am comfortable that the burden on the trial judge is outweighed by the gravity of the fundamental constitutional rights of criminal defendants.

*    *    *

I respectfully dissent because Mr. Roy's Sixth Amendment right was violated when he went without counsel while the jury heard testimony that directly incriminated him.  I would reverse his conviction under *Cronic* and remand for a new trial.